1  Mark Punzalan (SBN: 247599)
   markp@punzalanlaw.com
2  PUNZALAN LAW, P.C.
   600 Allerton Street, Suite 201
3  Redwood City, California 94063
   Tel: 650.362.4150
4  Fax: 650.362.4151

5  *Counsel for Plaintiff*

6  [Additional Counsel on Signature Page]

7

8                  **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10

11 | JOSEPH F. MARKETTE, on Behalf of | )
    | Himself and All Others Similarly Situated, | ) Case No. 3:15-cv-3425
12 |                                  | )
    |                      Plaintiff,  | )
13 |                                  | ) **CLASS ACTION**
    |                                  | )
14 |          v.                      | ) **COMPLAINT FOR**
    |                                  | ) **VIOLATIONS OF THE**
15 | XOMA CORPORATION, JOHN W.        | ) **FEDERAL SECURITIES LAWS**
    | VARIAN, and PAUL D. RUBIN,       | )
16 |                                  | ) **JURY TRIAL REQUESTED**
    |                      Defendants   | )
17 |                                  | )
                                        )
18

19

20

21

22

23

24

25

26

27

28

Plaintiff Joseph F. Markette ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by XOMA Corporation ("XOMA" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## I.      NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased XOMA common stock between November 6, 2014 and July 21, 2015, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's claims are asserted against certain of XOMA and certain of its current executive officers.

2.      XOMA is a biotech drug company that purports to discover and develop innovative antibody-based therapeutics.  Its lead product candidate is gevokizumab, which the Company describes gevokizumab as "a proprietary potent, humanized allosteric-modulating monoclonal antibody that binds to the inflammatory cytokine interleukin-1 beta ("IL-1 beta")."  The Company has asserted that it believed that gevokizumab "has the potential to address the underlying inflammatory causes of a wide range of diseases that have been identified as having unmet medical needs."

3.      XOMA developed the drug, gevokizumab, to treat, among other things, Behçet's disease uveitis, a multisystem inflammatory disorder most commonly involving the eyes which could lead to blindness.

4.      The Company has initiated three clinical trials to evaluate gevokizumab for the treatment of non-infectious intermediate, posterior or pan-uveitis ("NIU") and Behçet's disease uveitis.  Among the three gevokizumab trials is the Phase 3 EYEGUARD-B study for patients with Behçet's disease uveitis outside of the United States.

5. Since November 6, 2014, the Company has repeatedly made material misrepresentations and omitted material information concerning the imminently commercialization of gevokizumab. Specifically, the Company made misrepresentations and omitted information that led the investors to believe that the Phase 3 EYEGUARD-B study of gevokizumab, would be concluded successfully and that approval from the U.S. Food and Drug Administration ("FDA") would then be sought.

6. For example, on March 11, 2015, Paul D. Rubin ("Rubin"), XOMA's Chief Medical Officer and Senior Vice President ("SVP") of Research and Development ("R&D") discussed the Company's optimism with regard to the outcome of the gevokizumab EYEGUARD-B study. Speaking of the data acquired, Defendant Rubin stated, "although we don't know who's on active and who's on placebo, if you had an active drug, this is sort of the pattern you would expect to see," misleading the market to believe that the outcome would be successful.

7. On May 7, 2015, after the close of the market, Defendant John W. Varian ("Varian"), the Chief Executive Officer and a director of XOMA, told the market that gevokizumab was "one exacerbation away from being able to close the EYEGUARD-B study database" and that investors should expect to "be getting to that final targeted exacerbation any day now." As the market digested this news, the trading volume of XOMA spiked and its share price climbed over 12%, from the closing at $3.29 on May 7, 2015, to close at $3.70 on May 8, 2015.

8. On May 28, 2015, XOMA informed the market that it had reached its target exacerbation event as specified in the gevokizumab EYEGUARD-B study causing an increase in trading and leading to nearly an 8% jump in its share price on the day of the news.

