UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH F. MARKETTE,<br><br>  Plaintiff,<br><br>  v.<br><br>XOMA CORPORATION, et al.,<br><br>  Defendants. | Case No. 15-cv-03425-HSG<br><br>**ORDER APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL; SETTING FURTHER CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. Nos. 11, 12, 17 & 22 |

Before the Court are four competing motions to appoint lead plaintiff and lead counsel in this putative securities fraud class action brought by Plaintiff Joseph Markette ("Plaintiff") against Defendant XOMA Corporation ("XOMA") and two of its executives (together, "Defendants"). The four movants for lead plaintiff are: (1) Joseph Tarzia, on behalf of himself, his wife, his three children, his sister, his sister's trust, and his cousin (together, "Tarzia"), Dkt. No. 11 ("Tarzia Mot."), (2) Xoma Group, a group comprised of a married couple and two unrelated individuals, Dkt. No. 12 ("Xoma Mot."), (3) Nicholas and Kellie Exarhos (together, "Exarhos"), Dkt. No. 17 ("Exarhos Mot."), and (4) a group comprised of a married couple and three unrelated individuals ("Claycomb Group"), Dkt. No. 22 ("Claycomb Mot.").

For the reasons set forth below, the Court **GRANTS** Tarzia's motion and appoints Tarzia as the lead plaintiff in this action and his attorneys, Faruqi & Faruqi LLP, as lead counsel. The three other motions are **DENIED**. The Court **SETS** a further case management conference for May 24, 2016, at 2:00pm to discuss the status of action and an appropriate scheduling order.

**I.   BACKGROUND**

This is a putative securities fraud class action that Plaintiff brought against Defendants on behalf of all persons who purchased common stock in XOMA between November 6, 2014, and

July 21, 2015.  Dkt. No. 1 ("Compl.").

### A. Factual Allegations

XOMA is a biotechnology company that develops antibody-based therapeutics.  *Id.* ¶ 22.  Its lead product candidate is gevokizumab, a proprietary antibody that XOMA has asserted "has the potential to address the underlying inflammatory causes of a wide range of diseases that have been identified as having unmet medical needs."  *Id.*  Between November 6, 2014, and July 21, 2015, Plaintiff alleges that Defendants repeatedly made material misrepresentations and omitted material information in statements about the successful commercialization of gevokizumab.  *Id.* ¶¶ 26-34.  When news about a key clinical study became public on July 22, 2015, XOMA's common stock price plunged over 79% on extremely heavy trading volume.  *Id.* ¶ 36.

### B. Procedural History

Plaintiff filed this putative securities fraud class action against Defendants on July 24, 2015, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated by the SEC, 17 C.F.R. § 240.10b-5.  Plaintiff's counsel published a notice of pendency of action, as required by the Private Securities Litigation Reform Act ("PSLRA"), on a national wire service that same day.  Dkt. No. 11-1.

In response to that notice, four movants—Tarzia, Xoma Group, Exarhos, and Claycomb Group—initially sought appointment as lead plaintiff in the action.  In the wake of those motions, however, Exarhos filed a statement of non-opposition to the other motions, Dkt. No. 39, and Claycomb Group filed a statement of limited non-opposition, withdrawing its motion if (and only if) Xoma Group is appointed, Dkt. No. 38.[1]  Xoma Group has filed an opposition to Tarzia's motion, Dkt. No. 44 ("Xoma Opp."), Tarzia has filed a response to Xoma Group, Dkt. No. 50 ("Tarzia Opp."), Xoma Group has replied to Tarzia, Dkt. No. 52 ("Xoma Reply"), and Tarzia has

---

[1] Although the Court ultimately finds that Xoma Group should not be appointed lead plaintiff, the Court does not consider Claycomb Group's motion.  After filing its limited opposition, Claycomb Group did not continue to brief this motion or appear at oral argument.  As a result, the other movants did not have an opportunity to fully rebut Claycomb Group's showing.  Claycomb Group's decision both constitutes a withdrawal of its motion from consideration as a procedural matter, and is substantively disqualifying in that it shows that Claycomb Group is not an adequate lead plaintiff.

replied to Xoma Group, Dkt. No. 54 ("Tarzia Reply").