9. On July 22, 2015, the Company revealed that the gevokizumab EYEGUARD-B study did not meet the primary endpoint of first acute ocular exacerbation.

10. On this news, the price of XOMA common stock sank. Its share price fell $3.48, or over 79%, in premarket trading, from a closing share price of $4.39 on July 21, 2015 to open at $0.91 per share on July 22, 2015 on *extremely* heavy trading volume.

## II.   JURISDICTION AND VENUE

11.   The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

12.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

13.   This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  XOMA is headquartered in this District, with its principal place of business located at 2910 Seventh Street, Berkeley, California 94710.

## III.   PARTIES

15.   Plaintiff purchased XOMA's securities as set forth herein and in its certification filed herewith.

16.   XOMA is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principal corporate offices at 2910 Seventh Street, Berkeley, California 94710.  Its common stock trades on NASDAQ Global Market ("NASDAQ") under the symbol, "XOMA."

17.   Defendant Varian has a director of the Company since December 2008 and was appointed as CEO in January 2012 after serving as Interim CEO since August 31, 2011.

18.   Defendant Rubin has been the Chief Medical Officer and SVP of R&D since June 2011.

19.   Defendants Varian and Rubin are collectively referred to herein as the "Individual Defendants."

20.     XOMA and the Individual Defendants are collectively referred to herein as "Defendants."

21.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, possessed the power and authority to control the contents of XOMA's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     <u>Background</u>

22.     XOMA is a biotech drug company that purports to discover and develop innovative antibody-based therapeutics.   Its lead product candidate is gevokizumab, which the Company describes as "a proprietary potent, humanized allosteric-modulating monoclonal antibody that binds to the inflammatory cytokine interleukin-1 beta ("IL-1 beta")."   The Company has asserted that it believed that gevokizumab "has the potential to address the underlying inflammatory causes of a wide range of diseases that have been identified as having unmet medical needs."

23.     The Company describes gevokizumab as "a proprietary potent, humanized allosteric-modulating monoclonal antibody that binds to the inflammatory cytokine interleukin-1 beta ("IL-1 beta")."   The Company has asserted that it believed that gevokizumab "has the potential to address the underlying inflammatory causes of a wide range of diseases that have been identified as having unmet medical needs."

24.     XOMA developed the drug, gevokizumab, to treat, among other things, Behçet's disease uveitis, a multisystem inflammatory disorder most commonly involving the eyes which could lead to blindness.

25.     Together with Servier, the Company initiated three clinical trials to evaluate gevokizumab for the treatment of non-infectious intermediate, posterior or pan-uveitis ("NIU") and Behçet's disease uveitis.  Among the three gevokizumab trials is the Phase 3 EYEGUARD-B study for patients with Behçet's disease uveitis outside of the United States.

**B.     The Material Misrepresentations and Omissions**

26.     On November 6, 2014 the beginning of the Class Period, the Company issued a press release announcing its results for the quarter ended September 30, 2014.  The press release stated in relevant part:

> **Recent Highlights:**
>
> - Opened EYEGUARD-US, a clinical trial conducted at centers in the United States to study gevokizumab in patients with active or controlled Behçet's disease uveitis as part of a broader strategy to file the first Biologics Licensing Application (BLA) for gevokizumab in Behçet's disease uveitis.
>
> *     *     *
>
> "Our clinical development teams have been very productive in the past few months, opening both the EYEGUARD-US clinical study and the gevokizumab Phase 3 pyoderma gangrenosum study, while driving enrollment in our EYEGUARD-A and -C trials. They also exceeded our expectations with the launch of a Phase 1 study for XOMA 358, a novel monoclonal antibody discovered and developed at XOMA," stated John Varian, Chief Executive Officer of XOMA. "The EYEGUARD program, particularly the studies in Behçet's disease uveitis, puts us on the pathway to submit XOMA's first Biologics Licensing Application for gevokizumab, approval of which allows us to achieve our goal of transforming into a commercial organization marketing our products to the U.S. specialist prescriber.