As the remaining movants, Tarzia and Xoma Group each contend that they hold the largest financial stake in this litigation and are typical and adequate class representatives. While there are several subsidiary issues, the crux of their dispute is whether the other has improperly aggregated the financial interest of multiple persons to achieve the largest aggregate share of XOMA stock for the purpose of appointment as lead plaintiff. On the one hand, Tarzia seeks to represent his family members on their behalf without their appearance in the action, which Xoma Group contends is improper. On the other hand, Xoma Group seeks to aggregate the financial interests of several individuals who do not have any pre-litigation relationship, which Tarzia contends is improper.

The Court held a hearing on the Tarzia and Xoma Group motions on November 5, 2015. At the hearing, Tarzia manually lodged (and later filed) declarations from the family members who Mr. Tarzia is attempting to represent in this action formally assigning their litigation rights to Mr. Tarzia. Dkt. Nos. 58-63 ("Assignments"). Xoma Group did not file any written opposition to the Assignments, but orally argued they were untimely.

## II.     LEGAL STANDARD

Congress passed the lead plaintiff provision of the PSLRA to supplant the first-to-file system that previously determined who would control the prosecution of a securities class action. *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002) (discussing 15 U.S.C. 78u-4(a)(3)). Now, "district courts [must] select as lead plaintiff the one 'most capable of adequately representing the interests of class members.'" *Id.* (quoting 15 U.S.C. § 78u-4(a)(3)(B)(i)). "The 'most capable' plaintiff-and hence the lead plaintiff-is the one who has the greatest financial stake in the outcome of the case, so long as he meets the requirements of [Federal] Rule [of Civil Procedure] 23." *Id.*

"[The PSLRA] provides a simple three-step process for identifying the lead plaintiff pursuant to these criteria." *Id.* "The first step consists of publicizing the pendency of the action, the claims made and the purported class period . . . in a widely circulated national business-oriented publication or wire service." *Id.* (quoting 15 U.S.C. § 78u-4(a)(3)(A)). The plaintiff who files the securities action must complete step one within 20 days of filing. *Id.* (citing 15 U.S.C. § 78u-4(a)(3)(A)(i)). Any movant who seeks appointment as lead plaintiff must then file their

3

motion within 60 days of the date of the notice. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

"In step two, the district court must . . . compare the financial stakes of the various plaintiffs [seeking appointment] and determine which one has the most to gain from the lawsuit." *Id.* at 729-30 (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)). That plaintiff is the "presumptive lead plaintiff," and he must show, through "his pleadings and declarations, that he also satisfies the requirements of Rule 23(a), in particular those of typicality and adequacy." *Id.* at 730. "If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23." *Id.*

"The third step of the process is to give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23[.]" *Id.* at 730 (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)). "In seeking evidence that could rebut the presumptive lead plaintiff's showing . . . other plaintiffs may be allowed to conduct discovery if they 'demonstrate[] a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class.'" *Id.* (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iv)). Where facts regarding appointment are disputed, an evidentiary hearing may be appropriate. *Id.*

Once a district court has made its selection, "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z–1(a)(3)(B)(v). "[T]he district court should not reject a lead plaintiff's proposed counsel merely because it would have chosen differently." *Cohen v. U.S. Dist. Ct. for N. Dist. of Cal.*, 586 F.3d 703, 711-12 (9th Cir. 2009). "[I]f the lead plaintiff has made a reasonable choice of counsel, the district court should generally defer to that choice." *Id.* at 712. Courts should consider the following factors when determining whether the lead plaintiff has made a reasonable choice of counsel: (1) the lead plaintiff's sophistication and experience; (2) the process through which the lead plaintiff selected its candidates for and final choice of lead counsel; (3) the qualifications and experience of selected counsel, and (4) evidence of arms-length negotiations between lead plaintiff and proposed counsel." *Id.* (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 276 (3d Cir. 2001)).

///

## III. DISCUSSION

The Court will apply the test set forth in the PSLRA and *Cavanaugh* to select the lead plaintiff in this action. *See* 15 U.S.C. 78u-4(a)(3); 306 F.3d at 729-30.

### A. Notice, Timeliness, and Withdrawal

The first step asks whether proper notice was given to the putative class to allow the most qualified plaintiff to seek appointment. Plaintiff, who filed this action, published notice of suit in *Globe Newswire* on July 24, 2015. Dkt. No. 11-1 ("Bower Decl."), Ex. 1. This was sufficient notice. Each movant timely filed its motion thereafter, and Tarzia and Xoma Group's motions remain pending.