27.     During the Company's third quarter 2014 earnings call held on November 6, 2014 ("3Q14 Earnings Call"), after the close of the market, Defendant Varian stated, in relevant part:

> As we've said though, we are not waiting. We continue to move forward with the activities that will allow us to pursue Behçet's disease uveitis as our first BLA submission for gevokizumab. Specifically, we are preparing analyses of the previously generated gevokizumab Phase 2 data in Behçet's uveitis patients, such that it can be supportive of the EYEGUARD-B pivotal study.

We also initiated the supplemental EYEGUARD-U.S. study in September. Paul and I will discuss the study design and potential role for you today. Once we have the EYEGUARD-B data results in hand, assuming of course that they are positive, we will take the steps to request a pre-BLA meeting with FDA.

Today, we'd like to provide more clarity about the EYEGUARD-B study and Servier's progress with it. In May, we reported that Servier had informed that 75% of the number of pre-set targeted exacerbations that allow the unmasking of the data had occurred, and that Servier predicted the final event would happen in June.

I have asked Paul to spend a good portion of his comments today discussing our detailed learnings since we spoke with you last. Our learnings are encouraging to our ultimate goal and should give you a good understanding of how we got from where we were back in May to where we are today. We're getting closer to having the data, but as I said, we're not waiting. Our entire team is running flat-out to create additional opportunities for success.

*   *   *

We've chosen a Behçet's disease uveitis first strategies specifically because it allows us to take our fate into our own hands, once we have the EYEGUARD-B data from Servier. If we can gain approval in Behçet's disease uveitis, we believe we only need a positive result from either EYEGUARD-A or EYEGUARD-C to seek the broader, but still orphan indication of non-infectious uveitis.

*   *   *

Drug development is never as clear cut as one expects or hopes. There are many, many variables and dynamics that change rapidly and must be factored into your decision making. You have to have confidence that you will succeed in the end. We are moving gevokizumab in the right direction and we're working hard to ensure we have the multiple opportunities to succeed.

28.    Following up on Defendant Varian's statements, Defendant Rubin stated the following at the 3Q14 Earnings Call concerning the raw data from EYEGUARD-B trial:

It is encouraging to see that there are still a significant number of ongoing patients in the trial, who have not experienced an exacerbation or have been rescued early. Many of them have been in the trial for over six months without issues, long after the steroid tapering has been completed.

29.    On March 11, 2015, the Company issued a press release announcing its results for the quarter and full-year ended December 31, 2014.  The press release stated in relevant part:

"The fourth quarter was focused on driving enrollment in all five of our gevokizumab Phase 3 clinical trials, completing our first XOMA 358 clinical study, and putting the Company on a strong financial footing to allow us to achieve our goal of transforming XOMA into a commercial organization marketing our products to the U.S. specialist prescriber," stated John Varian, Chief Executive Officer of XOMA. "Our clinical and regulatory teams are compiling the documentation required to submit a Biologics Licensing Application, in anticipation of positive EYEGUARD-B clinical results and

1
2
3
4
5

FDA interactions. By investing significant time now, we are doing all we can to expedite the process of requesting a pre-BLA meeting with FDA if we obtain positive primary endpoint results.

"With the encouraging proof-of-concept results in Scleritis, we have identified another potential indication for gevokizumab, and with the successful completion of the XOMA 358 Phase 1 study, we have demonstrated our ability to expand our product pipeline with another internally discovered compound that may lead to therapies for people who are living with conditions that are in clear need of new treatment options," Mr. Varian concluded.

6       30.     During the Company's fourth quarter 2014 earnings call held on March 11, 2015

7   ("4Q14 Earnings Call"), after the close of the market, Defendant Varian stated, in relevant part:

8
9
10
11

[W]e are not waiting for EYEGUARD-B results. We are taking the steps necessary to allow Behcet disease uveitis to be our first indication for gevokizumab. If EYEGUARD-B is positive, we will request a pre-BLA meeting with the FDA to review the study. Our pre-BLA package will also include the two Phase II studies Servier and we previously conducted in patients with Behcet disease uveitis, as well as the entire safety database we have compiled for gevokizumab.