### B. Largest Financial Stake in the Litigation

The Court must next determine whether Tarzia or Xoma Group has the "greatest financial stake in the outcome of the case." *Cavanaugh*, 306 F.3d at 729.

#### 1. Standing, Power-of-Attorney Authorization, and Claim Assignment

This inquiry presents a threshold issue as to Tarzia. Xoma Group contends that Joseph Tarzia, who purports to assert claims on behalf of family members who have not appeared in this action, does not have standing to do so. For that reason, Xoma Group argues that Mr. Tarzia cannot aggregate his claims with his family's for the purpose of his lead plaintiff motion, and that he is subject to a unique standing defense that undermines his Rule 23 typicality. Tarzia responds that Xoma Group conflates various types of standing. He argues, for one thing, that there is no question he himself has constitutional standing as one who suffered personal injury. Because he has personal constitutional standing, he contends the authorizations that his family filed, giving him power of attorney in this action, permit him to aggregate their claims with his. And Tarzia argues that even if power-of-attorney is insufficient to permit aggregation, his family members have now validly assigned their litigation rights to him. Xoma Group replies only that those assignments are invalid because they are untimely.

As an initial matter, Tarzia has personal constitutional standing. Constitutional standing exists where a plaintiff has (1) injury-in-fact, which is a "concrete and particularized" harm to a "legally protected interest"; (2) causation in the form of a "fairly traceable" connection between

the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, Tarzia sufficiently alleges that: (1) he personally suffered an economic injury stemming from losses he sustained in connection with XOMA's stock; (2) those injuries are fairly traceable to Defendants' misrepresentations and omissions regarding product development; and (3) his injury is redressed by the damages sought. *See id.* At oral argument, Xoma Group agreed that Tarzia's personal standing is not contested. Because Tarzia has personal constitutional standing, he also has standing to serve as lead plaintiff and represent the putative class, which includes his family members. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements.").

The more pertinent question is whether Tarzia can pursue his family members' claims without their appearance. Tarzia initially argued that he could do so because his family gave him power of attorney in this case, Bower Decl., Ex. 2 at 3-5, a procedure found valid in *Bhojwani v. Pistiolis*, No. 06 Civ. 13761, 2007 WL 9228588, at *2 (S.D.N.Y. Jul. 31, 2007) (holding that a lead plaintiff could aggregate his claims with his absent family members' claims where they gave him power of attorney because they were a close-knit group that would otherwise be permissible). At oral argument, Xoma Group responded that *W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 104, 111 (2d Cir. 2008), abrogated *Bhojwani* because it held that an investment advisor bringing claims on behalf of its clients, but without injury of its own, lacked standing to assert those claims unless its clients formally assigned their litigation rights to it. *Id.*

The Court does not need to decide whether a power-of-attorney authorization alone is sufficient to permit aggregation of absent third parties' claims with a movant for lead plaintiff under the PSLRA. Here, it is undisputed that Mr. Tarzia's family members formally assigned their litigation rights in their claims to him. If Mr. Tarzia's family members' claims are now Mr. Tarzia's claims, as a matter of common sense, aggregation is not necessary because only one person holds the claims. Xoma Group does not argue that these assignments are invalid per se, but that they are untimely because they were not executed until shortly before oral argument.

6

1  The Court finds the assignments valid and timely. As an initial matter, post-complaint assignments of litigation rights have been found valid in circumstances analogous to those here. *See Northstar Fin. Advisors, Inc. v. Schwab Investments*, 779 F.3d 1036, 1044, 1048 (9th Cir. 2015) (finding in PSLRA case that district court did not abuse its discretion in permitting the "[plaintiff] to file a supplemental pleading after a post-complaint assignment from a party that clearly had standing," even where the plaintiff, unlike Tarzia here, previously lacked personal constitutional standing). And Xoma Group has pointed to no authority holding that the PSLRA requires an assignment to occur before a movant seeking appointment as lead plaintiff files the motion. *Cf. In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 116 (S.D.N.Y. 2009) (holding that post-complaint assignments are untimely under the PSLRA where executed by a movant who otherwise would not have any constitutional standing after he has already been appointed lead plaintiff). In this case, the assignments were lodged before this matter was taken under submission and later filed at the Court's direction, as authorized by Civil Local Rule 7-3(d). Accordingly, the Court finds that the assignments are valid and timely and, therefore, Tarzia may "aggregate" his personal financial stake with his family members', in the sense that their claims are now his to assert.[2]