12                              *     *     *

13
14

As we've said on many occasions, gevokizumab is our first, second, and third priority. In December 2012, we announced active, noninfectious anterior scleritis as one of the indications in our gevokizumab proof of concept program.

15
16
17

Scleritis is the inflammation of the sclera, or fibrous white membrane surrounding the eyeball, excluding the cornea. Scleritis is a chronic, painful inflammatory disease associated with systemic immune disorders including polyangiitis, which includes microscopic polyangiitis and giant cell arteritis.

18
19

Scleritis can lead to vision loss or blindness if left untreated. Scleritis is a rare disease with an estimated prevalence of approximately 18,000 patients in the U.S. The National Eye Institute or NEI conducted the open label proof of concept trial of gevokizumab in scleritis under Dr. [Nita Shen's] leadership.

20
21
22

The NEI has completed the study by enrolling eight patients with active, noninfectious anterior scleritis. The study objectives were to evaluate the safety and possible efficacy of gevokizumab in patients with active scleral inflammation at baseline.

23
24
25

Although the study is still ongoing, six of the eight study participants had a positive response in the first 16 weeks of gevokizumab treatment based on a standardized scale. We are very excited by these results, an indication which fits well with our strategic commercial focus for gevokizumab and our other pipeline programs. We will be working with NEI to design a possible multicenter controlled trial in this difficult to treat condition.

26                              *     *     *

27
28

We are all looking forward to the recurrence of the final ocular exacerbation in the EYEGUARD-B study. It will happen when it happens and we'll let you

know when the countdown to data analysis has started, but we are not waiting. We are urgently taking steps to execute on our Behcet's first strategy.

We and Servier can see the light at the end of the tunnel for EYEGUARDs A and C. We believe we need only one of these two studies, EYEGUARD-A or EYEGUARD-C, to be positive in order to submit a supplemental BLA with the FDA for the broader NIU indication providing we have approval from the FDA in Behcet disease uveitis.

\*   \*   \*

We do see [with regard to the EYEGUARD-B study] that if patients get to a certain point in time, the rate of exacerbation goes to virtually nothing. So when Servier sized the study and it had a predicted rate of exacerbations, they assumed every patient would exacerbate at some point in time, including gevokizumab patients.

So when that line was drawn and the exacerbations were calculated, how many patients needed to come in, there was an assumption that all patients would exacerbate but hopefully the gevokizumab patients would be later exacerbators. What we've seen, and we've said this, is that there is a group of patients that in this study who've gone a very long time, and on average more than nine months and even more than that, who have not exacerbated.

We know that all the patients that came into the study had to have had an exacerbation in the previous four months, and they had to have at least one more, and they had on average much more than one more, or more than one more, in the previous 14 months, or within the total 18 month period.

So these patients were exacerbating as they came into the study. We are seeing a group of patients who have gone a very long time and not having exacerbated. So that has thrown off our calculations somewhat, of when exacerbations would happen and when we would get to this point in time.

31.    Following up on Defendant Varian's statements, Defendant Rubin stated the following at the 4Q14 Earnings Call:

No, that's exactly right. As you know, the study is a [unintelligible] withdrawal trial, and historically, and this is kind of evidenced by our first study that we did in Turkish patients, when patients are not on an active therapy, they exacerbate relatively quickly, that they fall below a therapeutic level of drug, and that's what we saw in our Turkish patients. So in retrospect, we could have probably predicted that the majority of the exacerbations would have occurred in the first three months.