2.  <u>Method of Calculating Financial Stake</u>

Having resolved that Tarzia can aggregate his claims with those of his family, the Court turns to the question of how to calculate the value of the movants' claims. "The Ninth Circuit has declined to endorse a particular method" to calculate which movant has the largest financial stake in a securities class action. *Nicolow v. Hewlett Packard Co.*, No. 12-cv-05980, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013).[3] Courts in this district have used different methods that roughly

---

[2] *Friedman v. Quest Energy Partners LP*, 261 F.R.D. 607 (W.D. Okla. 2009), which Xoma Group cites for the proposition that Tarzia's assignments are untimely under the PSLRA, is inapposite. *Friedman* held that a movant cannot be appointed lead plaintiff, despite assignment of claims from absent third parties, where the movant did not have any standing at the time that the lead plaintiff motion was filed. *Id.* at 611-12. Even if the Court were to accept that rule, Tarzia had personal constitutional standing at the time he filed his lead plaintiff motion. The basis for the holding in *Friedman* was that "[the movant] did not have standing at the time it filed its motion and, thus, was not a member of the class, and it had no financial interest in the relief sought by the class at the time it filed its motion." *Id.* at 612. But, here, Tarzia was always a putative class member.

[3] The only guidance that the Ninth Circuit has provided is that "the [district] court may select accounting methods that are both rational and consistently applied" in order to "compare the financial stakes of the various plaintiffs[.]" *Cavanaugh*, 306 F.3d at 730 & n.4.

7

1  constitute two different categories. *Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451, 2011
2  WL 566814, at *3 (N.D. Cal. Feb. 15, 2011). "Methods in the first category equate financial
3  interest with actual economic losses suffered. In contrast, a second category of methods equates
4  largest financial interest with potential recovery." *Id.* (internal citations omitted).

5        Within the first category, some courts in this district have found that "[t]he weight of
6  authority puts the most emphasis on the competing movants' estimated losses, using a 'last in, first
7  out' ('LIFO') methodology." *Bodri v. Gopro, Inc.*, No. 16-cv-00232, 2016 WL 1718217, at *3
8  (N.D. Cal. Apr. 28, 2016) (quoting *Nicolow*, 2013 WL 792642, at *4); *see also City of Royal Oak
9  Ret. Sys. v. Juniper Networks, Inc.*, No. 11-CV-4003, 2012 WL 78780, at *4 (N.D. Cal. Jan 9,
10 2012); (applying LIFO method).[4] A court in the Southern District of New York helpfully
11 explained and compared the LIFO method and another economic loss method as follows:

> "LIFO calculates losses by assuming that the first stocks to be sold are the stocks purchased most recently prior to that sale. [One] alternative, 'first in, first out' ('FIFO'), assumes that the first stocks to be sold are the stocks that were acquired first. Often, these first-acquired stocks were acquired outside the class period. Since sales matched with pre-class period purchases are not included in the calculation of class period losses, any gains or losses from those most recent sales would not be included in the total loss."

17 *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 129 (S.D.N.Y. 2011). "The main advantage of LIFO is
18 that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class
19 period due to the inflation of the stock price. FIFO . . . may exaggerate losses." *Id.*

20       Other courts in this district have applied a different net economic loss method that looks to
21 the shares retained at the end of the class period that were purchased during the class period and
22 calculates the total net loss on those securities alone. *Mulligan v. Impax Labs., Inc.*, No. C-13-
23 1037, 2013 WL 3354420, at *6 (N.D. Cal. Jul. 2, 2013) (citing *Eichenholtz v. Verifone Holdings,
24 Inc.*, No. C 07-06140, 2008 WL 3925289, at **10-14 (N.D. Cal. Aug. 22, 2008) (creating test)).

---

[4] As Tarzia suggests, the LIFO calculation is often only one of four factors weighed in calculating the largest financial stake. *Id.* (discussing the "*Olsten-Lax* factors"). The other factors are: (1) the number of shares purchased, (2) the number of net shares purchased, and (3) the net funds expended during the class period. *Id.* But, recently, as in *Bodri*, courts in this district have tended to focus on net estimated losses (using the LIFO methodology) as the sole factor in the analysis. *See, e.g.*, 2016 WL 1718217, at *3.