I think we kind of looked at it as linear. It's clearly not linear. There's a large number at the beginning, which is exactly, when you understand the disease and what we're doing to these patients, makes complete sense. What we didn't know is that that rate would then kind of plateau with time. And that's exactly what we're seeing. ***So although we don't know who's on active and who's on placebo, if you had an active drug, this is sort of the pattern you would expect to see***.

(Emphasis added).

32.     On May 7, 2015, the Company issued a press release announcing its results for first quarter 2015, ended March 31, 2015.  The press release stated in relevant part:

> During the first quarter of this year, we made significant progress toward achieving our goal of becoming a commercial organization," said John Varian, Chief Executive Officer of XOMA. "Servier is just one ocular exacerbation away from being able to close the EYEGUARD™-B study database and expects to reach the targeted ocular exacerbation event any day. If the study results are positive, we will perform an analysis of the full EYEGUARD-B dataset and plan to quickly request a pre-Biologics License Application meeting with the U.S. Food and Drug Administration."

*     *     *

> **Recent Achievements**
>
> One ocular exacerbation away from reaching the targeted number of exacerbations in the pivotal Phase 3 EYEGUARD-B clinical study of gevokizumab in Behçet's disease uveitis.

33.     During the Company's first quarter 2015 earnings call held on May 7, 2015 ("1Q15 Earnings Call"), after the close of the market, Defendant Varian acknowledged that the Company had "anticipated" being in a "self-imposed quiet period."   However, he continued to make materially false and misleading statements that led the market to believe that concerning the gevokizumab Phase 3 EYEGUARD-B study would be successful.  At the 1Q15 Earnings Call, Defendant Varian stated, in relevant part:

> We are one exacerbation away from being able to close the EYEGUARD-B study database. That's right. One more patient with Behcet's disease uveitis needs to exacerbate.
>
> We had our second to last exacerbation just over a month ago, and the recent exacerbations have occurred about once a month. So the first thing I've done every morning for the last month is check my phone and e-mails, expecting and hoping for the news. It looks like I'll be doing that again tomorrow morning.
>
> We know we can expect the final exacerbation any time, since we know that in clinical trials exacerbations most frequently occur in patients during the first 90 days. Since Servier has enrolled 12 patients in EYEGUARD-B since the beginning of the year, and since spring is settling in across the northern hemisphere, we should be getting to that final targeted exacerbation any day now.
>
> In preparation, Servier has created and provided us with a detailed timeline of events from database lock, until we'll have preliminary topline data to announce. Based on this schedule, we are on track to be able to announce the primary endpoint results approximately seven weeks after the final exacerbation occurs.

*   *   *

Now, since we're right at the finish line, I am going to give you some additional color. Servier has performed a Herculean task to bring this trial to this important moment. While I can't be exact, I think it's important to give you some general background to reflect how hard they've worked on the study, which they've consistently shown is extremely important to them.

EYEGUARD-B had an original target enrollment of more than 50, but less than 100 patients, which Servier hit last June. The study is a double-masked one-to-one 60 milligrams of gevokizumab to placebo randomized trial.

The targeted number of exacerbations we've been chasing to allow the unblinding of the study is approximately one-half the number of patients originally targeted for enrollment. So while we can't say the exact number, I hope you can appreciate that we were a long way down the road, when we were a handful away, and particularly now just one.

In the early months of the study the exacerbation rate was running at Servier's expected rate. What neither our partner nor we expected was that once patients progressed through the early months of the study without exacerbating, we would see a virtual cessation in exacerbations.

Since Servier anticipated patients would continue to exacerbate in later months, it has taken more time to reach the preset exacerbation target than anyone would have predicted. Once we realized this was happening, in order to achieve the targeted number of events, Servier continued to enroll patients in EYEGAURD-B on the original targeted number.

As of today, they have enrolled approximately 20 additional patients. The majority of this effort occurred since last December and has enabled us to reach the doorstep we stand at today. We believe the increase in patient numbers and extended length of time we've experienced in EYEGAURD-B helps generate important additional information, since long-term control of Behcet's disease uveitis is so crucial.