United States District Court
Northern District of California

1  The advantage of this "retained shares" method is that it "look[s] to losses experienced due to the
2  shares that the plaintiff was holding at the time the fraud was disclosed, and thus focus[es] on
3  losses caused when stock purchased at artificially inflated prices decreases in value due to the
4  disclosure of the fraud. This metric thereby excludes losses caused by normal market fluctuations
5  prior and unrelated to the disclosure of the fraud." *Id.* But the retained shares method works best
6  where there is a "relatively constant fraud premium through the class period." *Id.* at *7. In other
7  words, it will most accurately calculate net loss where there are not multiple partial disclosures
8  that reveal the purported fraud during the class period. This is because it excludes losses caused
9  by those partial disclosures that came from the sale of shares during the class period. *Id.*

Still other courts in this district have used a maximum recoverable damages method, eschewing economic loss methods entirely. *See Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451, 2011 WL 566814, at **3-12 (N.D. Cal. Feb. 15, 2011) (calculating maximum recoverable damages alongside LIFO net losses); *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 997 (N.D. Cal. 1999) (finding maximum recoverable damages preferable to net economic losses but not deciding the question). The reason for using the recoverable damages method is intuitive: "[o]ne's 'interest' in a litigation is rather directly tied to what one might recover." *McKesson*, 97 F. Supp. 2d at 997. Some of the courts using this method, however, appear to have settled on economic loss metrics. *See Zhamukhanov v. AcelRx Pharm., Inc.*, No. 14-CV-04416, 2015 WL 906932, at *3 (N.D. Cal. Feb. 24, 2015) (finding that economic loss is the appropriate measure); *City of Royal Oak*, 2012 WL 78780, at *4 (applying the LIFO method).

In this case, Tarzia and Xoma Group both calculate net economic loss instead of maximum recoverable damages, but use different methods to calculate their net economic loss. Tarzia argues that the Court should apply the *Olsten-Lax* test because it uses the widely-accepted LIFO method. Tarzia Mot. at 5; Tarzia Opp. at 3-5; *see also* Bower Decl., Ex. 3 (net loss chart). Without challenging Tarzia's method, or even explaining its own, Xoma Group appears to calculate net loss by taking the total cost of its purchases, subtracting total sales revenue, and then subtracting

the "lookback value" of its shares retained at the end of the class period.[5] Xoma Opp. at 2; *see also* Xoma Reply at 1, n.1; Dkt. No. 53 ("Xoma Reply Decl."), Ex. 1 (net loss chart). And, problematically, neither movant recalculates its financial stake using the other movant's method, but each still quantitatively compares its calculation to the other movant's calculation.

While each movant's proposed method is sufficient under *Cavanaugh*, the Court finds that the retained shares method most accurately establishes the loss amount on these facts. Plaintiff's complaint alleges that a single disclosure revealed Defendants' purported fraud and does not suggest that any partial disclosures occurred during the class period. *See* Compl. ¶ 36 (alleging that Xoma's stock price plunged on extremely heavy trading volume after a single disclosure revealed that earlier assertions about product development were false and/or incomplete). When a single disclosure reveals a purported fraud, there is a constant fraud premium across the class period, meaning that the artificial inflation of the price of the security did not dissipate. In those situations, the retained shares method is more accurate than LIFO, net loss, and other economic loss methods because it excludes losses incurred during the class period that are likely attributable to normal market fluctuations rather than fraud. *See Mulligan*, 2013 WL 3354420, at *6. Here, Xoma Group's net loss method does not exclude any losses taken during the class period before the fraud was disclosed because, by definition, it includes all losses. And Tarzia's LIFO method, while better than net loss because it attempts to minimize the time between purchase and sale so as to exclude normal market fluctuations across the entire class period, likely still captures some loss that is not attributable to the purported fraud.

Applying the residual shares method, the Court first determines the number of each movant's residual shares. *Eichenholtz*, 2013 WL 3354420, at **4-7. Tarzia had a total of 166,400 shares, while Xoma Group had 174,700 shares at the close of the class period. Second, the Court calculates the total value of those shares applying the price of the stock at the time immediately before disclosure of the purported fraud. *Id.* The total value of the residual shares at the close of the class period, applying the pre-disclosure price of $4.39, was $730,496 for Tarzia and $766,933

---

[5] Lookback value is defined by Xoma Group as the 90-day price average of the security after the end of the class period. Xoma Opp. 1, n.1.