Based on our assumptions, the study has 90 percent power to detect the difference between treatment groups. The study's endpoint is the time to first exacerbation between the gevokizumab and placebo arms. As I said, if the database closing goes as planned, we'll be announcing the results approximately seven weeks after we report that final exacerbation has occurred.

34.     On May 28, 2015, the Company issued a press release announcing that the gevokizumab Phase 3 EYEGUARD-B study, the same study that was the subject of the negative news on July 22, 2015, reached its target exacerbation event as specified in the study design.  The positive news spurred XOMA's share price to rise nearly 8% on the day of the news.  The press release stated in relevant part:

BERKELEY, Calif., May 28, 2015 (GLOBE NEWSWIRE) -- XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today announced that the gevokizumab Phase 3

EYEGUARD-B study, sponsored by its development partner Servier, reached its target exacerbation event as specified in the study design. The objective of the first part of this study is to demonstrate the superiority of gevokizumab, as compared to placebo, on top of the current standard of care (immunosuppressant therapy and oral corticosteroids) in reducing the risk of Behçet's disease uveitis exacerbations and to assess the safety of gevokizumab.

Servier now will begin the process of closing the clinical database and analyzing the data from this part of the study. Servier has provided a detailed schedule of the activities it will undertake to allow the locking of the database. The primary endpoint result is expected in approximately seven weeks. The trial is ongoing and remains double-masked for the extension period of the study.

The Phase 3 EYEGUARD-B study (A randomisEd, double-masked, placebo-controlled studY of the Efficacy of GevokizUmAb in the tReatment of patients with Behçet's Disease uveitis) was designed to enroll patients with a history of Behçet's disease uveitis with ocular involvement of the posterior segment who have experienced a recent ocular exacerbation that was treated successfully with high doses of corticosteroids. Patients were randomized to either a 60 mg dose of gevokizumab or placebo administered subcutaneously once monthly on top of their current immunosuppressive and corticosteroid therapies. The primary endpoint is the time to first acute ocular exacerbation.

C.    **The Truth Emerges**

35.    On July 22, 2015, prior to the opening of the market, the Company issued a press release announcing that its pivotal Phase 3 clinical study evaluating gevokizumab for the treatment of patients with Behçet's disease uveitis outside the United States, EYEGUARD-B, missed the primary endpoint of time to first acute ocular exacerbation.  The press release stated in relevant part:

BERKELEY, Calif., July 22, 2015 (GLOBE NEWSWIRE) -- XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today announced the Phase 3 EYEGUARD-B study of gevokizumab in patients with Behçet's disease uveitis, run by its partner Servier, an independent French pharmaceutical research company driven by the pursuit of innovative drugs, did not meet the primary endpoint of time to first acute ocular exacerbation.

"Although the study did not achieve its main objective, we did see signals of drug activity such as preserved visual acuity, less severe ocular exacerbations and a reduced incidence of reported macular edema in patients treated with gevokizumab," said Paul Rubin MD, Senior Vice President Research and Development and Chief Medical Officer. "We will continue to work closely with our partner, Servier, and uveitis experts to conduct a thorough analysis of the data to fully understand gevokizumab's impact on several clinically relevant endpoints."

"The initial observations seen in the secondary endpoints are clinically important and meaningful to both clinicians and Behçet's disease uveitis patients," stated Dr. Ilknur Tugal-Tutkun, international coordinator for the EYEGUARD-B study and Professor of Ophthalmology, Head, Ocular Immunology and Uveitis Service at Istanbul University, Istanbul Faculty of

Medicine, Department of Ophthalmology. "We look forward to learning more."