1   for Xoma Group.  Third, the Court subtracts the average share price over the 90 days that followed
2   the fraud disclosure.  *Id.*  The parties agree that this lookback value was $0.83.  Based on this data,
3   the Court finds that Tarzia suffered a net loss of $592,384 and Xoma Group suffered a net loss of
4   $621,932.  Accordingly, under step two, Xoma Group is the presumptive lead plaintiff.

### C. Typicality and Adequacy of the Xoma Group

A presumptive lead plaintiff has the burden of setting forth a prima facie case that he can satisfy the class representative requirements of Rule 23(a), typicality and adequacy.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *Cavanaugh*, 306 F.3d at 730.  Competing movants can rebut this showing by setting forth evidence that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

#### 3. Typicality

Under Rule 23(a)(3), "[t]he test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation omitted).  "[R]epresentative claims are typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (internal quotation omitted).  Xoma Group contends (and Tarzia does not contest) that its claims are typical of the class because they share largely identical legal and factual issues and that it is not subject to any unique defenses.  On the record before it, the Court agrees.

#### 4. Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In its moving papers, Xoma Group asserts that there is a "close alignment of interests between [itself] and other class members" and that it has a "desire to prosecute [the action] on behalf of the class[.]"  Xoma Opp. at 5.  To that effect, Xoma Group submits a joint declaration that recites their collective commitment to take an "active role" in the case and to "communicate regularly with counsel and each other regarding major litigation

11

events[.]" Dkt. No. 45-1 ("Xoma Joint Decl.") ¶¶ 5-6.

Tarzia responds that Xoma Group is an inadequate lead plaintiff as a matter of law because it is an artificial collection of persons who their counsel assembled for the sole purpose of securing the lead plaintiff position in order to permit them to become class counsel. Tarzia Opp. at 7-17. Tarzia asserts that although the PSLRA allows a group of persons to serve as a lead plaintiff, the majority position in this district is that plaintiffs without any existing relationship cannot aggregate their financial stakes. *Id.* at 7-8. In any case, Tarzia notes that when courts have allowed artificial aggregation, the group must justify its composition and structure in terms of its adequacy. *Id.* at 8-11. To that end, Tarzia claims that the Court should defer to the SEC's litigation position stating that artificial lead plaintiff groups are permissible only where their existence is justified and they state a clear plan for resolving disputes among members. *Id.* at 11-17. Tarzia argues that Xoma Group's joint declaration fails to answer those questions and, therefore, warrants rejection. Xoma Group replies that courts in this district have approved artificial litigation groups in the past so long as they submitted a joint declaration like the one it has submitted. Xoma Reply at 3-4.

The PSLRA itself permits groups of persons to serve as a lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). But, in *Cavanaugh*, the Ninth Circuit left open the question of whether the PSLRA permits groups of persons without an existing relationship to aggregate their financial losses to become lead plaintiff. 306 F.3d at 731, n.8; *see also Nicolow*, 2013 WL 792642, at *5 (noting open question). It is true some courts have stated that "[a]lthough the PSLRA allows groups to serve as lead plaintiffs, courts have uniformly refused to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff." *Bodri*, 2016 WL 1718217, at *4 (quoting *In re Netflix, Inc., Sec. Litig.*, No. 12-0225, 2012 WL 1496171, at *4 (N.D. Cal. Apr. 27, 2012)); *see also Bowman v. Legato Sys.*, 195 F.R.D. 655, 658 (N.D. Cal. 2000) ("The [PSLRA] was intended to create a new model for securities fraud litigation, under which the district court would appoint a strong lead plaintiff who would actively manage the litigation on behalf of the class. [] Given this purpose, many district courts have rejected lead plaintiff applications from large, lawyer-solicited aggregations of shareholders or from subsets of such aggregations."); *Arondson v. McKesson*

12

*HBOC, Inc.*, 79 F. Supp. 2d 1146, 1154 (N.D. Cal. 1999) (adopting "[t]he strictest approach [which] forbids aggregation of unrelated plaintiffs, and interprets the term 'group' narrowly as a small number of members that share such an identity of characteristics, distinct from those of almost all other class members, that they can almost be seen as being the same person.").