"In recent years, our public focus has been on gevokizumab. However, during that time, we have significantly advanced other assets in our pipeline including XOMA 358, for which we completed a positive Phase 1 study showing it is active in down-regulating the insulin receptor and shows potential in treating patients who experience endogenous over-production of insulin, and XOMA 089, our late preclinical anti-TGFβ monoclonal antibody with potential in immuno-oncology and fibrosis," said John Varian, Chief Executive Officer of XOMA. "We will focus our efforts on creating value with these pipeline assets and reduce expenses where appropriate. While we continue to evaluate the data from EYEGUARD-B, the EYEGUARD-A and C studies, in the broader range of non-infectious uveitis, are still recruiting."

Gevokizumab appeared to be well tolerated in the trial. Adverse events were comparable between gevokizumab and placebo treated groups.

\* \* \*

EYEGUARD-B Study Design

The objective of the Phase 3 EYEGUARD-B study (A randomisEd, double-masked, placebo-controlled studY of the Efficacy of GevokizUmAb in the tReatment of patients with Behçet's Disease uveitis) was to demonstrate the superiority of gevokizumab, compared with placebo, on top of the current standard of care in reducing the risk of Behçet's disease uveitis exacerbations and to assess the safety of gevokizumab. The study was designed to enroll patients with a history of Behçet's disease uveitis with ocular involvement of the posterior segment who had experienced a recent ocular exacerbation that was treated successfully with high doses of corticosteroids.

The trial enrolled a total of 83 patients in the core part of the study (40 on gevokizumab and 43 on placebo). Patients were randomized to either a 60 mg dose of gevokizumab or placebo administered subcutaneously once monthly on top of their current immunosuppressive and corticosteroid therapies. They were randomized when they reached the step of 20 mg/day equivalent oral prednisone and continued a standardized tapering regimen until they reached 5 mg/day during double-masked treatment.

The primary endpoint was the time to first acute ocular exacerbation. Secondary endpoints included total number of exacerbations, best corrected visual acuity, vitreous haze, retinal lesions, fundus assessments and macular edema.

36.    As the result of this news, the share price of the Company's common stock plunged $3.48 in premarket trading, from a closing share price of $4.39 on July 21, 2015 to open at $0.91 per share on July 22, 2015, or over 79%, on ***extremely*** heavy trading volume.

## V.    LOSS CAUSATION

37.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially

inflated the price of XOMA's securities and operated as a fraud or deceit on Class Period purchasers of XOMA securities by materially misleading the investing public.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of XOMA's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of XOMA's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VI. FRAUD-ON-THE-MARKET DOCTRINE

38.    At all relevant times, the market for XOMA's securities was an efficient market for the following reasons, among others:

a)    XOMA securities met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

b)    XOMA filed periodic public reports with the SEC and NASDAQ; and

c)    XOMA regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

39.    As a result of the foregoing, the market for XOMA's securities promptly digested current information regarding XOMA from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of XOMA securities during the Class Period suffered similar injury through their purchase of XOMA securities at artificially inflated prices and a presumption of reliance applies.

## VII. NO SAFE HARBOR

40.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there

were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of XOMA who knew that the statement was false when made.

## VIII.   CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired XOMA securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable, since XOMA has millions of shares of stock outstanding and because the Company's shares were actively traded on NASDAQ.  According to XOMA's Form 10-Q filed with the SEC on May 7, 2015, as of May 5, 2015, XOMA had approximately 117.8 million shares issued and outstanding.  While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

43.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class and Private Placement Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants omitted and/or misrepresented material facts in their publicly disseminated press releases and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)     whether the price of XOMA securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of XOMA's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

44.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

45.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### CLAIMS FOR RELIEF

### COUNT I
### Against XOMA for Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (on behalf of the Class)

47.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

48.     This Count is asserted by Plaintiffs on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

49.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of XOMA's common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire XOMA's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

50.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for XOMA's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

51.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  Defendants' material misrepresentations and omissions as set forth herein violated that duty.

52.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs

and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

53. As a result of Defendants' fraudulent activity, the market price of XOMA was artificially inflated during the Class Period.