But even in this district treatment of this aggregation issue has not been uniform. *See Eichenholtz*, 2008 WL 3925289, at *8 ("There is widespread disagreement amongst district courts regarding this issue."). Many courts have found unrelated groups of investors appropriate where the group is small and cohesive and/or where the individual members have demonstrated an ability to effectively work together on behalf of the class. *See, e.g.*, *Johnson v. OCZ Tech. Grp., Inc.*, No. CV 12-05265, 2013 WL 75774, at *3 (N.D. Cal. Jan. 4, 2013) ("Small, cohesive groups similar to the [movant] are routinely appointed as Lead Plaintiff in securities actions when they have shown their ability to manage the litigation effectively in the interests of the class without undue influence of counsel."); *Bruce v. Suntech Power Holdings Co. Ltd.*, No. CV 12-04061, 2012 WL 5927985, at *2 (N.D. Cal. Nov. 13, 2012) ("While a pre-litigation relationship amongst lead plaintiffs is preferred, it is not required."); *Eichenholtz*, 2008 WL 3925289, at *8 ("[T]he court . . . finds that a pre-existing relationship between entities that comprise a group is not required if the resulting group is small and cohesive enough such that it can adequately control and oversee the litigation."); *In re Versata, Inc., Sec. Litig.*, No. 2001 WL 34012374, at **3-6 (N.D. Cal. Aug. 20, 2001) ("A case-by-case approach governed by the rule of reason allows the court both to guard against improper plaintiffs—whether or not they have a pre-litigation relationship—and to select investors who are most willing and able to represent the interests of the class."); *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 586 (N.D. Cal. 1999) (permitting aggregation of unrelated claims where "no single proposed plaintiff [] has purchased in each intra-class period" or "if it can be shown to serve the PSLRA's effort to shift control of the litigation away from the lawyers and to the investors."). Given this clear split in authority, the Court must choose whether to follow the brightline or the "rule of reason" approach regarding aggregation of unrelated claims.

The Court agrees with those who have taken the middle road and applied a reasonableness standard that takes into account the specific circumstances of the case. There is no clear basis in

13

the PSLRA for barring the aggregation of unrelated investors' claims as a matter of law. Although it is true that the PSLRA was designed to preclude lawyer-driven litigation, suggesting hostility to this kind of aggregation, "Congress enacts statutes, not purposes[.]" *Cavanaugh*, 306 F.3d at 731. In the Court's view, it would read too much into the PSLRA's purpose to categorically bar aggregation in this way. Additionally, "[r]equiring a pre-litigation relationship, though appealing in its simplicity, is too rigid; it is not the only way, or necessarily the best way, to ensure that the lead plaintiffs will actively represent the interests of the purported class." *Versata*, 2001 WL 34012374, at *5. "The beneficial characteristics sought in a group with a pre-existing relationship—cohesiveness, an ability to direct litigation, and collective confluence with the interests of the class—can be found in unrelated groups on a case-by-case basis." *Id.* The Court's conclusion is bolstered by the fact that the SEC, the agency that promulgates rules and gives guidance under the PSLRA, has adopted a rule of reason position. *See* Tarzia Opp. at 11-13 (discussing the SEC's litigation position on lead plaintiff claim aggregation).

None of this is to say that the Court will not inquire into "the basis of the group formation" in order to effectuate "the primary purpose of the PSLRA: to eliminate lawyer-driven litigation." *Eichenholtz*, 2008 WL 3925289, at *8. No matter what, "[a] 'group of persons' within the meaning of the Act should, like an institution or single large investor, be able to actively oversee the conduct of the litigation and monitor the effectiveness of counsel." *In re Network Assocs., Inc., Sec. Litig.*, 76 F.Supp.2d 1017, 1026 (N.D. Cal. 1999). But courts have found sufficient cohesiveness among unrelated persons where they are sophisticated investors who can "direct and supervise the activities of counsel to best vindicate the interests of all shareholders." *Johnson*, 2013 WL 75774, at *3.

In this case, there is no dispute that Xoma Group is composed of a married couple and two other unrelated individuals who have no pre-existing litigation relationship with the couple. *See* Xoma Reply at 2. As an initial matter, if the Xoma Group were composed only of the married couple, the Court would aggregate their claims without concern. *See Aronson*, 79 F. Supp. 2d at 1153-54 (stating that family members are the prototypical group with a "meaningful relationship" preceding litigation). Standing on their own, however, the married couple did not incur enough

14

loss to be the presumptive lead plaintiff. For that reason, the Court must determine whether to also aggregate the two other investors' losses. Under the rule of reason approach discussed above, the Court must consider whether Xoma Group made a sufficient showing of sophistication and cohesiveness among its unrelated investor-members to justify a finding of adequacy.