54. In ignorance of the true financial condition of XOMA, Plaintiffs and other members of the Class, relying on the integrity of the market and/or on the statements and reports of XOMA containing the misleading information, purchased or otherwise acquired XOMA's common stock at artificially inflated prices during the Class Period.

55. Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in XOMA's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased XOMA's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of XOMA's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of XOMA.

56. Throughout the Class Period, Defendants were aware of material non-public information concerning XOMA's fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

57. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of XOMA common stock during the Class Period.

**COUNT II**
**Against Individual Defendants for Violation of Section 20(a) of the Exchange Act**
**(on behalf of the Class)**

58.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

59.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of XOMA, were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

60.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

61.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of XOMA's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-

public information available to them but not the public, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of XOMA's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

62. Individual Defendants acted as controlling persons of XOMA within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, Individual Defendants had the power and authority to cause XOMA to engage in the wrongful conduct complained of herein. Individual Defendants controlled XOMA and all of its employees. As alleged above, XOMA is a primary violator of section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

63. As a direct and proximate result of the wrongful conduct of XOMA and Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**PRAYER**

**WHEREFORE**, Plaintiff demands judgment as follows:

(A) Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and his counsel as Class counsel;

(B) Awarding Plaintiff and the members of the Class damages, including interest;

(C) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D) Awarding such equitable/injunctive or other relief as the Court may deem just and proper

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

DATED: July 24, 2015                    PUNZALAN LAW, P.C.

4

By: /s/ *Mark Punzalan*

5

Mark Punzalan

6

LEVI & KORSINSKY, LLP
Nicholas I. Porritt (to be admitted *pro hac vice*)

7

Adam M. Apton  (to be admitted *pro hac vice*)
1101 30th Street N.W., Suite 115

8

Washington, D.C. 20007
Tel: (202) 524-4290

9

Fax: (202) 363-2121

10

-and-

11

12

LEVI & KORSINSKY, LLP
Julia J. Sun (to be admitted *pro hac vice*)

13

30 Broad Street, 24th Floor
New York, New York 10004

14

Telephone:  (212) 363-7500
Facsimile:  (212) 363-7171

15

16

*Counsel for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

**CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, JOSEPH F. MARKETTE, declare as to the claims asserted under the federal securities laws, as follows:

1. have reviewed this Complaint and authorized its filing;

2. I did not purchase the securities that are the subject of this Complaint at the direction of Plaintiffs' counsel or in order to participate in this litigation;

3. I am willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary;

4. My transaction(s) in Xoma Corporation securities which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. During the three years prior to the date of this Certification, I have not participated, nor have I sought to participate, as a representative in any class action suit in the United States District Courts under the federal securities laws.

6. I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this class action, except for: (i) such damages or other relief as the Court may award to me as my pro rata share of any recovery or judgment; (ii) such reasonable fees, costs or other payments as the Court expressly approves to be paid to or on behalf of me; or (iii) reimbursement, paid by my attorneys, of actual or reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I hereby certify, under penalty of perjury, that the foregoing is true and correct. Executed this 23rd day of July 2015.

Signed:  *Joseph F Markette*

NAME: Joseph F. Markette

**Joseph F. Markette**
**Transactions in XOMA Corporation (XOMA) Common Stock Class**
**Period: November 6, 2014 through July 21, 2015, inclusive**

| Date of Transaction | Buy (B) or Sell (S) | Quantity | Price ($) |
|---|---|---|---|
| 5/18/2015 | B | 200 | 3.4386 |
| 5/18/2015 | B | 100 | 3.44 |
| 6/1/2015 | B | 200 | 3.5185 |
| 6/11/2015 | B | 200 | 3.77 |
| 6/17/2015 | B | 200 | 3.6589 |
| 6/18/2015 | B | 100 | 3.7785 |
| 6/29/2015 | B | 200 | 3.7784 |
| 7/10/2015 | B | 100 | 4.44 |
| 7/13/2015 | B | 100 | 4.6799 |
| 7/17/2015 | B | 100 | 4.4899 |