To make that showing, the Xoma Group relies exclusively on a joint declaration from its members that stating that they would actively participate in the litigation and communicate with their counsel. Xoma Joint Decl. ¶¶ 5-6. Apart from these generalities, the declaration says nothing about their level of sophistication, the structure of decision-making in their group, or whether the investors are the true movants as opposed to their counsel. This kind of barebones declaration has been found insufficient in the past. *See Eichenholtz*, 2008 WL 3925289, at *9 ("[T]he declaration does not . . . clarify how the group will tackle the massive coordination and strategic issues that are certain to arise in this litigation. Simply stated, this conclusory declaration has little or no substance."); *cf. Versata*, 2001 WL 34012374 (permitting the aggregation of unrelated investors, which included investment firms and institutional investors, where their declaration showed they were "impressive in their business sophistication" and their "individual desire to take a pro-active role in vigorously representing the class and directing counsel"). Most importantly, it is clear that Xoma Group was "created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel and, as such, are 'groups' of the sort district courts in this circuit and throughout the country look upon with disfavor." *See Eichenholtz*, 2008 WL 3925289, at *9. Accordingly, the Court finds that Xoma Group is not an adequate lead plaintiff.

### D. Typicality and Adequacy of Tarzia

Under *Cavanaugh*, where the presumptive lead plaintiff is found inadequate, courts must then turn to the movant with the next largest financial stake. In this case, that is Tarzia.[6] Tarzia

---

[6] Xoma Group argues that the Court should "look through" the aggregate losses that it asserts and appoint it lead plaintiff if the losses of the married couple and/or the other two unrelated investors are individually greater than Mr. Tarzia's losses. *See Bruce*, 2012 WL 5927985, at * 2 (appointing group of unrelated investors because one of the individuals in the group personally maintained the largest stake); *Hodges v. Akeena Solar, Inc.*, 263 F.R.D. 528, 533 (N.D. Cal. Oct. 21, 2009) ("[I]t is not necessary for the members of [a group] to aggregate themselves in order to overcome the largest stake requirement—one of its members could meet that requirement by herself."). But given that the Court has found Mr. Tarzia's family members' assignments are valid, Mr. Tarzia's

shares largely identical issues of fact and law with the putative class. Xoma Group contends that Tarzia does not satisfy the typicality requirement, however, because he is subject to a unique standing defense because he seeks to represent his absent family members. But as the Court has already explained, Mr. Tarzia does not have a standing problem. For that reason, the Court finds that Tarzia does not suffer from any typicality defects. With respect to adequacy, the Court has no reason to doubt that Tarzia will not fairly represent the putative class's interest in this litigation. For that reason, the Court appoints Tarzia as lead plaintiff in this action.

### D. Appointment of Class Counsel

The final step of the PSLRA procedure is to appoint class counsel. Mr. Tarzia's chosen counsel has submitted its firm resume, demonstrating its experience and success in litigating securities class actions. *See* Dkt. No. 11-5. The Court has no reason to suspect Mr. Tarzia did not engage in arms-length negotiations with their counsel before his selection, nor any reason to suspect that his counsel's interests do not align with the interests of the putative class. In short, Mr. Tarzia appears to have made a reasonable choice of counsel. Accordingly, the Court appoints Tarzia's chosen counsel, Faruqi & Faruqi LLP, as lead counsel in this action.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Tarzia's motion for appointment as lead plaintiff and **APPOINTS** Tarzia lead plaintiff and his counsel, Faruqi & Faruqi LLP as lead counsel. The Court therefore also **DENIES** Xoma Group's motion, **DENIES** the Exarhos' motion, and **DENIES** the Claycomb Group's motion. Additionally, the Court **SETS** a further case management conference for May 24, 2016, at 2:00pm to set a schedule in this case.

**IT IS SO ORDERED.**

Dated: 5/13/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

personal financial stake is larger than the losses of the married couple and each other individual investor in Xoma Group. Even if that were not the case, the Court does not believe the "look through" method would resolve the adequacy issue that defeated Xoma Group's motion.