Barbara A. Rohr SBN 273353
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: brohr@faruqilaw.com

Nadeem Faruqi (*pro hac vice)*
Richard W. Gonnello (*pro hac vice*)
Katherine M. Lenahan (*pro hac vice*)
Sherief Morsy (*pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Ave., 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: nfaruqi@faruqilaw.com
rgonnello@faruqilaw.com
klenahan@faruqilaw.com
smorsy@faruqilaw.com

*Attorneys for Lead Plaintiff Joseph Tarzia*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEPH F. MARKETTE, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>XOMA CORPORATION, JOHN W. VARIAN, and PAUL D. RUBIN,<br><br>Defendants. | Case No. 15-CV-3425 (HSG)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>CLASS ACTION</u>** |

**TABLE OF CONTENTS**


NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 6

THE PARTIES ........ 7

A. The Plaintiff ........ 7

B. The Defendants ........ 7

RELEVANT NON-PARTIES ........ 9

FACTUAL BACKGROUND ........ 10

A. The Company ........ 10

B. Gevokizumab ........ 11

C. Non-Infectious Uveitis ........ 11

D. Behçet's Disease Uveitis ........ 14

E. Existing NIU and BPU Treatments ........ 14

F. Phase 2 of the BPU Trials ........ 23

G. Time To Event Studies ........ 27

1. Censoring ........ 28

2. Kaplan-Meier Curve Analysis ........ 28

3. The Effect Of Censoring On Kaplan-Meier Curves ........ 32

H. XOMA's Phase 3 EYEGUARD Program ........ 33

I. The EYEGUARD-B Trial ........ 34

J. XOMA's Fraudulent Scheme To Pump The Blinded EYEGUARD-B Data ........ 36

1. The Reclassifications ........ 37

2. Defendants Hype Blinded Data Pattern ........ 39

FALSE AND MISLEADING CLASS PERIOD STATEMENTS ........ 39

POST CLASS PERIOD STATEMENTS AND EVENTS ........ 45

ADDITIONAL SCIENTER ALLEGATIONS ........ 48

A. Core Operations ........ 49

B. Concealment ........ 51

C. Defendants Were Aware of And Had Access To Facts Undermining Their Statements ........ 53

D. Education, Experience, and Training of the Individual Defendants ........ 54

E. XOMA's Cash Position ........ 55

F. Insider Selling ........ 57

G. Former Employees ........ 63

CLASS ACTION ALLEGATIONS ........ 63

LOSS CAUSATION ........ 65

CONTROL PERSON LIABILITY ........ 66

APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE ........ 67

THE AFFILIATED UTE PRESUMPTION ........ 68

NO SAFE HARBOR ........ 69

CAUSES OF ACTION ........ 70

PRAYER FOR RELIEF ........ 73

JURY TRIAL DEMAND ........ 74

The allegations in this Amended Class Action Complaint[1] are based on the personal knowledge of Lead Plaintiff Joseph Tarzia ("**Plaintiff**") as to Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Plaintiff's information and belief is based upon the investigation by Plaintiff's counsel into the facts and circumstances alleged herein, including: (i) review and analysis of those public filings XOMA Corporation ("**XOMA**" or the "**Company**") made with the United States Securities and Exchange Commission ("**SEC**") referenced herein; (ii) review and analysis of those press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning XOMA and the other defendants named herein (together with XOMA, the "**Defendants**"); (iii) review and analysis of those Company conference calls, press conferences, and related statements and materials referenced herein; and (iv) review and analysis of those other documents referenced herein. Many additional facts supporting the allegations are known only to Defendants and/or are within their exclusive custody or control and/or in the custody or control of the U.S. Food and Drug Administration ("**FDA**"), the European Medicines Agency ("**EMA**"), or with XOMA's drug development partner, Les Laboratoires Servier and/or Institut de Rescherches Servier (collectively "**Servier**"). Plaintiff believes that additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## NATURE OF THE ACTION

1. Plaintiff brings this federal class action on behalf of all persons or entities who purchased XOMA common stock at artificially inflated prices between November 6, 2014 and July 21, 2015, inclusive (the "**Class Period**"), and were damaged thereby, and seeks to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"), and Rule 10b-5 promulgated thereunder.

[1] Attached hereto as Exhibits 1 & 2, are a Table of Defined Terms and Glossary, respectively. All internal citations and quotations are omitted, and all emphases are added unless otherwise noted.

2. XOMA is a thirty-five year-old so-called "zombie" biopharmaceutical company, which to date has burned through over $1 billion in investor funding without ever successfully bringing a drug to market. XOMA's recent efforts focused on its failed development of gevokizumab, a compound that XOMA believed exhibited anti-inflammatory properties. Gevokizumab was repeatedly referred to by Defendants as XOMA's "first, second, and third priority."

3. The primary focus of XOMA's gevokizumab development efforts was a series of clinical trials known as the EYEGUARD™ program ("**EYEGUARD**"). The EYEGUARD trials aimed to establish gevokizumab's efficacy in treating non-infectious[2] uveitis ("**NIU**"), a group of inflammatory eye diseases that produce swelling in the eyes and can cause decreased visual acuity and blindness. NIU can be caused by, *inter alia*, Behçet's disease. NIU caused by Behçet's disease is known as Behçet's disease uveitis ("**BU**").

4. Uveitis disrupts vision primarily by causing problems with the lens, retina, optic nerve, and vitreous. *See* Facts about Uveitis, National Eye Institute, https://nei.nih.gov/health/uveitis/uveitis. Uveitis can manifest in the anterior or posterior portions of the eye, or throughout the entire eye (a/k/a panuveitis). *See id.*

5. XOMA projected high hopes for gevokizumab's ability to treat NIU. As part of its overall strategy, XOMA initially planned to file a Biologic License Application[3] ("**BLA**") with the FDA for permission to market gevokizumab in Behçet's disease posterior uveitis[4] ("**BPU**"), a rare form of NIU that XOMA believed the FDA would look at more favorably because of its eligibility

---

[2] Infectious uveitis (*i.e.*, uveitis caused by infections) also exists but is irrelevant to this cause.

[3] A BLA is a request for permission from the FDA to market a biologic product. *See* 21 C.F.R. § 601.2

[4] Since panuveitis, or uveitis of all major parts of the eye, necessarily involves inflammation of the posterior segment of the eye (*See* Facts about Uveitis, National Eye Institute, https://nei.nih.gov/health/uveitis/uveitis (last visited July 8, 2016)), the term BPU as used herein shall encompass both Behçet's disease posterior uveitis and panuveitis.

for an **Orphan Drug Designation**.[5] Thereafter, XOMA intended to submit a supplemental BLA filing to obtain FDA approval for gevokizumab to treat the broader NIU indication assuming a successful BLA for treatment in BPU.

6. XOMA partnered with Servier to develop gevokizumab for use by those with NIU and BU. XOMA and Servier launched and completed proof-of-concept gevokizumab trials in BPU in 2010 and 2011. In 2012, XOMA initiated the EYEGUARD studies. EYEGUARD-A and EYEGUARD-C studied gevokizumab's effect in treating NIU. Critically, XOMA and Servier designed and initiated EYEGUARD-B (the "**Trial**"), a double-blind[6] time-to-event ("**TTE**") study in BPU patients that was designed to measure gevokizumab's efficacy in delaying BPU exacerbations, *i.e.*, a worsening of symptoms as defined by the Trial's protocol ("**Exacerbation(s)**").

---

[5] Orphan Drug Designation is a special status granted by the FDA to a drug or biological product to treat a rare disease or condition upon request of a sponsor. *See* FDA, *Designating an Orphan Product: Drugs and Biological* Products, http://www.fda.gov/forindustry/developingproductsforrarediseasesconditions/howtoapplyfororphanproductdesignation/default.htm (last visited July 8, 2016). In order to qualify for this status, a drug or biologic must be "intended for the safe and effective treatment, diagnosis or prevention of rare diseases/disorders that affect fewer than 200,000 people in the U.S., or that affect more than 200,000 persons but [sponsors] are not expected to recover the costs of developing and marketing a treatment drug." FDA, *Developing Products for Rare Diseases & Conditions*, http://www.fda.gov/ForIndustry/DevelopingProductsforRareDiseasesConditions/ucm2005525.htm (last visited July 8, 2016). The incentives for Orphan Drug Designation include (1) 7-year marketing exclusivity, (2) tax credits (up to 50% of clinical development costs, (3) waiver of application filing fees, and (4) assistance during the development process. *See* Mathew T. Thomas, MD, FDA, Office of Orphan Products Development, *The Orphan Drug Act and the Development of Products for Rare Diseases*, *available at* https://rarediseases.info.nih.gov/files/fda%20orphan%20drugs.pdf Drugs (last visited July 8, 2016).

[6] A double-blind study, or double-masked study, is a type of study where "two or more parties involved in the clinical trial do not know which participants have been assigned which interventions. Typically, the parties include the investigator and participants." *See* Clinicaltrials.gov, Glossary of Common Site Terms, https://clinicaltrials.gov/ct2/about-studies/glossary (last visited July 8, 2016).

7. The Trial divided patients into two cohorts: (1) those who received corticosteroids (*i.e.*, prednisone), the dosage of which was tapered to 5 mg/day while remaining on a constant dosage of ***at least 1*** ***additional immunosuppressant*** (“**Standard Therapies**”) plus subcutaneous injections of a placebo (the “**Standard Therapy Group**:); and (2) those who received Standard Therapies plus subcutaneous injections of gevokizumab (the “**Gevokizumab Group**”). The Trial measured gevokizumab’s efficacy by measuring the relative relapse rates between the Gevokizumab Group and the Standard Therapy Group. In other words, the Trial was designed to test whether gevokizumab was superior to a placebo ***on top of the current standard of care***.

8. The unblinding of the Trial (the “**Unblinding**”) was to be triggered by the occurrence of the 29th[7] Exacerbation (the “**Unblinding Event**”), at which time the Trial would be unblinded and the data would be analyzed. Defendants initially told investors that they expected the Unblinding Event to occur in June 2014. By November, however, the event had yet to occur.

9. As investors were growing anxious, Defendants held a conference call on November 6, 2014, the first day of the Class Period to address the reason for the delay. This call marked the beginning of a process whereby Defendants intentionally misled investors about the reasons for the delay, and misrepresented that the ***blinded*** Trial data they possessed indicated that the Trial’s results would be positive.

10. First, Defendants explained that some of the Exacerbations previously counted towards the number needed to reach the Unblinding Event had to be reclassified (the “**Reclassifications**”) as “rescues” because those patients received rescue therapy (*i.e.*, steroid or immunosuppressant doses outside of the protocol’s specifications to treat their symptoms) prior to experiencing an Exacerbation (the “**Rescues**”). Defendants concealed the fact that the number of Rescues was significant and repeatedly tried to pass the Rescues off as immaterial to the Trial’s success due to the TTE nature of the Trial. As explained in further detail below, however, while no longer classified as Exacerbations for the purpose of determining the Unblinding Event, the

[7] During the Class Period, Defendants refused to reveal the number of Exacerbations required to unblind the data. This information was only disclosed after the Class Period.

Rescues would nonetheless impact the ultimate results of the Trial. Furthermore, the large number of Rescues rendered the trial less likely to succeed because the FDA would treat all rescued patients as if they had Exacerbated.

11. Second, Defendants attributed the delay of the Unblinding Event to a reduction in the rate of Exacerbations (the "**Slowdown**") rather than the significant number of unplanned Rescues. Defendants told investors that (1) most Exacerbations occurred during the first three months of enrollment (the "**Relapsers**"); and (2) a sizeable group of patients had not yet exacerbated after 6-9 months of enrollment (the "**Survivors**"). Defendants spun this dichotomy of exacerbations (the "**Exacerbation Pattern**") as "encouraging" and the kind of pattern one would expect to see if gevokizumab was "***an active drug***," despite the fact that the Exacerbation Pattern was in no way indicative of gevokizumab's efficacy.

12. After the Class Period, XOMA shocked the market by revealing that gevokizumab failed to demonstrate any efficacy in treating BPU. In response, XOMA's common stock price dropped $3.48 per share, or more than 79%, from a closing price of $4.39 on July 21, 2015 to open on July 22, 2015 at $0.91 per share on heavy trading volume. XOMA eventually abandoned the EYEGUARD program and further gevokizumab development— but long after insiders had cashed out.

13. The true facts, which were known and/or recklessly disregarded by Defendants but concealed from the investing public during the Class Period, were as follows:

a) The Exacerbation Pattern was not "encouraging" or in any way indicative of gevokizumab's efficacy without knowledge of which patients were in the Standard Therapy Group and which patients were in the Gevokizumab Group (¶¶71-80);

b) Biologically active (*i.e.*, effective) drugs could have exacerbation patterns vastly different than the Exacerbation Pattern given the nature of the EYEGUARD-B's TTE Trial, which was essentially a comparison of the relative relapse rates between the Gevokizumab Group and the Standard Therapy Group (¶¶71-80);

c) Defendants lacked a material factual basis for stating and/or implying that the Exacerbation Pattern was somehow indicative of gevokizumab's efficacy, as confirmed by Defendants' subsequent admission after the Class Period that Defendants possessed a "paucity of actual data in the Behçet's disease uveitis population, in general, ***especially as it relates to response to therapy***" (¶105), the fact that patients in the Standard Therapy Group were on therapies that often led to significant periods of remission and in fact initially controlled each patient's BPU (¶¶84, 39-62), the fact that the Standard Therapies had the potential to cause or contribute to the Exacerbation Pattern (¶¶39-62), and the fact that XOMA's Phase 2 data contained evidence that patients had significant periods of remission on Standard Therapies (¶70);

d) A large number of Rescues occurred that rendered the trial less likely to succeed given that the Rescues were due to medically relevant exacerbations that would weigh against gevokizumab's efficacy in the sensitivity analyses that XOMA and the FDA would perform in connection with the Trial's results, and therefore materially decreased the likelihood of a successful outcome (¶¶90-96); and

e) As a result of the aforementioned misrepresentations and/or omissions, XOMA's business and financial prospects concerning gevokizumab were worse than what the speakers had led the market to believe they were.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock when the true facts were revealed, Plaintiff and other Class Members have suffered significant damages.

## JURISDICTION AND VENUE

15. This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) & 78t(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). XOMA maintains its principal place of business in this District. Certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in this District.

18. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**THE PARTIES**

**A. The Plaintiff**

19. Lead Plaintiff Joseph Tarzia, individually and as assignee of his family's claims, as set forth in his shareholder certification (ECF No. 11-3) and declarations previously submitted to the Court (ECF Nos. 58-63), purchased XOMA common stock at artificially inflated prices during the Class Period and was thereby damaged when the truth was revealed.

**B. The Defendants**

20. Defendant XOMA is a Delaware corporation with its principal executive offices located at 2910 Seventh Street, Berkeley, California 94710. XOMA is a biotechnological company that focused on the development of gevokizumab to treat NIU and BPU. During the Class Period, the Company's stock was traded on the NASDAQ Global Select Market ("**NASDAQ**") under the symbol "XOMA."

21. Defendant John Varian ("**Varian**") was at all relevant times the Chief Executive Officer ("**CEO**") and a Director of XOMA. Because of his positions with the Company, Varian had access to all the Company's study protocols, patient data, updates, outcomes, and results. Varian directly participated in and controlled the management of the Company, including, without limitation, the publication of statements by and on behalf of XOMA concerning gevokizumab in the Company's press releases, SEC filings, and other public statements. Varian personally sold at

least 82,630 shares of XOMA common stock during the Class Period, receiving over $315,400 in proceeds.

22. Defendant Paul Rubin ("**Rubin**") was at all relevant times the Chief Medical Officer ("**CMO**") of XOMA. Because of his position with the Company, Rubin had access to all the Company's study protocols, patient data, updates, outcomes, and results. Rubin directly participated in and controlled the management of the Company, including, without limitation, the publication of statements by and on behalf of XOMA concerning gevokizumab in the Company's press releases, SEC filings, and other public statements. Rubin personally sold at least 79,530 shares of XOMA common stock during the Class Period, receiving over $340,464 in proceeds.

23. Defendant Kelvin M. Neu ("**Neu**") served as Managing Director of non-party Baker Bros. Advisors LLC, a Delaware limited liability company, which acquired and beneficially owned approximately 30.57% of XOMA's outstanding common stock on March 28, 2012, and, at the end of the Class Period, held only 18% of XOMA's outstanding common stock. *See* XOMA Corporation, Proxy Statement (Schedule 14A), at 3 (dated Apr. 10, 2015). Defendant Neu became a member of the board on July 19, 2012 before forgoing reelection on May 20, 2015. Neu was motivated to maximize the Baker Bros. XOMA investment, and as a result, Baker Bros. sold at least 8,362,772 shares of XOMA common stock during the Class Period, for total proceeds of approximately $35,782,615.95.

24. Defendants Varian, Rubin, and Neu are collectively referred to hereinafter as the "**Individual Defendants**" and, together with XOMA, they are referred to herein as the "**Defendants**."

25. The Individual Defendants, because of their positions with the Company, possessed the authority to control, correct, and/or update the contents of XOMA's public disclosures to the market. Each of the Individual Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts relating to the Company's financial results and operations. The Individual Defendants further had the duty to correct and/or update any previously issued statements that were untrue or became materially misleading or untrue, so that

the market price of the Company's publicly traded common stock would be based upon truthful, complete, and accurate information. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the Company's financial results and operations. By virtue of such duties, these officers and directors were required, *inter alia*, to:

a) conduct and supervise the business of XOMA in accordance with federal laws;

b) supervise the preparation of XOMA's SEC filings and approve any reports concerning XOMA's financial reporting and results; and

c) ensure that XOMA established and followed adequate internal controls.

26. As officers, directors, and/or controlling persons of a publicly-held company which is registered with the SEC under the federal securities laws and the securities of which were traded on the NASDAQ GM and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to (1) promptly disseminate complete, accurate and truthful information with respect to the Company's financial statements and operations; (2) correct any previously issued statements that were materially misleading or untrue so that the market could accurately price the Company's publicly traded securities based upon truthful, accurate, and complete information; and (3) update any previously-issued forward-looking statements that became materially misleading or untrue so that the market could accurately price the Company's publicly traded stock based upon truthful, accurate, and complete information.

27. The Individual Defendants are each primarily liable for the misrepresentations and misleading statements alleged herein and are also liable as controlling persons of XOMA. The scheme deceived the investing public regarding XOMA's EYEGUARD-B Trial, which caused Plaintiff and other members of the Class to purchase XOMA common stock at artificially inflated prices during the Class Period and suffer damages when the truth was revealed.

**RELEVANT NON-PARTIES**

28. Servier is a pharmaceutical research and development company founded in 1954 and based primarily in France. *See* Servier, *Servier Group – Legal structure and governance*,

http://www.servier.com/content/legal-structure-and-governance (last visited July 8, 2016). On January 4, 2011, XOMA and Servier publicly announced their collaboration on gevokizumab's research and development. *See* Press Release, *XOMA and Servier Sign Development and Commercialization Agreement for XOMA 052*, http://investors.xoma.com/releasedetail.cfm?ReleaseID=541243 (Jan. 4, 2011). Under their collaboration agreement, Servier would receive the non-U.S. and non-Japan development and commercialization rights to BU. *See id.* During the Class Period, Servier helped XOMA conduct the EYEGUARD-B trial.

29. Baker Bros. Advisors, LLC is a privately-owned hedge fund based in New York, NY. *See* Bloomberg, *Company Overview of Baker Bros. Advisors, LLC*, http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=26916626 (last visited July 8, 2016). During the Class Period, Baker Bros. Advisors, LLC beneficially owned and/or sold shares through the following affiliated individuals and organizations: (1) Felix Baker, (2) Julian Baker, (3) 667, L.P., (4) Baker Bros Life Sciences LP, and (5) Baker Bros. Advisors (GP) LLC, (collectively, "**Baker Bros.**"). *See* XOMA Corporation, Statement Of Changes In Beneficial Ownership (Form 4) (dated May 27, 2014). Baker Bros. beneficially owned approximately 30.57% of XOMA's outstanding common stock on March 28, 2012 (XOMA Corporation, Current Report (Form 8-K), 2 (dated July 19, 2012)); after selling stock during the Class Period, Baker Bros. ownership of outstanding common stock fell from 30.57% to 18.00%. *See* XOMA Corporation, Proxy Statement (Schedule 14A), at 3 (dated Apr. 10, 2015).

## FACTUAL BACKGROUND

### A. The Company

30. XOMA is a biotechnology company which focused on developing gevokizumab for commercial use. *See* Press Release, *XOMA Announces Servier Has Initiated Phase 3 Gevokizumab Trial in Patients With Behcet's Uveitis*, http://investors.xoma.com/releasedetail.cfm?ReleaseID=709899 (Sept. 27, 2012) ("**Sept. 27, 2012 Press Release**"). XOMA was founded in 1981 by non-party Patrick J. Scannon ("**Scannon**"), and

in the 35 years since its inception has never brought a drug of its own to market. *See* Andrew Pollack, New York Times, *It's Alive! Meet One of Biotech's Zombies*, *available at* http://www.nytimes.com/2007/02/11/business/yourmoney/11xoma.html (Feb. 11, 2007). To date, the Company has lost more than $1 billion futilely experimenting with a myriad of drugs and indications. *See* Ron Leuty, San Francisco Bus. Times, *Biotech Zombie Xoma Plods Toward Its Next Target*, *available at* http://www.bizjournals.com/sanfrancisco/blog/biotech/2016/03/xoma-gevokizumab-layoffs-berkeley-biotech.html (Mar. 10, 2016).

**B. Gevokizumab**

31. XOMA's lead product candidate during the Class Period was gevokizumab, a/k/a XOMA-052, a humanized monoclonal antibody with the potential to treat a wide variety of inflammatory diseases. XOMA, Pipeline: Gevokizumab, http://www.xoma.com/content/pipeline/gevokizumab.htm (last visited July 8, 2016). Gevokizumab works by binding to IL-1 beta, a proinflammatory cytokine. *Id.* By binding to IL-1 beta, gevokizumab modulates the activation of the IL-1 receptor, thereby preventing the cellular signaling events that produce inflammation. *Id.* According to the Defendants, gevokizumab was XOMA's "first, second, and third priority." XOMA Corporation, Q4 2014 Earnings Call, Bloomberg Tr., at 5 (Mar. 11, 2015) ("**March 11, 2015 Call**").

32. The primary focus of XOMA's gevokizumab development efforts was a series of Phase 3[8] clinical trials known as the EYEGUARD trials. These trials aimed to prove gevokizumab's efficacy in treating NIU and BPU. XOMA Corporation, Annual Report (Form 10-K), at 1 (dated Mar. 12, 2014).

**C. Non-Infectious Uveitis**

33. "Uveitis is a general term describing a group of inflammatory diseases that produce swelling and destroy eye tissues." Facts about Uveitis, National Eye Institute,

---

[8] Phase 3 trials provide the critical documentation of effectiveness and important additional safety data required for licensing. *See* FDA, *Step 3: Clinical Research*, http://www.fda.gov/ForPatients/Approvals/Drugs/ucm405622.htm (last visited July 8, 2016).

https://nei.nih.gov/health/uveitis/uveitis (last visited July 8, 2016). Uveitis disrupts vision primarily by causing problems with the lens, retina, optic nerve, and vitreous. *Id.* The diseases that cause the inflammatory responses inside the eye most often affect the uvea, the middle layer of the eye which contains many of the eye's blood vessels. *Id.* The uvea is located between the sclera, the white of the eye, and the retina, the eye's inner layer. *Id.* The uvea contains three parts: (1) the iris—the colored part of the eye; (2) the choroid layer, which consists of the blood vessels and connective tissue between the sclera and the retina and provides nutrients to the retina; and (3) the ciliary body, which secretes the transparent liquid within the eye, controls the shape of the lens, and provides nutrients to keep the lens healthy. *Id.* For ease of reference, an illustration is provided below:




34. Uveitis most often affects people between the ages of 20 and 60 (*id.*) and is one of the leading causes of blindness (*see* What are the Types of Uveitis? Prevent Blindness.org, http://www.preventblindness.org/Uveitis (last visited July 8, 2016)). Uveitis is often grouped into the following types, depending on the part of the uvea affected:

- **Anterior uveitis**: The most common form of uveitis (accounting for 40-70% of all cases); it affects the front of the eye and is often called iritis. It is often of unknown etiology, acute, and associated with eye pain, light sensitivity, and redness.
- **Intermediate uveitis**: The least common form of uveitis (accounting for 7-15% of all cases); it is an inflammation of the ciliary body, the front end of the retina, and the vitreous. Symptoms include dark, floating spots, and blurred vision.
- **Posterior uveitis**: It is the inflammation of the choroid, retina, and optic nerve. It is seen in 15-22% of uveitis types. It is often chronic, recurrent, and affects both eyes.
- **Panuveitis**: It is inflammation of the entire uvea. Panuveitis sufferers are more likely to experience vision loss. Symptoms include dark floating spots, blurred vision, or loss of vision.

*Id.* Symptoms of uveitis include the following in one or both eyes: vision changes; dark, floating spots ("floaters"); eye pain; eye redness; light sensitivity; and swelling. *See* Noninfectious Uveitis, WebMD, http://www.webmd.com/eye-health/noninfectious-uveitis. Eye exams used to detect uveitis include the following: an eye chart or visual acuity test, which measures whether vision has decreased; a funduscopic exam, in which the pupils are dilated with eye drops, after which an ophthalmoscope is used to shine a light into the eye to allow for a noninvasive inspection of the inside of the eye; ocular pressure exam, in which an instrument is used to measure the pressure inside the eye; slit lamp exam, in which the eye is inspected noninvasively, often with fluorescein, a dye that makes the blood vessels easier to see. *Id.*

35. Uveitis comes in two varities: infectious or noninfectious. Infectious uveitis is caused by bacteria or a virus. *Id.* NIU is not caused by an infection, but rather by a multitude of factors. *Id.* For example, NIU can be caused by an eye injury or a disease elsewhere in the body, such as Behçet's disease. *Id.*

**D. Behçet's Disease Uveitis**

36. XOMA, along with Servier, developed gevokizumab to treat NIU and BPU. *See* Sept. 27, 2012 Press Release. Behçet's disease is a rare, noncontagious, autoinflammatory disorder of unknown cause. *See* Behçet's Disease, American Behçet's Disease Association, http://www.behcets.com/site/c.8oIJJRPsGcISF/b.9196317/k.904C/Behcets_Disease.htm. It is known as the "Silk Road" disease, as its prevalence is highest in the eastern Mediterranean, the Middle East, and East Asia, with the highest prevalence in Turkey. *Id.* It tends to develop in people in their 20's and 30's. *Id.* There are approximately 16,000-20,000 cases in the U.S. *Id.*

37. Behçet's disease has a chronic course and is characterized by recurrent acute exacerbations (a sudden worsening of symptoms) including uveitis, oral ulcers, genital ulcers, and skin lesions, as well as lesions affecting the large vessels, gastrointestinal tract, and central nervous and respiratory systems. Ex. 3, Ilknur Tual-Tutkun MD, *et al*., *Safety and Efficacy of Gevokizumab in patients with Behçet's Disease Uveitis: Results of an Exploratory Phase 2 Study*, Ocular Immunology & Inflammation, at 2 (pub. online Jan. 30, 2016) ("**Servier Phase 2 Results**"). BU and BPU are, "relapsing disease[s] [with] great variability in the recurrence rate of individual exacerbations." *Id.* at 8.

38. Approximately half of Behçet's disease patients develop uveitis, typically affecting the anterior or posterior segments of the eye. Ex. 4, Ahmet Gul, *et al*., *Interleukin-1B-regulating antibody XOMA 052 (gevokizumab) in the treatment of acute exacerbations of resistant uveitis of Behçet's disease: An open-label pilot study*, Ann Rheum Dis., at 563 (pub. online Feb. 9, 2012) ("**Xoma Phase 2 Results**"). Uveitis in Behçet's patients in the posterior segment of the eye, or BPU, leads to blindness in approximately 25% of cases. Ex. 3, Servier Phase 2 Results, at 1.

**E. Existing NIU and BPU Treatments**

39. The goal of BPU therapy "is to treat the acute disease, but perhaps even more important is to prevent or at least to decrease the number of repetitive ocular inflammatory episodes of [the] posterior" segment of the eye. C. Stephen Foster & Albert T. Vitale, *Diagnosis & Treatment of Uveitis* ("**Diagnosis & Treatment**"), at 870 (2d ed. 2013).

40. There is no FDA-approved treatment for BU in the United States. *See* Treatment, American Behçet's Disease Association, http://www.behcets.com/site/c.8oIJJRPsGcISF/b.9145379/k.FED2/Treatment.htm. While numerous treatments have been tried in BU with varying success, evaluation of these treatments is difficult due to the "unpredictable and intermittent course of the symptoms." Diagnosis & Treatment, at 870. Indeed, BU is relapsing and remitting, meaning that "[s]udden onset of uveitis attacks and spontaneous resolution of acute inflammatory signs are the rule." Esen Karamursel Akpek, M.D., Uveitis.org, *Behcet's Disease: An Overview* ("**Akpek Overview**"), at 3, available at http://www.uveitis.org/docs/dm/adamantiades_behcets_disease.pdf.

41. To further complicate matters, the length of time that a patient has had Behçet's disease is also relevant to the frequency of exacerbations, as remissions and exacerbations of Behçet's disease "'burn out' after approximately 10 years of activity." Akpek Overview, at 1. "Both the onset of eye disease and its greatest damage were also usually within the first few years of disease onset. These suggest that the disease burden of Behçet syndrome is usually confined to the early years of its course, and in many patients the syndrome 'burns out'." Kural-Seyahi E. *et al.*, *The Long-Term Mortality and Morbidy of Behcet Syndrome: a 2-decade outcome survey of 387 patients followed at a dedicated center*, 82 Medicine (Baltimore) 60, 60 (Jan. 2003), *available at* http://journals.lww.com/md-journal/pages/articleviewer.aspx?year= 2003&issue=01000&article=00006&type=abstract. Thus, a patient who has had BU for over 10 years would be less likely to suffer exacerbations than a patient who had suffered from the disease for less time.

42. Moreover, the treatment of BU depends on a variety of factors, including the type of uveitis involved, the severity of the symptoms, the patient's country of origin, the patient's age and sex, and the treating physician's preference. *See* G Hatemi et al., *Management of Behcet disease: a systematic literature review for the European League Against Rheumatism evidence-based recommendations for the management of Behcet disease*, 68 Annals of Rheumatic Diseases 1528, 1528 (2009) ("**Management of BD**"); Ilknur Tugal-Tutkun, MD, *Behcet's Uveitis* at 5-6, 16

Middle East African J. of Ophthalmology 219 ("**MEAJO Article**"), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2855662/ (noting that the different health care systems and economic status of different countries may limit a physician's treatment choices); Diagnosis and Treatment, at 870 (Generally, "treatment [of BU] should be more aggressive whenever the following are present: complete [Behçet's disease], involvement of the [central nervous system], vascular involvement, retinal and bilateral involvement, male sex, and a geographic origin in the Mediterranean basin or Far East."). Male patients and those with early onset disease require more aggressive treatment. Erkan Alpsoy, *New Evidence-Based Treatment Approach in Behcet's Disease*, 2012 Pathology Research International, at 1, 2 (Aug. 1, 2011).

43. The most common manifestations of BU are anterior or posterior uveitis, which "have significantly different therapeutic implications." Ex. 5, Ellison L Smith, MD & Yusuf Yazici, MD, *Treatment of Behcet's syndrome* at 2 ("**Smith & Yazici**"), UpToDate, https://www.uptodate.com/contents/treatment-of-behcetssyndrome?to…et%27s+uveitis&selectedTitle=1%7E150&view=print&displayedView=full.

44. Anterior uveitis is treated with topical corticosteroids, or corticosteroids applied directly to the eye via drops or injections. *See* Susan Wittenberg, MD, Am. Acad. of Ophthalmology, *10 Clinical Pearls for Treating Uveitis*, http://www.aao.org/young-ophthalmologists/yo-info/article/10-clinical-pearls-treating-uveitis (Aug. 1, 2008). Anterior uveitis may also resolve itself spontaneously over 2-3 weeks without treatment. *See* Diagnosis & Treatment, at 864.

45. BPU, by contrast, "constitutes a serious threat to vision and requires intensive immunosuppression." Ex. 5, Smith & Yazici, at 9. Immunosuppressants "reduce[] the activity of the immune system, which in turn interrupts the inflammation process that causes most of the symptoms of Behçet's disease." NHS Choices, Behçet's disease – Treatment, http://www.nhs.uk/Conditions/Behcets-disease/Pages/Treatment.aspx (last visited July 8, 2016).

46. For patients suffering from BPU, treatment with high-dose prednisone, a common corticosteroid, is often initiated as soon as possible, in combination with noncorticosteroid

immunosuppressive drugs. Ex. 5, Smith & Yazici, at 10; Akpek Overview, at 7. While systemic corticosteroids, such as prednisone, help reduce the acute inflammation of BPU, disease activity tends to recur or progress if they are used without other immunosuppressive therapy. Ex. 5, Smith & Yazici, at 10. The prednisone dosage is then gradually tapered. Akpek Overview, at 2. Through this regimen, patients benefit from prednisone's rapid suppression of the inflammation, while the noncorticosteroid immunosuppressant is given time to be fully effective. Akpek Overview, at 2; *see also* Diagnosis & Treatment, at 870.

47. Steroid tapering is recommended because corticosteroid usage has several harmful side-effects, including: diabetes, osteoporosis, hypertension, gastritis, depression, insomnia, weight gain, facial distortion, aseptic necrosis of the hip, skin thinning, glaucoma, and cataracts. *See* Ex. 6, Douglas A. Jabs, MD et al., *Guidelines for the Use of Immunosuppressive Drugs in Patients with Ocular Inflammatory Disorders: Recommendations of an Expert Panel*, Am. J. of Ophthalmology at 493 (Elsevier Science Inc. 2000) ("**Jabs Guideline**") at 494; *see also* Gabrielle Weiner, *Savvy Steroid Use- American Academy of Opthalmology*, http://www.aao.org/eyenet/article/savvy%ADsteroid%ADuse1/16 (last visited June 10, 2016). According to the Jabs Guideline, oral corticosteroids should be tapered "[a]fter a satisfactory anti-inflammatory response." Ex. 6, Jabs Guideline at 494. The Jabs Guideline provides the following suggestions for tapering prednisone for ocular inflammation:

**TABLE 2.** Suggested Guidelines for the Use of Prednisone for Chronic Ocular Inflammation

| Parameter | Suggested Guideline |
|---|---|
| Initial dose | 1 mg/kg/day* |
| Maximum adult oral dose | 60–80 mg/day |
| Maintenance dose (adult) | ≤10 mg/day |
| Tapering schedule | Over 40 mg/day, decrease by 10 mg/day every 1–2 weeks |
| | 40–20 mg/day, decrease by 5 mg/day every 1–2 weeks |
| | 20–10 mg/day, decrease by 2.5 mg/day every 1–2 weeks |
| | 10–0 mg/day, decrease by 1 to 2.5 mg/day every 1–4 weeks |
| Monitor | Blood pressure, weight, glucose every 3 months |
| | Lipids (cholesterol and triglycerides) annually |
| | Bone density within first 3 months and annually thereafter |
| Supplemental treatment | Calcium 1500 mg daily and vitamin D 800 IU daily |
| | Estrogens and antiresorpative agents as needed |

*In selected situations, where an immediate effect is needed, some investigators will begin with intravenous methylprednisolone at a dosage of 1 gm/day for 3 days and then start oral prednisone.

*See id.* at 494 (red box added for emphasis). This was the prednisone tapering schedule used in the EYEGUARD-B Trial. *See* XOMA Corporation, Q3 2014 Earnings Call, FD (Fair Disclosure) Wire Tr., at 5 (Nov. 6, 2014) ("**November 6, 2014 Call**").

48. As shown in the table above, a "maintenance dose" of prednisone for patients with chronic ocular inflammation is ≤ 10 mg/day. *Id.* A maintenance dose is the "amount of a medication administered to maintain a desired level of the medication in the blood." Medical Dictionary, The Free Dictionary, *Dose*, http://medical dictionary.thefreedictionary.com/dose (last visited July 6, 2016).

49. According to Dr. Russell Van Gelder, the Chair of the University of Washington's Department of Ophthalmology, methotrexate, azathioprine, MMF, and cyclosporine "[a]ll of the drugs show roughly the same efficacy—about 60% to 70%—for [] achieving steroid-sparing dose of less than 10 mg prednisone daily" for the treatment of uveitis. Lynda Charters, *Future of uveitis therapy takes shape with new treatments*, Opthalmology Times (July 1, 2014),

http://ophthalmologytimes.modernmedicine.com/ophthalmologytimes/content/tags/alcon-laboratories/future-uveitis-therapy-takes-shape-new-treatments?page=full.

50. One conventional immunosuppressive therapy for BPU consists of prednisone with the noncorticosteroid immunosuppressants cyclosporine and azathioprine or oral methotrexate. Diagnosis & Treatment, at 874. Additional noncorticosteroid immunosuppressants used to treat BPU include chlorambucil, cyclophosphamide, and mycophenolate mofetil ("**MMF**"). *See* Diagnosis & Treatment, at 870-73. For example, all of the patients enrolled in Servier's Phase 2 study of gevokizumab had a history of BPU and received a stable regimen of oral corticosteroids plus at least one of azathioprine, cyclosporine, MMF, or methotrexate. Servier's Phase 2 Study at 2-3.

51. Several of the noncorticosteroid immunosuppressant drugs described above have been shown to sustain remission of BPU when used alone or in combination with another noncorticosteroid immunosuppressant or prednisone. Ex. 5, Smith & Yazici, at 9-10. In certain cases, low-dose corticosteroids at a dose of ≤ 10 milligrams along with a noncorticosteroid immunosuppressant, can control BPU. *See* Diagnosis & Treatment, at 870.

52. In fact, a number of studies have demonstrated that noncorticosteroid immunosuppressant drugs can be used as a monotherapy; for example, cyclosporine at 10 milligrams/kilogram/day. *See id.* at 872.

53. Doctors have also successfully used a combination of cyclosporine and azathioprine "as a steroid-sparing[9] strategy in the treatment of [BU]." *Id.* at 873. For example, comparative trials have shown that azathioprine and cyclosporine are effective at preventing BU flare-ups. According to a study co-authored by Dr. Ilknur Tugal-Tutkun, ***one of the authors of Xoma's Phase 2 Results and Servier's Phase 2 Results*** (*see* Exhs. 3 & 4), "[t]he combination of azathioprine and cyclosporine is more effective than is monotherapy with either agent, and combination therapy is

[9] "Steroid-sparing" means that the drug is given to reduce or eliminate the need for steroids. The Johns Hopkins Lupus Center, *Immunosuppressive Medications*, http://www.hopkinslupus.org/lupus-treatment/lupus-medications/immunosuppressive-medications/ (last visited July 8, 2016).

used as an intensive immunosuppressive regimen for the treatment of patients with severe Behçet's uveitis." Ilknur Tugal-Tutkun, MD, *et al.*, *Efficacy of infliximab in the treatment of uveitis that is resistant to treatment with the combination of azathioprine, cyclosporine, and corticosteroids in Behçet's disease: an open-label trial*, 52 Arthritis & Rheumatism 2478, 2479 (Aug. 2005), http://onlinelibrary.wiley.com/doi/10.1002/art.21231/epdf (internal citations omitted); Tugal-Tutkun, MEAJO Article at 5; *see also* Erkan Alpsoy, *New Evidence-Based Treatment Approach in Behcet's Disease*, 2012 Pathology Research International 1, 8 (Aug. 1, 2011).

54. Based on a review and analysis of available literature, the European League Against Rheumatism's ("**EULAR**") recommended that any Behçet's patient with "inflammatory eye disease affecting the posterior segment should be on a treatment regime that includes azathioprine and systemic corticosteroids." G Hatemi, A Gul et al., *EULAR recommendations for the management of Behcet disease*, 67 Annals of the Rheumatic Diseases 1656, 1657 (2008), *available at* http://ard.bmj.com/content/67/12/1656.full.pdf+html. The EULAR recommendations "target all doctors and surgeons who are involved in the treatment of [Behçet's disease]." *Id.* at 1656. Dr. Ahmet Gul, one of the co-authors of both Management of BD and the EULAR Recommendations, ***also co-authored the Xoma Phase 2 and Servier Phase 2 Reports***. *See* Exhs. 3 & 4.

55. Subsequent to the 2008 publication of EULAR's recommendations, another study of azathioprine in patients with BPU was published. In that study, BPU patients were treated with a combination of azathioprine with low dose prednisone (approximately 10 milligrams). It was found that among 146 responders to the drug regimen, "the cumulative relapse rates of uveitis were 11% at 1 year" or, stated another way, 89% of patients on azathioprine and prednisone did not exacerbate within a *year*. D. Sadoun, *et al.*, *Azathioprine in Severe Uveitis of Behçet's Disease* ("**Azathioprine Study**"), 62 Arthritis Care & Research 12, 1733, 1735 (Dec. 2010). Relapse was defined as "[1] a decrease in visual acuity [defined below] below 20/100, [2] an increase in the virtreous haze [defined below and in the glossary] of ≥ 2, [3] a relapse of cystoid macular edema [defined in the glossary], or [4] serous retinal detachment [that] was defined as severe." *Id* at 1733.

56. The results of a study of another noncorticosteroid immunosuppressant, MMF, on patients with non-infectious ocular inflammatory disease, 40% of whom had posterior or panuveitis, is also instructive. That study found that "when given as a single noncorticosteroid immunosuppressive agent," MMF "is likely to result in complete, sustained control of inflammation in an estimated 53% of patients with ocular inflammation within 6 months after initiating therapy, and 73% by one year." Ebenezer Daniel, JMBBS, MS(Ophth) et al., *Mycophenolate Mofetil for Ocular Inflammation* 7 (2009) (author's manuscript), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2826576/pdf/nihms152740.pdf. "Within six months and one year respectively, approximately 40% and 55% of patients [on MMF] were able to lower their corticosteroid treatment to acceptable levels while maintaining sustained, complete control of inflammation." *Id.* At 12 months, 41.7% of study patients with posterior or panuveitis had controlled inflammation on $\leq$5 mg of prednisone. *Id.* at 11.

57. Several sources note that the noncorticosteriod immunosuppressants chlorambucil and cyclophosphamide may also be effective in preventing BU exacerbations. For example, the Jabs Guideline suggests that BU patients can obtain long-term drug-free remissions after 6 to 24 months of chlorambucil therapy. Ex. 6, Jabs Guidelines at 502. While "[o]ne to three months of therapy is usually required before the immunosuppressive action of chlorambucil is apparent," the dose is then adjusted to maintain clinical remission for approximately 1 year." Diagnosis & Treatment, at 872.

58. Additionally, cyclophosphamide has been found effective in Japan in preventing ocular attacks and maintaining good visual acuity for long periods of time. Akpek Overview at 3; Diagnosis & Treatment, at 872. It has also been shown to be superior to steroids in suppressing ocular inflammation in patients with BU. Diagnosis & Treatment, at 872. In a study of cyclophosphamide and corticosteroids in patients with non-infectious ocular inflammation, by 12 months "complete inactivity" of inflammation "was observed in 81.3% [of] patients with uveitis," and "[o]utcomes were similar within subgroups of uveitis patients." Siddharth S. Pujari, MS(Ophth), MPH, *et al.*, *Cyclophosphamide for ocular inflammatory diseases 4 (2010)* (author's

manuscript), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2819575/ (Dec. 6, 2009). By 12 months, 49.1% of study patients with uveitis had controlled inflammation on ≤5 mg of prednisone. *Id.* at 17.

59. Moreover, in a long-term study of BPU patients on combination therapy with cyclophosphamide, prednisolone (0.5 mg/kg daily), and azathioprine, patients "demonstrated significant improvements in visual acuity scores as well as improvements across several measures of ocular disease activity." Ex. 5, Smith & Yazici at 10.

60. In addition to the standard noncorticosteroid immunosuppressants, the immunomodulatory agent[10] infliximab has also been shown to be effective in treating BU. Diagnosis & Treatment, at 870-74. Infliximab has been approved for BU in Japan, but remains as an off-label treatment in other countries. MEAJO Article at 5.

61. Lastly, in March 2014, the American Academy of Ophthalmology recommended that the biologic therapies infliximab and adalimumab be used as first or second-line "corticosteroid-sparing therapy for patients with ophthalmic manifestations of Behçet's disease." Grace Levy-Clarke, MD et al., *Expert Panel Recommendations for the Use of Anti-Tumor Necrosis Factor Biologic Agents in Patients with Ocular Inflammatory Disorders*, 121 Am. J. Ophthalmology 785, 789 (Mar. 2014) (the "**2014 AAO Recommendation**").

62. The 2014 AAO Recommendation also cited a retrospective comparison of patients suffering from BU who were treated with either cyclosporine or infliximab in addition to corticosteroids. 2014 AAO Recommendation at 789. Both groups had an average of three exacerbations per year ***before medication***. *Id.* After medication, this number was reduced to 1.2 exacerbations per year in the cyclosporine group and 0.4 exacerbations per year in the infliximab group. *Id.*

---

[10] Immunomodulatory agents are substances that affect the functioning of the immune system. Merriam-Webster, Dictionary, http://www.merriam-webster.com/dictionary/immunomodulator (last visited July 8, 2016). Immunomodulatory agents can be steroidal or nonsteroidal.

### F. Phase 2 of the BPU Trials

63. In 2010 and 2012, XOMA and Servier each conducted separate Phase 2[11] studies of gevokizumab in patients with BPU. *See* Press Release, *Positive XOMA 052 Results in Inflammatory Eye Disease – Behcet's Uveitis – Presented at American College of Rheumatology Scientific Meeting*, http://investors.xoma.com/releasedetail.cfm?ReleaseID=528942 (Nov. 10, 2010); BioMed Central, IRCTN Registry No. 15180871, *A study of gevokizumab in subjects with Behçet's disease uveitis*, http://bit.ly/28KOPph (last visited July 8, 2016). The results of these studies are attached hereto as Exhibits 3 and 4 and briefly summarized below.

64. XOMA's Phase 2 study was conducted in Turkey and enrolled Behçet's disease patients with BPU ("**XOMA's Phase 2 Study**"). Ex. 4, Xoma Phase 2 Results at 563. XOMA's Phase 2 study evaluated the safety and pharmokinetics of gevokizumab. *Id.* Under the protocol, noncorticosteroid immunosuppressant treatments and colchicine were suspended on day 0. *Id.* Patients continued to receive 10 mg or less of prednisolone, a corticosteroid, during the study, with the exception of one subject receiving 20 mg of prednisolone. *Id.* Patients were first administered a single intravenous infusion of gevokizumab at a dosage of 0.3 mg/kg. *Id.* The study protocol was amended to allow a second dose of XOMA 052, a/k/a gevokizumab, as a rescue for patients developing new uveitis attacks on day 28 or later, if they responded to treatment without any serious adverse events between days 0 and 28. *Id.* Prednisolone was also allowed as rescue medication at the investigator's discretion. *Id.* All but one patient had exacerbated during the study. *Id.*

65. Servier conducted a larger open-label Phase 2 study to evaluate the safety of three different fixed-dose regimens of gevokizumab, on top of a stable regimen of immunosuppressive drugs, including corticosteroids, in patients with BPU ("**Servier's Phase 2 Study**"). Ex. 3, Servier Phase 2 Results, at 2. The results of this study were eventually published online in January 2016.

---

[11] Phase 2 trials determine the effective and safe doses of a drug. *See* FDA, *Step 3: Clinical Research*, http://www.fda.gov/ForPatients/Approvals/Drugs/ucm405622.htm (last visited July 8, 2016).

*Id.* at 1. Servier's Phase 2 study was a 336-day study which enrolled 21 patients and was conducted at three sites in South Korea, four sites in Turkey, and one site in Tunisia. *Id.* at 4. To enroll in the study, patients had to have Behçet's disease with a history of uveitis involving the posterior segment of the eye and be on a stable regimen of oral corticosteroids (equivalent to ≤20mg/day of prednisolone) and at least one of the standard immunosuppressive drugs (azathioprine 2.5 mg/kg/day or less, cyclosporine at 5 mg/kg/day or less, mycopheolate mofetil at 3 g/day or less, or methotrexate up to the highest tolerable dose) for at least four weeks prior to entering the study. *Id.* at 2-3. During the study, patients received 30 or 60 milligrams of gevokizumab "on top of a stable regiment of [noncorticosteroid] immunosuppress[ants] and corticosteroids (≤20mg/day of prednisolone)." *Id.* at 1.

66. Servier's Phase 2 Study consisted of two periods: a response phase and a follow-up period. The initial period was the response phase, which aimed to evaluate the response to gevokizumab for up to 21 days in patients with a recent acute exacerbation of Behçet's uveitis. A recent, or new, acute ocular exacerbation was defined as at least one of the following in the index eye: (1) ≥2+ vitreous haze score using the Standardization of Uveitis Nomenclature (SUN) with or without anterior chamber cells; (2) a documented ≥15 letter ETDRS or two-line Snellen score decrease in best corrected visual acuity ("**BCVA**") attributed to ocular exacerbation associated with Behçet's; or (3) the presence of new active retinal infiltrates and/or acute retinal vasculitis. These terms are explained below:

- Vitreous haze is the obscuration of fundus details by vitreous cells and protein exudation. Janet Davis et al., Scale for Photographic Grading of Vitreous Haze in Uveitis, Am J. Ophthalmol. (pub. online Aug. 16, 2010), http://www.ncbi.nlm.nih.gov/pmc/ articles/PMC3220938/#R2.

- The fundus is the interior surface of the eye opposite the lens that includes the retina, optic disc, macula, fovea, and posterial pole. Fundus (eye), Wikipedia https://en.wikipedia.org/wiki/Fundus_(eye).

- The SUN scale is "[a] standardized grading schema for aspects of intraocular inflammation, that is, anterior chamber cells, anterior chamber flare, and vitreous

haze." Uveitis Classification, eMedicine, http://emedicine.medscape.com/article/1208936-overview.

- BCVA is an individual's best distance vision with eyeglasses or contact lenses. Eye-Testing – The Eye Chart and 20/20 Vision, All About Vision.com http://www.allaboutvision.com/eye-test/.
- ETDRS refers to the Early Treatment Diabetic Retinopathy Study chart for assessing visual acuity. Prospective Evaluation of Visual Acuity Assessment: A Comparison of Snellen Versus ETDRS Charts in Clinical Practice, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2814576/.
- A Snellen score is the score given on the Snellen Chart, which is the typical eye chart used to measure visual acuity, with a large "E" at the top and rows of letters below. *See id.*
- LogMar is a measure of an individual's score on a LogMar eyechart, which is similar to the Snellen Chart, as it comprises rows of letters, but is designed to be a more accurate estimate of acuity. LogMar Chart, Wikipedia, https://en.wikipedia.org/wiki/LogMAR_chart.

67. Of the 21 patients enrolled in Servier's Phase 2 study, 17 were categorized as "**Acute Patients"**, or patients who were experiencing a new acute ocular exacerbation as defined above. Ex. 3, Servier Phase 2 Results, at 2. Four patients who did not have an acute exacerbation but were considered at-risk of further exacerbation on the basis of retinal vascular leakage findings on fundus fluorescein angiography (FFA) were directly randomly assigned to the follow-up period ("**At Risk Patients**"). *Id.*

68. A response to gevokizumab in the Acute Patients was defined as any of the following: (1) improvements in the index eye on day-14 or -21 visits without any deterioration from the baseline in the other two parameters and no exacerbation in either eye, (2) improved vitreous haze score by ≥2 units, (3) ≥15-letter improvement in BCVA, or (4) resolution of retinal infiltrates or acute signs of retinal vasculitis. *Id.* at 3. Acute Patients who responded to treatment and At Risk patients then entered a follow-up period lasting until the next exacerbation or 336 days (follow-up beyond 168 days was optional). *Id.* at 2. In the follow-up period, Acute Patients and

At Risk Patients were randomly assigned to one of three regimens of gevokizumab at study entry. *Id.* at 3.

69. All Acute Patients initially received either 30 or 60 mg IV infusion of gevokizumab. *Id.* at 3. At the time of response, they received a second 30 or 60 mg IV infusion of gevokizumab, followed by maintenance treatment with either 30 mg (IV or subcutaneously) or 60 mg (subcutaneously). *Id.* After an initial IV infusion of 30 or 60 mg gevokizumab, At Risk patients received the same treatment as that administered in the follow-up period for Acute Patients. *Id.* For ease of reference, the graphic below illustrates the design of this trial.




FIGURE 1. Trial design. Acute patients had a second dose injected at the time of response (days 14 or 21). Participation in the follow-up period between 168 and 336 days was optional. IV, intravenously; SC, subcutaneously.*See *Methods* for exact details of dose regimens.

*Id.* at 2.

70. The results of Servier's Phase 2 study were as follows: (1) 3 of the 17 Acute Patients could not be evaluated due to premature withdrawal; (2) the remaining 14 Acute Patients responded within 21 days, with response observed as early as Day 1 in one patient; (3) all Acute Patients showed rapid control of acute ocular exacerbation, mostly within 1 week, without any increase in corticosteroid dosage; and (4) there were a total of 17 withdrawals, 11 of which were due to ocular exacerbations, and, in 2 cases, occurred after the unplanned tapering of steroids. *Id.* ***Before entering the study, Acute Patients had a mean of 3.8 exacerbations in the two years prior to entering the study, or one exacerbation every 6 months***. *Id.* at 6. ***At Risk patients had 2.3***

***exacerbations in that same period, or one exacerbation every 10 months***. *Id.* The following graphic illustrates the results of Servier's Phase 2 study:




FIGURE 2. Flow chart of patients. *Patient did not continue after day 168.

*Id.* at 4-5.

**G. Time To Event Studies**

71. Also known as "survival studies," TTE studies measure the time to a certain "event of interest." Jason T. Rich, *et al.*, *A Practical Guide to Understanding Kaplan-Meier Curves*, Otolaryngol Head Neck Surg 2010, http://www.ncbi.nlm.nih.gov/pmc/articles/pmid/20723767/ (Feb. 24, 2014). TTE studies compute the "variable for each subject having a beginning and an end anywhere along the time line of the complete study." *Id.* "Common events studied are death, disease, ***relapse***, and recovery." Ritesh Singh & Keshab Mukhopadhay, *Survival analysis in clinical trials: Basics and must know areas*, Perspect Clin Res. 2011 Oct-Dec; 2(4), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3227332/ (last visited July 5, 2016).

**1. Censoring**

72. Two things happen to all subjects in a TTE study: (1) "a subject can have the event of interest" or (2) a subject is censored. Jason T. Rich, *et al.*, *A Practical Guide to Understanding Kaplan-Meier Curves*, Otolaryngol Head Neck Surg. 2010, http://www.ncbi.nlm.nih.gov/pmc/articles/pmid/20723767/ (Feb. 24, 2014). Censoring means that "the total survival time for that subject cannot accurately be determined." *Id.* For example, the subject can be withdrawn from the study or can drop out from the study due to treatment failure, or when follow-up is otherwise lost on a subject. *Id.* Subjects "who deviate from treatment protocol[s]" can also be censored. Susanna Dodd, *et al.*, *Nonadherence to treatment protocol in published randomized controlled trials: a review*, BioMed Central, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3492022/ (Jun. 18, 2012).

73. "Informative censoring" is present when "what causes a subject to be censored is []dependent [on] what would cause him/her to have an event." Theresa A. Scott, MS, Vanderbilt University, Department of Biostatistics, *Clinical Statistical Considerations*, at 14, *available at* http://biostat.mc.vanderbilt.edu/wiki/pub/Main/TheresaScott/ClinicalTrials_Stats.TAScott.handout .pdf (last visited July 5, 2016). For example, "if a subject is pulled off a drug because of a treatment failure," the subject's censoring indirectly reflects a bad clinical outcome which could impute bias into the resulting analyses, *i.e.*, misrepresent the drug's efficacy. *Id.*

**2. Kaplan-Meier Curve Analysis**

74. In 1958, Edward L. Kaplan and Paul Meier published a seminal paper detailing how to deal with incomplete or missing observations in TTE studies. Jason T. Rich, *et al., A Practical Guide to Understanding Kaplan-Meier Curves*, Otolaryngol Head Neck Surg. 2010, http://www.ncbi.nlm.nih.gov/pmc/articles/pmid/20723767/ (Feb. 24, 2014). The Kaplan-Meier Curve has since "become a familiar way in dealing with differing survival times (times-to-event), especially when not all the subjects continue in the study." *Id.* The Kaplan-Meier curve is a method of "computing the survival over time" of subjects in a TTE study "in graphical form." Manish Kumar Goel, *et al.*, *Understanding survival analysis: Kaplan-Meier estimate*, Int. J.

Ayurveda Res., http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3059453/ (last visited July 5, 2016). Kaplan-Meier Curves are particularly useful when "***comparing*** two drugs and looking for the survival [or TTE] of subjects." *Id.*

75. The Kaplan-Meier Curve computes "the probability of surviving [or not experiencing the event of interest] in a given length of time in many small intervals" (the "**Survival Probability**"). *Id.* "Survival times need not relate to actual survival with death being the event, the 'event' may be an event of interest." Jason T. Rich et al., A Practical Guide to Understanding Kaplan-Meier Curves, *in Otolaryngol Head Neck Surg. 2010*, http://www.ncbi.nlm.nih.gov/pmc/articles/pmid/20723767/ (Feb. 24, 2014). The Survival Probability at any given time is calculated as follows:

$$S_t = \frac{\begin{matrix}\text{Number of subjects} \\ \text{living at the start}\end{matrix} - \begin{matrix}\text{Number of subjects} \\ \text{died}\end{matrix}}{\text{Number of subjects living at the start}}$$

*Id.* Censored subjects are indicated on the Kaplan-Meier Curve as tick marks and do not result in a drop on the Curve. Jason T. Rich, *et al.*, *A Practical Guide to Understanding Kaplan-Meier Curves*, Otolaryngol Head Neck Surg. 2010, http://www.ncbi.nlm.nih.gov/pmc/articles/pmid/20723767/ (Feb. 24, 2014). The following depicts an example of the outcomes of a single group depicted in a Kaplan-Meier Curve:




Manish Kumar Goel, *et al.*, Understanding survival analysis: Kaplan-Meier estimate, *in Int. J. Ayurveda Res.*, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3059453/ (last visited July 5, 2016). The Y-axis, or vertical axis, represents the percentage or proportion of patients remaining who have not yet experienced an event. Weisenthal Cancer, YouTube.com, *Personalized Chemotherapy: Understanding Clinical Trials – the Kaplan Meier Graph* (Sept. 13, 2012). Each time a patient reaches an event of interest, the line dips downward to indicate that the percent of patients who have not reached the event has decreased. *Id.* Hence, as time goes on, fewer patients are left in the study, and the downward dips are deeper. *Id.*

76. The following curve demonstrates a Kaplan-Meier Curve analysis when used to compare two treatments:




Ying Zhao *et al.*, *Clinical Significance of altered S100A2 expression in gastric Cancer*, *available at* https://www.spandidos-publications.com/or/29/4/1556, Figure 4 (Jan. 15, 2013). Each curve on the preceding Kaplan-Meier Curve graph represents two different groups or sets of patients. Weisenthal Cancer, YouTube.com, *Personalized Chemotherapy: Understanding Clinical Trials – the Kaplan Meier Graph* (Sept. 13, 2012). As demonstrated in the example above, the green line has better "survival" rates, given the significant graphical gap, or separation, between the two curves. *Id.* Thus, if one had to pick which drug treated a disease better, it would be the one used on patients in the green line. *Id.* "The crucially important point [is] that [a] [Kaplan-Meier Curve]

comparative analysis ***depends upon the whole curve and not upon isolated points.***" Jason T. Rich, *et al.*, *A Practical Guide to Understanding Kaplan-Meier Curves*, Otolaryngol Head Neck Surg. 2010, http://www.ncbi.nlm.nih.gov/pmc/articles/pmid/20723767/ (Feb. 24, 2014).

### 3. The Effect Of Censoring On Kaplan-Meier Curves

77. Censored subjects play an important role in calculating the survival probability on a Kaplan-Meier Curve. The survival curve does not change "at the time of a censored observation, but at the next event after the censored observation the number of people 'at risk' [or surviving] is reduced by the number censored between the two events." The BMJ, *Survival Analysis*, *available at* http://www.bmj.com/about-bmj/resources-readers/publications/statistics-square-one/12-survival-analysis (last visited July 5, 2016). Put another way, at the next event, censored patients "are not counted in the denominator." Manish Kumar Goel, *et al.*, *Understanding survival analysis: Kaplan-Meier estimate*, Int. J. Ayurveda Res., http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3059453/ (last visited July 8, 2016). "[B]ecause censoring the patient reduces the number of patients who are contributing to the curve, each [event] after that point represents a higher proportion of the remaining population, and so every step down afterwards will be a little bit larger than it would have been" had the patient not been censored. Ex. 7, Cancerguide.org, *Statistics*, http://cancerguide.org/scurve_km.html (last visited July 8, 2016) ("**Statistics**").

78. For example, assume below that Group 1 (depicted in blue dashed line) and Group 2 (depicted in the solid red line) both enrolled five patients. Also assume that Groups 1 and 2 each have one patient experiencing the event of interest at month 1. Lastly, assume that in Group 2, 2 patients are censored before the end of the month 1.

79. After month 1, the survival probability for Group 1 would be 80% ((5-1)/5), or the 5 at risk patients at the time of the event minus the patient experiencing the event, divided by the 5 at risk patients at the time of the event. *See* Ex. 7, Statistics. Whereas, only 66.6% ((3-1)/3) of the patients in Group 2, remain event-free, despite the fact that the same number of patients experienced an event of interest in both groups. *See id.* The reason for the disparity between the

two Groups is that the 2 censored patients in the hypothetical Group 2 reduced the number of at risk patients from 5 to 3 (5-2), thereby reducing the over survival probability ((3-1)/3). *See id.* The chart below demonstrates how each Group's survival probabilities would look like graphed on the Kaplan-Meier Curve:




80. Consequently, in order to conduct a meaningful comparative analysis between two groups (such as comparing the effectiveness of a group taking a drug and another group taking a placebo), information regarding the survival rates and censor dates—not to mention the identity of each patient's group—is required.

**H. XOMA's Phase 3 EYEGUARD Program**

81. On August 22, 2012, XOMA announced that the FDA granted Orphan Drug Designation to gevokizumab for the treatment of non-infectious intermediate, posterior, or pan-uveitis, as well as chronic non-infectious anterior uveitis. Press Release, *XOMA Receives Orphan Drug Designation From U.S. Food & Drug Administration for Gevokizumab*,

http://investors.xoma.com/releasedetail.cfm?ReleaseID=701926 (Aug. 22, 2012). In 2012, XOMA initiated its Phase 3 EYEGUARD studies in NIU and BPU. Press Release, *XOMA Reports 2012 Operational Highlights and Fourth Quarter and Full-Year Financial Results*, http://investors.xoma.com/releasedetail.cfm?ReleaseID=747604 (Mar. 12, 2013). This program initially included three pivotal trials: (1) EYEGUARD-A in patients with active NIU, sponsored by XOMA; (2) EYEGUARD-C in patients with controlled NIU also sponsored by XOMA, and (3) EYEGUARD-B in patients with BPU sponsored by Servier. *Id.* On September 30, 2014, XOMA also announced the initiation of a fourth EYEGUARD study, EYEGUARD-US, which was a randomized withdrawal study conducted in the U.S. to determine the efficacy and safety of gevokizumab in patients with BPU. Press Release, *XOMA Initiates U.S. Clinical Trial of Gevokizumab in Patients with Behcet's Disease Uveitis – EYEGUARD(TM)-US*, http://investors.xoma.com/releasedetail.cfm?ReleaseID=873853 (Sept. 30, 2014).

## I. The EYEGUARD-B Trial

82. On September 27, 2012, XOMA announced the initiation of its key EYEGUARD-B Trial. *See* Sept. 27, 2012 Press Release. The Trial was designed to test the relative efficacy of gevokizumab on top of Standard Therapies in delaying a relapse of BPU as compared to patients controlled only on Standard Therapies. Press Release, *XOMA Announces Results From Phase 3 EYEGUARD-B Study*, http://investors.xoma.com/releasedetail.cfm?ReleaseID=923200 (July 22, 2015) ("**Results PR**"); Ex. 8, Clinicaltrialsregister.eu, *A randomized, doublemasked, placebo-controlled study of the efficacy of gevokizumab in the treatment of patients with Behçet's Disease uveitis EYEGUARD TM-B*, at E.2.1 ("**Clinical Trials Register**"). The Trial was conducted outside the United States with sites in the following countries: Brazil, China, France, Germany, Greece, Italy, South Korea, Portugal, Russia, Saudi Arabia, Spain, Tunisia, Turkey, and the United Kingdom. Ex. 8, Clinical Trials Register, at E.8.6.3. Varian explained that the Trial was designed "based on the positive results from our Phase 2 [BPU] trials[.]" *See id.* at 4.

83. EYEGUARD-B was a randomized, double-blind, multi-part study (the "core" part of the study), followed by a 12-month double-blind extension and then an 8-month open label

extension. *See* Ex. 8, Clinical Trials Register, at E.8.1.7.1. The Trial enrolled patients with a history of BPU who had experienced a recent ocular exacerbation of the disease that was treated successfully with Standard Therapies. Ex. 8, Clinical Trials Register. Under EYEGUARD-B's protocol, an exacerbation occurs when a patient experiences any of the following in either eye: (1) a 2 unit worsening of a vitreous haze score using the SUN scale, (2) a ≥ 15 letter decrease in BCVA, (3) an emergence of retinal infiltrates, or (4) acute retinal vasculitis.[12] *See* November 6, 2014 Call, at 5. An exacerbation meeting any of those four criteria would qualify as a "per protocol" exacerbation and would be counted toward the predefined (and undisclosed) targeted number of Exacerbations needed to close the study and measure the primary endpoint. *See* November 6, 2014 Call, at 5; *see also* Sept. 27, 2012 Press Release.

84. The Trial divided patients into two cohorts: (1) those who received corticosteroids (*i.e.*, prednisone) the dosage of which was tapered to 5 mg/day per the Jabs Guideline while remaining on a "constant level" dosage of ***at least 1* additional immunosuppressant** (XOMA Corporation, XOMA's CEO Discusses Safety and Efficacy Study of Gevokizumab in Patients With Non-Infectious Uveitis Currently Controlled by Systemic Treatment Conference Call, Seeking Alpha Tr., at 5 (Oct. 4, 2012); Ex. 8, Clinical Trials Register, at E.2.1, E.3), *i.e.*, the Standard Therapies, plus subcutaneous injections of a placebo, *i.e.*, the Standard Therapy Group; and (2) those who received Standard Therapies plus subcutaneous injections of gevokizumab, *i.e.*, the Gevokizumab Group (*See* November 6, 2014 Call, at 5; Ex. 8, Clinical Trials Register, at E.2.1, E.3). Immunosuppressants acknowledged previously by XOMA and Servier as Standard Therapies include azathioprine, cyclosporine, MMF, and methotrexate. *See* Ex. 3, Servier Phase 2 Results, at 3.

85. The Trial's primary endpoint of the study was a Kaplan-Meier Curve comparison of the time to first Exacerbation for the Gevokizumab Group and the Standard Therapy Group. *See*

---

[12] Retinal infiltrates are inflammatory cells, dead retinal tissue, and possible micro-organisms that enter the retina. Retinal infiltrates, University of Michigan Kellogg Eye Center, http://www.kellogg.umich.edu/theeyeshaveit/optic-fundus/retinal-infiltrate.html.

November 6, 2014 Call, at 5. In other words, the Trial measured gevokizumab's efficacy by measuring the relative relapse rates between the Gevokizumab Group and the Standard Therapy Group. *Id.* The secondary endpoints were total number of Exacerbations, BCVA, vitreous haze, retinal lesions, fundus assessments, and macular edema. *See* Results PR. The hazard ratio was 0.3, which Rubin described as a prediction that the ratio of Exacerbations in the Standard Therapy and Gevokizumab groups would occur at a 3:1 ratio, or that there would be three Exacerbations in the Standard Therapy Group for every one Exacerbation in the Gevokizumab Group. *See* November 6, 2014 Call, at 5.

86. The Trial had a target enrollment of 60 subjects (*see* Ex. 8, Clinical Trials Register, at F.4.2.2), and would Unblind once the 29th patient had an Exacerbation, that is, once the Unblinding Event occurred (*see* Results PR). Defendants refused to disclose the number of Exacerbations necessary to unblind the Trial until after the Class Period. *See* Results PR; November 6, 2014 Call, at 9.

87. If XOMA's BLA for BPU was successfully approved by the FDA, a supplemental BLA based off of either EYEGUARD-A or EYEGUARD-C would be filed to obtain FDA approval in the broader NIU indication. November 6, 2014 Call, at 4.

**J. XOMA's Fraudulent Scheme To Pump The Blinded EYEGUARD-B Data**

88. XOMA initially told investors that the Unblinding Event would occur in June 2014. *See* John Varian, CEO, XOMA Corporation, Q1 2014 Earnings Call, at 5 (May 7, 2014) (transcript on file with Bloomberg, Inc.).

89. The Trial missed its June 2014 target. On June 30, 2014, Varian disclosed in an analyst conference call that 75% of the Exacerbations required for the Unblinding Event had occurred as of early May 2014 (John Varian, CEO, XOMA Corporation, Eyeguard-B Clinical Update Call, 1 (June 30, 2014) (transcript on file with Bloomberg, Inc.)), meaning that approximately 22 (0.75*29) Exacerbations had occurred (*See* Results PR). By July 1, 2014, the Unblinding Event had still not occurred. *See* John Varian, CEO, XOMA Corporation, XOMA's CEO Presents at EYEGUARD-B Communication Plan Update Conference, 2 (July 1, 2014)

(transcript on file with Seeking Alpha). On August 7, 2014, Varian evaded an analyst's question regarding the number of EYEGUARD-B Exacerbations left before the Unblinding Event, stating only that there were "still a few to go." John Varian, CEO, XOMA Corporation, Q2 2014 Earnings Call, 8 (Aug. 8, 2014) (transcript on file with Bloomberg, Inc.).

**1. The Reclassifications**

90. On November 6, 2014, Defendants held an analyst conference call to reveal that certain previously reported Exacerbations were being reclassified (the "**Reclassifications**"), and these reclassified patients were being censored from the primary endpoint and would not be counted towards the Unblinding Event. November 6, 2014 Call, at 6. The Reclassifications were the result of a data scrub by Servier which  revealed that a portion of the patients with medically validated Exacerbations were previously rescued by physicians who did not follow the Trial's steroid tapering schedule by either increasing steroid dosages or introducing additional immunosuppressive therapies in those patients' treatment regimens (the "**Rescues**"). November 6, 2014 Call, at 5. Rubin explained that "***[t]he most frequent reason***," patients were being rescued was "***because their ocular symptoms worsened***." *Id.*

91. These Rescues would "directly impact the primary endpoint calculation" in the sense that they would be censored from the Kaplan-Meier Curve, but they would not count towards triggering the Unblinding Event. *Id.* at 6.

92. The Rescues would, however, be included in XOMA's and the FDA's sensitivity analyses. *Id.* Under a sensitivity analysis, "one or more potentially crucial assumptions are altered" and then "key trial results under both the primary and the alternative analysis are then compared." *See* Lehana Thabane, *et al.*, *A Tutorial on sensitivity analyses in clinical trials: the what, why, when and how*, BMC Medical Research Methodology (July 16, 2013). As explained by Rubin, when conducting the sensitivity analyses the FDA would treat the Rescues "as if they have failed" and "include all patients as if they [E]xacerbated." November 6, 2014 Call, at 10. , Varian stated that after the primary endpoint, "the sensitivity analysis is probably the most important one."

*Id.* at 9. Thus, as much as the Rescues "directly impact the primary endpoint[,]" they impact the sensitivity analyses "even more so[.]" *Id.* at 6.

93. Instead of revealing the large number of Rescues, Defendants attempted to mitigate the effect the Rescues had on the length of the study and its likely results. Rubin stated that EYEGUARD-B was enrolling new patients, not because of the Reclassifications, but because of the "slowing pace of exacerbations[,]" *i.e.*, the Slowdown, thereby creating the misimpression that the number of Rescues was immaterial. *Id.*

94. In truth, the number of Rescues, was substantial. For the reasons set forth below, upon information and belief, the number of Rescues at issue was 12, *i.e.*, 20% of the 60 patients originally enrolled (*See* Ex. 8, Clinical Trials Register, at F.4.2.2):

- The Trial eventually enrolled 83 patients. *See* Results PR.
- Of these 83 patients, 29 of them necessarily suffered an Exacerbation that led to the Trial's Unblinding, leaving 54 (83-29) patients remaining. *See* Results PR.
- Of these 54 patients, 22 never Exacerbated, leaving 32 (54-22) patients remaining who were either rescued or otherwise censored (*e.g.*, because they enrolled in the Trial but did not Exacerbate before the Unblinding Event). *See* XOMA Corporation, EYEGUARD-B Phase 3 Study Results Call, Bloomberg Tr., at 2 (July 22, 2015) ("**Results Call**") (22 patients in Trial for 9 months or longer, *i.e*, enrolled prior to the Class Period, never Exacerbated during the Trial.).
- Of the remaining 32 patients, even if Plaintiff assumes that zero of the 20 patients enrolled after the Reclassifications never Exacerbated and were censored as a result, 12 (32-20) patients necessarily were rescued—and likely more given that new patients were enrolled precisely so that they would Exacerbate and speed up the Unblinding of the Trial. *See* XOMA Corporation, Q1 2015 Earnings Call, Bloomberg Tr., at 2 (May 7, 2015) (noting approximately 20 patients newly enrolled).

95. Defendants misled investors by failing to disclose the substantial number of Rescues. If, the Slowdown was encouraging, then a large number of early Relapsers must conversely be discouraging. Any large number which suggests that patients were relapsing quickly, or otherwise Rescued due to lack of drug effect was material to the sensitivity analyses, which would assume that those Rescues were Exacerbations. *See* November 6, 2014 Call, at 10.

96. Defendants further decided to pump the blinded EYEGUARD-B data they possessed. *See* November 6, 2014 Call, at 6. Rubin and Varian described the Slowdown, which they attributed to a group of patients who had been in EYEGUARD-B for six months or longer without Exacerbating, *i.e.*, the Survivors, as "encouraging[.]" *Id.* at 3, 6. Defendants had no basis for such statements.

### 2. Defendants Hype Blinded Data Pattern

97. On March 11, 2015, Defendants held another conference call with analysts. This time, Defendants seized on an analyst's question asking whether there was a "bifurcation in terms of when the events occur" in EYEGUARD-B. March 11, 2015 Call, at 14. Varian responded affirmatively, stating that "there's a group of patients who get past a certain point and they've not exacerbated" and that it was "encouraging[.]" *Id.* at 14. Rubin, after being asked if there was anything "cautionary" he could add, took it a step further, stating the Exacerbation Pattern demonstrated that "if you had an active drug, this is the sort of pattern you'd expect to see." *Id.*

98. Defendants had no material basis for these statements.

## FALSE AND MISLEADING CLASS PERIOD STATEMENTS[13]

99. On November 6, 2014, XOMA held a call with analysts wherein the Defendants discussed the reason for the substantial delay in the EYEGUARD-B trial hitting its last exacerbation. Although, as discussed above in ¶¶90-96, Defendants revealed that an undisclosed number of Exacerbations were reclassified as Rescues due to deviations from the Trial's protocol,

---

[13] Although many statements by the Defendants are listed in this section, the statements being challenged as false and/or misleading are those statements that are ***bolded, italicized, and in some instances <u>underlined</u>*** for emphasis.

Defendants misled investors as to the import of the Reclassifications and their impact on the likely outcome of the Trial:

* * *

> [Varian:] Today, we'd like to provide more clarity about the EYEGUARD-B study and Servier's progress with it. In May, we reported that Servier had informed us that 75% of the number of pre-set targeted exacerbations that allow the unmasking of the data had occurred, and that Servier predicted the final event would happen in June. I have asked Paul to spend a good portion of his comments today discussing our detailed learnings since we spoke with you last. ***Our learnings are encouraging to our ultimate goal*** and should give you a good understanding of how we got from where we were back in May to where we are today.
>
> * * *
>
> [Rubin:] What has happened over the past few months is that a number of previously-identified medically validated exacerbations have been reclassified as rescues prior to or without exacerbations. In each of these cases, additional monitoring show that the physician did not follow the steroid tapering schedule and that they increased or did not reduce the steroid levels strictly as defined in the protocol. Over these past few months, the number of subjects reclassified due to this data scrub is almost identical to the newly occurred per-protocol exacerbations. Monitoring of the per-protocol exacerbations currently reported to us is complete, so that none of the existing count should be lost, as we await for the final ones to occur.
>
> ***Again, while these loss per-protocol exacerbations were removed from the race to the target, they were medically validated exacerbations, in spite of a non-protocol steroid tweaking. Again, they directly impact the primary endpoint calculation and even more so, the sensitivity analyses***. Servier has been very diligent on following these patients and ensuring their data
> is appropriately cleaned and verified for the eventual efficacy analysis. We are also preparing ourselves by working closely with them to understand patient status.
>
> ***Another factor that is both frustrating as well as encouraging is that the rate of exacerbations began slowing this summer. It is encouraging to see that there are still a significant number of ongoing patients in the trial, who have not experienced an exacerbation or have been rescued early.*** Many of them have been in the trial for over six months without issues, long after the steroid tapering has been completed. We've also seen the high percentage that exacerbate fairly soon after randomization.

> And we are completely masked whether these early exacerbating patients, rescued or controlled patients are in drug or placebo, so nothing can really be read into this distribution . . .
>
> ***<u>Now, in order to address the slowing pace of exacerbations</u>, Servier has continued its enrollment in EYEGUARD-B, in spite of the fact that it hit target enrollment in the second quarter of this year.*** Since a high percentage of patients exacerbated in the early months, we can expect a sizeable portion of these newly enrolled patients to exacerbate fairly soon. So we can achieve the per-protocol exacerbations target.
>
> ***We remain very hopeful that these masked results are an encouraging indication of the potential of gevokizumab in this disease and we eagerly await the opportunity to review these data in an unmasked fashion in the near future.*** Now I know this was a long and complicated explanation but we believe it was important to articulate the underlying facts, as we work toward this important goal.

* * *

100. The foregoing statements in ¶99 were materially false and/or misleading because they omitted and/or misrepresented the following adverse facts that then existed and were known or recklessly disregarded by the speaker at the time of each statement:

a) A large number of Rescues occurred that rendered the Trial less likely to succeed given that the Rescues were due to medically relevant exacerbations that would weigh against gevokizumab's efficacy in the primary analysis and the sensitivity analyses that XOMA and the FDA would perform in connection with the study's results, and therefore decreased likelihood of a successful study (¶¶90-96);

b) Servier enrolled new patients in material part because a large number of Rescues occurred, which fact itself reduced the Trial's prospects (¶¶90-96);

c) The Exacerbation Pattern was not "encouraging" or in any way indicative of gevokizumab's efficacy without knowing which patients were in the Standard Therapy Group and which patients were in the Gevokizumab Group (¶¶71-80); and

d) Defendants lacked a material factual basis for stating and/or implying that the Exacerbation Pattern was somehow indicative of gevokizumab's efficacy, as confirmed by Varian's subsequent admission after the Class Period that Defendants possessed a "paucity of actual data in the Behçet's disease uveitis population, in general, ***especially as it relates to response to therapy***" (¶105), the fact that patients in the Standard Therapy Group were on Standard Therapies that often led to significant periods of remission and in fact initially controlled each patient's BPU (¶84, 39-62), the fact that the Standard Therapies had the potential to cause or contribute to the Exacerbation Pattern (¶¶39-62), and the fact that XOMA's Phase 2 data contained evidence that patients had significant periods of remission on Standard Therapies (¶70);

e) As a result of the aforementioned misrepresentations and/or omissions, XOMA's business and financial prospects concerning gevokizumab were worse than what the speakers had led the market to believe they were.

101. On March 11, 2015, XOMA held an earnings call, wherein the Defendants updated investors on the status of XOMA's EYEGUARD-B trial and wherein Defendants stated that the Exacerbation Pattern they observed in the blinded patient data that was then available was indicative of a positive efficacy finding for XOMA's EYEGUARD-B Trial:

* * *

> [Biren Amin of Jefferies]: Yeah. Thanks for taking my questions. Maybe I'll just start with EYEGUARD-B. I think last spring, the company had disclosed the percentage [of] events that were achieved, and I'm trying to maybe just get an update on that, if you could, maybe just describe how many number of events have been reported in the trial? Thanks.
>
> [Varian:] So Biren, we never gave a number as — but what we said last fall, in November was that there were a handful to go, and all I can tell you today is, there's less than a handful to go, okay. So — and we can't be more specific than that. It's SERVIER's study, and they've been very adamant about what we could say. So we are working down towards the final events that's going. We're moving towards it.
>
> What SERVIER has done, and this is really important, and this is actually something we did talk about, which is we do know, and we clearly see, based on [the] blinded data that, when patients come into this study in the

first 90 days, there's a sizable percentage of those patients who come in, in those first 90 days who exacerbate, and then it trails down to very, very little as time goes by.

* * *

[Matt Kaplan of Ladenburg Thalmann:] Yeah, just a follow-up to Biren's question, in terms of the EYEGUARD-B, it seems as though you're seeing somewhat of a bifurcation in terms of when the events occur on a blinded basis in the study. Can you – maybe can you talk to that, and talk about your optimism in terms of the outcome of the study with respect to that?

[Varian:] Well, here's the big preamble. Everything, all data are blinded as it should be, right, so you truly know nothing. We do see that if patients get to a certain point in time, the rate of exacerbation goes to virtually nothing. So when SERVIER sized the study, and it had a predicted rate of exacerbations, they assumed every patient would exacerbate at some point in time, okay, including gevokizumab patients, okay.

So when that line was drawn and the exacerbations were calculated, and how many patients needed to come in, there was an assumption that all patients would exacerbate, but hopefully the gevokizumab patients would be later exacerbat[e]rs. What we've seen, and we've said this, is that there is a group of patients that, in this study who've gone a very long time, and on average, more than nine months, and even more than that, who have not exacerbated.

We know that patients, all the patients that came into the study had to have had an exacerbation in the previous four months, and they had to have at least one more, and they had on average much more than one more, or more than one more, in the previous 14 months, or within the total 18-month period.

So these patients were exacerbating as they came into the study. We are seeing a group of patients who have gone a very long time, and not having exacerbated. So that has thrown off our calculation somewhat of, when exacerbations would happen, and when we would get to this point in time. It could be great news, or it could mean nothing. We won't know until the data are unblinded.

So we do see, the beginning of the period in the first 90 days, a very – the highest rate of exacerbations, and we see that there's a group of patients who get past a certain point, and they have not exacerbated. ***<u>So it's encouraging</u>, but it doesn't mean anything until the study is unblinded.***

Do you want to say any more cautionary things on that, Paul?

> [Rubin:] ***<u>Nothing cautionary</u>.*** Yeah. No, that's exactly right. So you're seeing — as you know, the study is a [] withdrawal trial [], and historically, and this is kind of evidenced by our first study that we did in Turkish patients, when patients are not on an active therapy, they exacerbate relatively quickly, that they fall below a therapeutic level of drug, and that's what we saw in our Turkish patients. So in retrospect, we could have probably predicted that the majority of the exacerbations would have occurred in the first three months.
>
> I think we kind of looked at it as linear. It's clearly not linear. There's a large number at the beginning, which is exactly, when you understand the disease and what we're doing to these patients, makes complete sense. What we didn't know is that, that rate would then kind of plateau with time. And that's exactly what we're seeing. ***So although we don't know who's on active and who's on placebo, <u>if you had an active drug, this is sort of the pattern you'd expect to see</u>.***

* * *

102. The foregoing statements in ¶101 were materially false and/or misleading because they omitted and/or misrepresented the following adverse facts that then existed and were known or recklessly disregarded by the speaker at the time of each statement:

a) The Exacerbation Pattern was not "encouraging" or in any way indicative of gevokizumab's efficacy without knowing which patients were in the Standard Therapy Group and which patients were in the Gevokizumab Group (¶¶71-80);

b) Biologically active (*i.e.*, effective) drugs could have exacerbation patterns vastly different than the Exacerbation Pattern given the nature of the EYEGUARD-B Trial's TTE study, which was essentially a comparison of the relative relapse rates between the Standard Therapy Group and the Gevokizumab Group (¶¶71-80);

c) Defendants lacked a material factual basis for stating and/or implying that the Exacerbation Pattern was somehow indicative of gevokizumab's efficacy, as confirmed by Defendants' subsequent admission after the Class Period that Defendants possessed a "paucity of actual data in the Behçet's disease uveitis population, in general, ***especially as it relates to response to therapy***" (¶105), the fact that patients in the Standard Therapy Group were on

Standard Therapies that often led to significant periods of remission and in fact initially controlled each patient's BPU (¶84, 39-62), the fact that the Standard Therapies had the potential to cause or contribute to the Exacerbation Pattern (¶¶39-62), and the fact that XOMA's Phase 2 data contained evidence that patients had significant periods of remission on Standard Therapies (¶70);

d) A large number of Rescues occurred that rendered the trial less likely to succeed given that the Rescues were due to medically relevant exacerbations that would weigh against gevokizumab's efficacy in the primary analysis and the sensitivity analyses that XOMA and the FDA would perform in connection with the study's results, and therefore decreased likelihood of a successful outcome (¶¶90-96); and

e) As a result of the aforementioned misrepresentations and/or omissions, XOMA's business and financial prospects concerning gevokizumab were worse than what the speakers had led the market to believe they were.

103. In response to the statements made during the call, Matt Kaplan of Ladenburg Thalmann upgraded XOMA's stock setting a price target of $6.00 per share.

**POST CLASS PERIOD STATEMENTS AND EVENTS**

104. On July 22, 2015, before the market opened, XOMA announced the top-line results from the EYGUARD-B trial. In regard to the primary endpoint, the Company explained that the Trial "did not meet the primary endpoint[.]" Results PR.

105. That morning the Company held a special conference call to discuss the EYEGUARD-B study results and further reiterated several times that the data was "encouraging" and that gevokizumab offered a "positive drug effect" despite failing to hit its primary endpoint. Defendants provided more detail about the Trial:

* * *

> [Varian:] The placebo patients in the study did not behave in the manner every expert with whom we consulted and every paper we've read would have predicted. Based on the natural history of the disease, the Behçet's uveitis patients were not expected to just get better at the 5 milligram level of corticosteroids they were taking during the study, but somehow they did. In the mass data, we were seeing the highest number of patients

exacerbate within the first 90 days, followed by a reduced rate of exacerbations between days 90 and nine months. . . .

What was encouraging to us in the mass data was the substantial subset of patients that did not exacerbate or require rescue. Of the 55 patients who were enrolled in the study for at least nine months as of the day survey reached the final exacerbation, nearly 40% never exacerbated. On average, this subset of patients remained fully controlled for an average of over a year. Now, prior to entering the study, this subset had an average of just over three exacerbations in the 18 months prior to being enrolled in EYEGUARD-B. The patient population that did exacerbate came into the study with a consistent recent history having averaged just under three exacerbations in the same 18-month period. We really believe gevokizumab was working since it seemed contrary to everything we thought we knew that this could occur without some drug affect. We and our partners at Servier, as well as their outside advisors, were stunned to see that gevokizumab did not reach statistical significance in EYEGUARD-B. Okay. I'm going to start with some of Paul's prepared comments, because he sent me a copy of what he was planning to say. . . . ***The final results, as I will explain in a few moments, underscores the <u>paucity</u>[[14]] of actual data in the Behçet's disease uveitis population*** . . .

The primary endpoint was the difference in the number of days to first acute ocular exacerbation. This event-driven trial was analyzed after 29 documented and validated first ocular exacerbations occurred. . . . EYEGUARD-B enrolled 83 patients; 40 who received gevokizumab and 43 who received placebo. This 83 is the total. And as I said a few moments ago, 55 patients were in the study for at least nine months as of the date of the final exacerbation. The groups were balanced in their demographic characteristics with the exception of duration of disease, which was 54.5 months in the gevokizumab-treated group versus 40 months in the placebo group. ***The primary endpoint time to first exacerbation showed no statistical difference between the active and placebo groups, although the mean time to first exacerbation was 119 days in the gevokizumab-treated group versus 95 days in the placebo patients, an approximately 24 day difference.*** The ***lack of a positive outcome was multi-factorial and was consistent after applying multiple <u>sensitivity analysis</u>.*** When we began to examine the datasets, there were indications that gevokizumab did offer a positive drug effect in treated patients.

* * *

[Matt L. Kaplan of Ladenburg Thalmann:] In your prepared remarks, you talked a little bit about how you were potentially thrilled by the blinded results. And can you talk a little bit more about that and what you had seen on a blinded basis? And the results that you've seen here in the study, how they differed from what you expect historically? . . .

[14] The Merriam-Webster dictionary defines "paucity" as meaning "a small amount of something: an amount that is less than what is needed or wanted[.]" Merriam-Webster, Dictionary, http://www.merriam-webster.com/dictionary/paucity (last visited July 8, 2016).

> [Rubin:] Well, as you mentioned before, this is really the first large – relatively large well-controlled trials in Behçet's disease, so trying to power and make assumptions of placebo response is based upon really talking to experts and their appreciation of the natural history of the disease. So, when we spoke with them, they thought that it would be very unusual for a patient taper down to 5 milligrams of corticosteroid to remain, especially with a history of relatively frequent exacerbations, to remain disease free for a period of time. So, when we reviewed the data and we saw a large cohort of patients that were disease free and coupled with the fact that our experts said this would be extremely unusual in a placebo-treated group that was down to 5 milligrams, that was kind of the cause for our belief that this very well may be indicative of a positive drug. It turns out in retrospect that at least for some of these patients, a good number, or even with Behçet's uveitis, that they can be maintained that 5 milligrams prednisone for a long period of time. And again, this is contrary to our belief and the belief of the patients who've had the most experience with the disease. In terms of the secondary endpoints, as I mentioned, some of these things – we're not really talking about statistics until we get very good confirmation, but some of the results were – I'll say were very intriguing and did reflect what we believe is a signal in anti-inflammatory response of the drug in these patients.

106. Despite Defendants' attempt to put a positive spin on this data, the market was not impressed. Accordingly, on this news, shares of XOMA common stock dropped $3.48 per share, or more than 79%, from a closing price of $4.39 on July 21, 2015 to open on July 22, 2015 at $0.91 per share on heavy trading volume.

107. On or around July 22, 2015, Baker Bros. sold 11,000,000 shares, divesting most of their remaining XOMA investment. *See* XOMA Corporation, Statement of Changes in Beneficial Ownership, SEC Form-4 (dated July 23, 2015).

108. On August 6, 2015, XOMA announced it would significantly reduce its expenses in its EYEGUARD program, effectively abandoning it. Press Release, XOMA Reports Financial Results for Second Quarter 2015 (Aug. 6, 2015). In connection with its expense-lowering efforts, XOMA cut 30% of its workforce, or 58 positions, resulting in a workforce of 134 employees. *See* XOMA Corporation, Current Report (Form 8-K) (filed Aug. 25, 2015).

109. On September 28, 2015, Servier notified XOMA of Servier's intention to terminate the Collaboration and License Agreement, abandoning gevokizumab and restoring XOMA's worldwide rights to the product. *See* XOMA Corporation, Current Report (Form 8-K) (filed Oct.

1, 2015). Servier noted that "further development of gevokizumab in the orphan indications that have been explored to date, is no longer consistent with [its] strategic priorities." *Id.* Servier confirmed it would close its gevokizumab studies. *Id.*

110. On or around March 9, 2016, XOMA announced its decision to abandon gevokizumab, "Gevokizumab clearly does not fit within our forward focus. We've been approached recently by several companies interested in acquiring the asset. These factors led to our decision to launch a formal sales process." *See* John Varian, CEO, Q4 2015 Earnings Call, 2-3 (Mar. 9, 2016) (transcript on file with Bloomberg, Inc.).

111. XOMA's share price has never recovered. On September 4, 2015, XOMA received a letter from The NASDAQ Stock Market LLC notifying it that it was subject to delisting if its stock remained below the minimum $1.00 bid price for 180 calendar days. *See* XOMA Corporation, Current Report (Form 8-K) (filed Sept. 4, 2015). XOMA received a similar notice on March 15, 2016. *See* XOMA Corporation, Current Report (Form 8-K) (filed Mar. 4, 2015). To this day, XOMA trades below $1.00, at approximately $0.60.

**ADDITIONAL SCIENTER ALLEGATIONS**

112. As alleged herein, Defendants acted with scienter because at the time that they issued public documents and made other public statements in XOMA's name, they knew or recklessly disregarded the fact that such statements were materially false and misleading and/or omitted material facts concerning the prospects of its EYEGUARD-B Trial. Defendants (1) knew that such documents and statements would be issued or disseminated to the investing public, (2) knew that persons were likely to rely upon those misrepresentations and omissions, and (3) knowingly and/or recklessly participated in the issuance and/or dissemination of such statements and/or documents as primary violators of the federal securities laws. The Defendants' materially false and misleading statements and omissions of material fact artificially inflated XOMA's stock price during the Class Period.

**A. Core Operations**

113. Because the fraud alleged herein relates to the core business of XOMA, knowledge of the facts underlying the fraudulent scheme may be imputed to the Individual Defendants. During the Class Period, Defendant Varian stated, "[a]s we've said on many occasions, gevokizumab is our first, second, and third priority." March 11, 2015 Call, at 4. Indeed, XOMA acknowledged in its 2014 Prospectus that it its "ability to achieve profitability is dependent in large part on the success of [its] development programs, obtaining regulatory approval for [its] product candidates and licensing certain of [its] compounds" and that it was "substantially dependent on Servier for the development and commercialization of gevokizumab." 2014 Prospectus, at S-31. Varian also declared that gevokizumab was XOMA's "flagship product[.]" Press Release, XOMA Appoints John Varian as Chief Executive Officer (Jan. 5, 2012). Accordingly, the Individual Defendants, as senior level executives and/or directors at a company with only 183 full-time employees, were in such positions at the Company to access all material, non-public information concerning gevokizumab and the EYEGUARD trials. *See* XOMA Corporation, Annual Report (Form 10-K), at 19 (filed Mar. 11, 2015). Thus, the Individual Defendants were well aware that the positive statements detailed above about the prospects of the EYEGUARD-B Trial, made contemporaneously and with knowledge of contradictory information, were materially false and/or misleading when made.

114. The Company had a contractual right to Servier's EYEGUARD-B records. On or around December 30, 2010, XOMA entered into a license and collaboration agreement with Servier to jointly develop and commercialize gevokizumab in multiple indications. *See* XOMA Corporation, Prospectus Supplement To Prospectus Dated September 20, 2013 (Form 424B5), S-9 (Dec. 9, 2014) ("**2014 Prospectus**"); XOMA Corporation, EXHIBIT 10.42 to Annual Report (Form 10-K, filed Mar. 10, 2011), *Collaboration and License Agreement* (dated Dec. 30, 2010) (the "**Collaboration Agreement**"). The Collaboration Agreement provided that "each Party shall make available to the other Party all data and results generated under any Global Research and Development Plan[,]" each Party had the "right to review and copy such records maintained by the

other Party at reasonable times," and "[e]ach Party [was to] provide the other party and the [Joint Development Committee] with regular reports detailing its Development activities under [gevokizumab's] Development Plan[.]" Collaboration Agreement, at ¶¶3.11, 4.4(a).

115. The Individual Defendants also had actual access to the Trial's protocols and procedures because they discussed the relevant data in detail before and throughout the Class Period. As early as August 7, 2012, Varian stated that XOMA was "work[ing] closely with [Servier]" on developing EYEGUARD-B. John Varian, CEO, XOMA Corporation, Q2 2012 Earnings Call, 4 (Aug. 7, 2012) (transcript on file with Bloomberg, Inc.). Rubin also claimed that the Trial protocol was sized and powered in part by statisticians at XOMA. November 6, 2014 Call, at 5. In that same call, Rubin defended the Trial's design and the Exacerbation definition, claiming that designing the study "any other way would have been unethical." *Id.* Without access to the Trial protocol, Defendants could not have made these statements.

116. XOMA also spent significant financial resources on the development of gevokizumab and the EYEGUARD-B Trial. Although Servier was responsible for conducting the Trial, XOMA regularly communicated with Servier regarding its status. John Varian, CEO, XOMA Corporation, Q1 2014 Earnings Call, at 4-5 (May 7, 2014) (transcript on file with Bloomberg, Inc.). Further, by the third quarter of 2013, Servier had paid the initial $50 million in gevokizumab development costs in NIU required under the Collaboration Agreement, obligating XOMA to pay 50% of the cost of gevokizumab's development. *See* Press Release, XOMA Reports First Quarter 2014 Operational Highlights and Financial Results, http://investors.xoma.com/releasedetail.cfm?ReleaseID=846189 (May 7, 2014).

117. In addition, the Individual Defendants repeatedly confirmed that they received interim patient rescue data from the EYEGUARD-B Trial. Even prior to the Unblinding Event, the Individual Defendants would have had access to the ongoing results given that XOMA collaborated with Servier in developing and conducting the trial. For example, on the November 6, 2014 conference call, Defendant Rubin stated that "the ***number*** of subjects reclassified due to this data scrub is almost identical to the newly occurred per protocol exacerbations." November 6,

2014 Call, at 6. During the March 11, 2015 analyst conference call, when asked whether Defendants saw a bifurcation in data, Varian stated that they had, explaining that "[w]hat we've seen, and we've said this, is that there is a ***group of patients, that, in this study who've gone a very long time, and on average more than nine months, and even more than that, who have not exacerbated.***" Q4 2014 Earnings Call, at 14. During the May 6, 2015 conference call, Rubin stated that the Company had "access to all [of Servier's] data[.]" During their May 7, 2015 conference call, Defendants recounted more precise numbers; for example, Varian recalled that Servier enrolled 12 individuals since the beginning of 2015 and approximately 20 individuals since EYEGUARD-B hit target enrollment. XOMA Corporation, Q1 2015 Earnings Call, Bloomberg Tr., at 2 (May 7, 2015). Defendants could not have issued these statements without access to and knowledge of the underlying data the statements purport to represent.

**B. Concealment**

118. Defendants attempted to conceal their fraudulent scheme even after the Company made the July 22, 2015 announcement that the Trial failed. On the Results Call that day, Varian admitted there was a "***paucity of actual data in the Behçet's disease uveitis population, in general, especially as it relates to response to therapy.***" Results Call, at 2. Varian's admission acknowledged the absence of any material scientific basis to support Defendants' earlier positive statements about the blinded data.

119. In response, Matt Kaplan of Ladenburg Thalmann, who had upgraded XOMA's stock in response to the statements about the Trial made on the March 11, 2015 conference call (*see* ¶105), asked why the Trial's results were so different than what the Company had claimed to see "on a blinded basis." Results Call, at 9. Rubin then backtracked, stating that they based their predictions on "talking to experts and their appreciation of the ***natural history of the disease***." *Id.* He continued that the experts "thought that it would be very unusual for a patient taper[ed] down to 5 milligrams of corticosteroid to remain, especially with a history of relatively frequent exacerbations, to remain disease free for a period of time." *Id.* This explanation was plainly bogus for three reasons.

120. First, the natural history of a disease "refers to the progression of a disease process in an individual over time, ***in the absence of treatment***." *See* CDC, An Introduction to Applied Epidemiology and Biostatistics, *in Principles of Epidemiology in Public Health Practice*, http://www.cdc.gov/ophss/csels/dsepd/ss1978/ lesson1/section9.html (3d ed. May 18, 2012). Defendants, however, knew full well that the natural history of BPU was completely irrelevant to the Trial results as ***all*** patients in the EYEGUARD-B Trial were receiving the "current standard of care," (*see* Clinical Trials Register at E.2.1).

121. Second, given the voluminous sources that Plaintiff's counsel was able to find that show that the Standard Therapies that all patients in the Trial were ***can*** control the symptoms of BPU for a long period of time (*see* ¶¶39-62), it is not plausible that Defendants' experts could not predict or were surprised by the fact that the Standard Therapies caused the slow exacerbation rate.

122. Third, based on their previous statements regarding another study, Defendants were clearly aware that the Standard Therapies could cause the slow exacerbation rate. On the November 6, 2014 call, Defendants were questioned about the EYEGUARD-U.S. study. In particular, analysts wanted to know whether there were "any safeguards built into [the EYEGUARD-U.S.] protocol to . . . circumvent . . . the EYEGUARD-B challenges[.]" November 6, 2014 Call, at 12. Rubin responded that patients in EYEGUARD-U.S. do not "have to be on steroid at all to be in [the EYEGUARD-U.S.] trial." *Id.* Varian stated that it would be "***a little bit [too] much disclosure***" to explain the impact of this protocol differentiation. *Id.* Confusing investors even further, Rubin interjected, stating that ***steroid tapering would*** "***confound the ultimate effect***." *Id.* In the context of clinical trials, "confounding is often referred to as a 'mixing of effects' wherein the effects of the exposure under study on a given outcome *are mixed in with the effects of an additional factor* (or set of factors) *resulting in a distortion of the true relationship*." Andrea C. Skelly, *et al.*, *Assessing bias: the importance of considering confounding*, Evid. Based Spine Care J. 2012, *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3503514/ (Feb. 2012). A confounding factor or

treatment may, therefore, "mask an actual association or, more commonly, falsely demonstrate an apparent association between the treatment and outcome when no real association between them exists." *Id.* Thus, even though Defendants knew at the beginning of the Class Period that the Standard Therapies could have potentially confounding effects on the results of the EYEGUARD-B trial, they studiously avoided addressing this fact, choosing instead to create the illusion that the blinded data likely indicated gevokizumab's efficacy.

### C. Defendants Were Aware of And Had Access To Facts Undermining Their Statements

123. Defendants were also conscious of the adverse Phase 2 data. Crucially, Varian stated that XOMA was "preparing ***analysis*** of previously generated gevokizumab Phase 2 data in the [BPU] patients such that it can be supportive of the EYEGUARD-B pivotal study." November 6, 2014 Call, at 3. Defendants also continually discussed the Phase 2 BPU studies. For example, Varian stated that both Servier's and XOMA's Phase 2 studies "generated consistently positive data" (November 6, 2014 Call, at 3) and that XOMA had "very good Phase 2 data" (John Varian, CEO, XOMA Corporation, Q1 2014 Earnings Call, 6 (May 7, 2015) (transcript on file with Bloomberg, Inc.)). Yet, the Servier Phase Results indicated that Standard Therapies could result in remission of up to ***10 months***. *See* ¶70.

124. Defendants were keenly aware of that the Standard Therapies were being administered in the trial. According to the EU Clinical Trials Register for the EYEGUARD-B study, for the main objective of the trial, *see* E.2.1, "[t]he objective of this study is to demonstrate the superiority of gevokizumab as compared to placebo on top of current standard of care in reducing the risk of Behçet's disease uveitis exacerbations." Ex. 8. Rubin was also cognizant of the fact that "it [is] typical for [patients] to be put on . . . corticosteroid ***or*** . . . some of these immuno-suppressants [which] . . . ***control*** [Behçet's] disease [uveitis]." Paul Rubin, CMO, XOMA (XOMA) Presents at Credit Suisse 2014 Healthcare Conference, 5 (transcript on file with Seeking Alpha) (Nov. 12, 2014). Indeed, the Company understood "that patients can be under control with other therapies . . . [f]rom prednisone ***and/or*** other immunosuppressives[.]" *See*

XOMA Corporate Presentation (Jan. 2015). Defendants were also familiar with resources discussing BPU and the efficacy of Standard Therapies in delaying BPU Exacerbations; for example Varian referenced 2014 AAO Recommendation at the beginning of the Class Period. *See* November 6, 2014 Call, at 3. After the Class Period, Varian also told investors that the Company had consulted "***experts regarding their experience***" with BPU, further evidencing Defendants' awareness of the treatment effect of Standard Therapies. *See* Results Call, at 2.

125. In light of the paucity of information on BPU treatment (Results Call at 2), Defendants must have been mindful of data suggesting that Standard Therapies could control and delay BPU Exacerbations for months (¶¶105, 39-62, 70).

**D. Education, Experience, and Training of the Individual Defendants**

126. Moreover, each of the Individual Defendants were highly educated, trained, and experienced in drug development and clinical trials and were therefore well aware that their statements regarding the magnitude and relevance of the Rescues and the blinded EYEGUARD-B Trial data were false and/or misleading.

127. Defendant Varian had extensive experience in pharmaceutical development prior to his appointment to XOMA CEO in January 2012. Varian received a B.B.A. degree from Western Michigan University. XOMA Corporation, Annual Report Form 10-K, at 35 (filed Mar. 12, 2014). Varian was an Audit Principal and Senior Manager at Ernst & Young from 1987 until 1991 and focused on life sciences. *See id.* From 1991 through 1997, Varian served as the Vice President Finance and CFO of Anergen Inc. *See id.* From June 1997 until October 1998, Varian served as Neurex Corporation's CFO before it was acquired by Elan Pharmaceuticals, Inc. *See id.* At Elan Pharmaceuticals Inc., Varian served as Senior Vice President, Finance and Administration from October 1998 to April 2000. *See id.* Prior to joining XOMA, Varian was CEO of Aryx Therapeautics from December 2003 through August 2011, and CFO of the same from April 2006 through March 2011. *See id.* Varian also served, and continues to serve, as a XOMA board director from 1998. *See id.*

128. Defendant Rubin is also highly educated and has extensive experience in pharmaceutical research and development. He received his M.D. from Rush Medical College and completed training in internal medicine at the University of Wisconsin. *See id.* Prior to joining XOMA as CMO in June 2011, Rubin was CMO at Funxional Therapeutics Ltd. *See id.* From 1987 to 1993, Rubin served as Vice President, Immunology and Endocrinology at Abbott, where he advanced zilueton, the first 5-lipoxygenase inhibitor, from discovery to approval for treatment of asthma. *See id.* From 1993 to 1996, Rubin held senior level positions at Glaxo-Wellcome Pharmaceuticals, including Vice President of Worldwide Clinical Pharmacology and Early Clinical Development. *See id.* From 1996 to 2002, Rubin served as Senior Vice President, Development, then later as Executive Vice President, Research and Development at Sepracor and was responsible for development of Sepracor's internally developed and approved products including, *inter alia*, Xopenex®, Lunesta®, Xopenex HFA®, and Brovana®. *See id.* He also served as President and CEO of Critical Therapeutics, Inc. from 2002 to 2007, and CEO of Resolvyx Pharmaceuticals, Inc. from 2007 to 2009. *See id.*

129. Defendant Neu is also highly educated and experienced. Dr. Neu holds an M.D. from the Harvard-MIT Division of Health Sciences and Technology and spent three years in the Immunology Ph.D. program at Stanford University as a Howard Hughes Medical Institute Fellow. *See* XOMA Corporation, Proxy Statement (Schedule 14A), 21 (dated Apr. 11, 2014). He also holds an A.B. from Princeton University. *Id.*

**E. XOMA's Cash Position**

130. XOMA's cash burn rate required it to raise substantial amounts of cash and provided Defendants with a motive to create the illusion that the EYEGUARD-B Trial would be successful. To date, XOMA has spent over $1 billion without successfully marketing a single drug. *See* Ron Leuty, San Francisco Bus. Times, *Biotech Zombie Xoma Plods Toward Its Next Target*, *available at* http://www.bizjournals.com/sanfrancisco/blog/biotech/2016/03/xoma-gevokizumab-layoffs-berkeley-biotech.html (Mar. 10, 2016). To sustain its business model, XOMA incurred significant amounts of debt during the Class Period and had little cash on hand to

continue operating as it had in the years prior. In order to overcome the hurdle of its own record of consistent failure, Defendants were motivated to, and actually fostered the illusion that gevokizumab, and in particular, the EYEGUARD-B Trial, would finally be XOMA's turning point.

131. The Company's survivability hinged on Defendants' scheme to inflate its stock price. On November 6, 2014, CFO Fred Kurland, summarizing XOMA's financial position, stated that "at September 30, 2014, [XOMA] ***had cash equivalents and short-term investments of $59.1 million***" and that XOMA was "on target with [its] full year guidance of ***an operating burn of $55 million to $60 million***" indicating that XOMA barely had enough cash to continue operating for the year. November 6, 2014 Call, at 2.

132. Concurrently, XOMA carried millions in outstanding debt on the following loans: (1) ***$6.3 million*** in outstanding principal on its General Electric Capital Corporation Term Loan; (2) ***$19 million*** in outstanding principal under the Servier Loan Agreement[15]; (3) and ***$13.2 million*** in outstanding principal under a secured note agreement with Novartis (formerly Chiron Corporation), totaling ***$38.5 million*** in outstanding principal as of September 2014. *See* XOMA Corporation, Quarterly Report (Form 10-Q), 9-11 (dated Nov. 6, 2014).

133. To continue operating and for the Individual Defendants to reap benefits from their stock awards, Defendants conditioned the market to believe that EYEGUARD-B would be successful thereby inflating XOMA's common stock price. *See supra* ¶99. Accordingly, on December 9, 2014, Defendants conducted, a ***$40 million offering*** infusing the debt-laden Company with cash to further Defendants' scheme. Press Release, *XOMA Announces Pricing of $40.0 Million Registered Offering of Common Stock and Warrants*, http://investors.xoma.com/releasedetail.cfm?ReleaseID=886788 (Dec. 9, 2014). By conducting the offering, Defendants "remove[d] the potential of a going concern risk in the [subsequent] 2014

[15] On December 30, 2010, XOMA entered into a loan agreement with Servier (the "**Servier Loan Agreement**"). 2014 Prospectus, at S-10. The Servier Loan Agreement provides for an advance of up to €15.0 million, with proceeds converting to approximately $19.5 million in January 2011. *Id.*

10[-]K." Jason Kantor, PhD, *et al.*, Credit Suisse, *Updating Model for Recent Equity Raise*, 1 (Dec. 15, 2014). A "going concern is an accounting term for a company that has the resources needed to continue to operate indefinitely until a company provides evidence to the contrary." Going Concern, Investopedia, http://www.investopedia.com/terms/g/goingconcern.asp (last visited July 8, 2016). "If a business is not a going concern, that means that it has gone bankrupt and its assets were liquidated." *Id.* Accordingly, XOMA's very existence was at risk without the infusion of cash provided by the offering.

**F. Insider Selling**

134. According to Forms 4 filed with the SEC by XOMA insiders, the Individual Defendants and certain members of the XOMA Board of Directors made stock sales that were highly suspicious in both timing and amount.

135. ***Chief Executive Officer John Varian***: Between November 6, 2014 and July 21, 2015, Varian sold thousands of shares of XOMA common stock, as set forth in the following chart:

| Trade Date | Number of Shares Sold | Sales Price | Proceeds |
|---|---|---|---|
| 11/13/2014[16] | 2,630 | $3.8924 | $10,237 |
| 12/15/2014 | 10,000 | $4.4929 | $44,929 |
| 1/15/2015 | 10,000 | $3.4582 | $34,582 |
| 2/17/2015 | 10,000 | $3.5192 | $35,192 |
| 3/16/2015 | 10,000 | $3.7223 | $37,223 |
| 4/15/2015 | 10,000 | $3.8606 | $38,606 |
| 5/15/2015 | 10,000 | $3.34 | $33,400 |
| 6/15/2015 | 10,000 | $3.6362 | $36,362 |
| 7/15/2015 | 10,000 | $4.4869 | $44,869 |

136. In a nine-month span, Varian sold a total of 82,630 shares of XOMA common stock at an average price of $3.82 per share, for total proceeds of approximately $315,400. The

[16] The Form-4 dated November 17, 2014 and filed with the SEC states that one of the transactions on this date was conducted on November 13, 2013, evidencing that Varian may not have been forthcoming in reporting his transactions.

proceeds amounted to approximately 55.38% of Varian's annual base salary earned during the year ended December 31, 2014.[17] Furthermore, Varian's sales during the Class Period constituted approximately 6.96% of his common stock holdings as of March 1, 2015.[18] Varian has only sold shares *once* since the Class Period ended.

137. ***Chief Medical Officer Paul Rubin***: Between November 6, 2014 and July 21, 2015, Rubin sold thousands of shares of XOMA common stock, as set forth in the following chart:

| Trade Date | Number of Shares Sold | Sales Price | Proceeds |
|---|---|---|---|
| 11/20/2014 | 5,000 | $4.55 | $22,750 |
| 12/15/2014 | 1,600 | $4.6256 | $7,401 |
| 3/23/2015 | 32,742 | $3.9362 | $128,879 |
| 5/28/2015 | 1,788 | $3.6 | $6,437 |
| 7/9/2015 | 4,400 | $4.55 | $20,020 |
| 7/10/2015 | 29,000 | $4.5512 | $131,984.80 |
| 7/15/2015 | 5,000 | $4.5984 | $22,992 |

138. In a nine-month span, Rubin sold a total of 79,530 shares of XOMA common stock at an average price of $4.28 per share, for total proceeds of approximately $340,464. The proceeds amounted to approximately 82.84% of Rubin's annual base salary earned during the year ended December 31, 2014.[19] Furthermore, Rubin's sales during the Class Period constituted approximately 17.17% of his common stock holdings as of March 1, 2015.[20] Rubin has only sold shares of XOMA common stock once since the Class Period ended.

---

[17] Varian's annual base salary was derived from the "Compensation Components" section on page 9 of XOMA's Schedule 14A Proxy Statement, filed with the SEC on April 10, 2015.

[18] Varian's common stock holdings as of March 1, 2015 were derived from the "Beneficial Stock Ownership" section on page 3 of the XOMA Schedule 14A Proxy Statement, filed with the SEC on April 10, 2015.

[19] Rubin's annual base salary was derived from the "Compensation Components" section on page 9 of XOMA's Schedule 14A Proxy Statement, filed with the SEC on April 10, 2015

[20] Rubin's common stock holdings as of March 1, 2015 were derived from the "Beneficial Stock Ownership" section on page 3 of the XOMA Schedule 14A Proxy Statement, filed with the SEC on April 10, 2015. According to this Proxy Statement, this number "[i]ncludes 320,741 shares of Common Stock issuable upon the exercise of options exercisable as of 60 days after

139. ***Controlling Shareholder Baker Bros.***: Although not named as defendants, between November 6, 2014 and July 21, 2015, Baker Bros. sold millions of shares of XOMA common stock, as set forth in the following chart:

| Entity | Trade Date | Number of Shares Sold | Sales Price | Proceeds |
|---|---|---|---|---|
| Baker Biotech Capital (GP), LLC | 12/2/2014 | 60,833 | $5.3591 | $326,010.13 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/2/2014 | 428,583 | $5.3591 | $2,296,819.16 |
| 14159 Capital (GP), LLC | 12/2/2014 | 10,534 | $5.3591 | $56,452.76 |
| Baker Biotech Capital (GP), LLC | 12/3/2014 | 69,153 | $4.8402 | $334,714.35 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/3/2014 | 486,800 | $4.8402 | $2,356,209 |
| 14159 Capital (GP), LLC | 12/3/2014 | 11,965 | $4.8402 | $57,913 |
| Baker Biotech Capital (GP), LLC | 12/4/2014 | 153,618 | $4.5457 | $689,301 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/4/2014 | 1,122,584 | $4.5457 | $5,102,930.09 |
| 14159 Capital (GP), LLC | 12/4/2014 | 28,086 | $4.5457 | $127,670 |
| Baker Biotech Capital (GP), LLC | 12/9/2014 | 46,383 | $4.6159 | $214,099.29 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/9/2014 | 337,541 | $4.6159 | $1,558,055.50 |

March 1,2015[, but d]oes not include 6,881 shares of Common Stock that have been deposited pursuant to the Company's Deferred Savings Plan.

| | | | | |
|---|---|---|---|---|
| 14159 Capital (GP), LLC | 12/9/2014 | 8,429 | $4.6159 | $38,907.42 |
| Baker Biotech Capital (GP), LLC | 12/12/2014 | 29,960 | $4.714 | $141,231.44 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/12/2014 | 218,383 | $4.714 | $1,029,457.46 |
| 14159 Capital (GP), LLC | 12/12/2014 | 5,457 | $4.714 | $25,724.30 |
| Baker Biotech Capital (GP), LLC | 12/15/2014 | 54,396 | $4.4502 | $242,073.08 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/15/2014 | 396,469 | $4.4502 | $1,764,366.34 |
| 14159 Capital (GP), LLC | 12/15/2014 | 9,908 | $4.4502 | $44,092.58 |
| Baker Biotech Capital (GP), LLC | 12/16/2014 | 37,592 | $4.2709 | $160,551.67 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/16/2014 | 274,734 | $4.2709 | $1,173,361.44 |
| 14159 Capital (GP), LLC | 12/16/2014 | 6,874 | $4.2709 | $29,358.17 |
| Baker Biotech Capital (GP), LLC | 12/17/2014 | 81,109 | $4.309 | $349,498.68 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/17/2014 | 590,638 | $4.309 | $2,545,059.14 |
| 14159 Capital (GP), LLC | 12/17/2014 | 14,753 | $4.309 | $63,570.68 |
| Baker Biotech Capital (GP), LLC | 12/18/2014 | 19,599 | $4.289 | $84,060.11 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/18/2014 | 142,543 | $4.289 | $611,366.93 |
| 14159 Capital | 12/18/2014 | 3,558 | $4.289 | $15,260.26 |

| | | | | |
|---|---|---|---|---|
| (GP), LLC | | | | |
| Baker Biotech Capital (GP), LLC | 12/19/2014 | 88,937 | $4.2085 | $374,291.36 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/19/2014 | 647,781 | $4.2085 | $2,726,186.34 |
| 14159 Capital (GP), LLC | 12/19/2014 | 16,182 | $4.2085 | $68,101.95 |
| Baker Biotech Capital (GP), LLC | 12/26/2014 | 15,420 | $3.7106 | $57,217.45 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/26/2014 | 112,855 | $3.7106 | $418,759.76 |
| 14159 Capital (GP), LLC | 12/26/2014 | 2,825 | $3.7106 | $10,482.45 |
| Baker Biotech Capital (GP), LLC | 12/29/2014 | 26,137 | $3.6762 | $96,084.84 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/29/2014 | 190,117 | $3.6762 | $698,908.12 |
| 14159 Capital (GP), LLC | 12/29/2014 | 4,746 | $3.6762 | $17,447.25 |
| Baker Biotech Capital (GP), LLC | 12/30/2014 | 46,362 | $3.6495 | $169,198.12 |
| Baker Brothers Life Sciences Capital (GP), LLC | 12/30/2014 | 337,123 | $3.6495 | $1,230,330.39 |
| 14159 Capital (GP), LLC | 12/30/2014 | 8,415 | $3.6495 | $30,710.54 |
| Baker Biotech Capital (GP), LLC | 1/2/2015 | 25,092 | $3.5537 | $89,169.44 |
| Baker Brothers Life Sciences Capital (GP), LLC | 1/2/2015 | 182,454 | $3.5537 | $648,386.78 |
| 14159 Capital (GP), LLC | 1/2/2015 | 4,544 | $3.5537 | $16,148.01 |

| | | | | |
|---|---|---|---|---|
| Baker Biotech Capital (GP), LLC | 1/5/2015 | 118,652 | $3.8115 | $452,242.10 |
| Baker Brothers Life Sciences Capital (GP), LLC | 1/5/2015 | 863,100 | $3.8115 | $3,289,705.65 |
| 14159 Capital (GP), LLC | 1/5/2015 | 21,548 | $3.8115 | $82,130.20 |
| Baker Biotech Capital (GP), LLC | 1/6/2015 | 118,571 | $3.86 | $457,684.06 |
| Baker Brothers Life Sciences Capital (GP), LLC | 1/6/2015 | 859,988 | $3.86 | $3,319,553.68 |
| 14159 Capital (GP), LLC | 1/6/2015 | 21,441 | $3.86 | $82,762.26 |

140. In a nine-month span, Baker Bros. sold a total of 8,362,772 shares of XOMA common stock at an average price of $4.28 per share, for total proceeds of approximately $35,782,615.95. The proceeds are approximately *three times* the purchase price of those shares.[21] Furthermore, Baker Bros. sales during the Class Period constituted approximately 27% of their common stock holdings as of March 1, 2014.[22] Although Baker Bros. sold its remaining shares immediately after the Class Period ended, they profited handsomely from their Class Period sales and the insider information Neu, the Baker Bros. inside director, was privy to. The Baker Bros. had not sold any shares of XOMA common stock prior to the above listed transactions.

141. The Individual Defendants along with the Baker Bros., sold a combined total of 8,524,932 shares of XOMA common stock, for combined proceeds of over $36,438,480—in a

[21] The purchase price was derived from the "Source and Amount of Funds or Other Consideration" section on page 5 of XOMA's Schedule 13D announcing Baker Bros. acquisition of XOMA stock, filed with the SEC on March 12, 2012.

[22] Common stock holdings as of March 1, 2014 were derived from the "Beneficial Stock Ownership" section on page 3 of the XOMA Schedule 14A Proxy Statement, filed with the SEC on April 11, 2014.

span of only nine months, with the heaviest trading (98.44% of shares sold) occurring within the 70 days after start of the Class Period, creating a strong inference of scienter.

### G. Former Employees

142. Fact Witness ("**FW**") 1 began working at XOMA in 2012. Eventually, FW1 became Clinical Program Manager at Xoma until his[23] departure in August 2015. During his last year at XOMA, he reported to Ann Neale ("**Neale**"), VP of Clinical Operations and Data Assessment. According to FW1, Neale reported to Rubin. While at XOMA, FW1 was told by multiple sources that the Baker Brothers were "very involved investors."

143. FW2 worked at XOMA from May 2010 to July 2013 as Senior Director of Commercial Development. At that time, he reported to James R. Neal, who was then-VP of Business Development. James R. Neal is now XOMA's Chief Operating Officer. FW2 recalls that while he was at XOMA, the Baker Brothers, particularly Julian Baker, spoke with Varian and Rubin often.

## CLASS ACTION ALLEGATIONS

144. Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities who purchased XOMA common stock between November 6, 2014 and July 21, 2015, inclusive, and were damaged thereby, seeking to pursue remedies under the Exchange Act (the "**Class**").

145. Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

146. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, XOMA common stock was actively traded on the

---

[23] FW's are referred to with masculine pronouns regardless of their gender to protect their identities.

NASDAQ GM, which is an efficient market. While the exact number of Class members cannot be determined at this early stage, Plaintiff believes that thousands of people held XOMA common stock during the Class Period. Record owners and other members of the Class may be identified from records maintained by XOMA or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

147. Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct as complained of herein.

148. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the Class.

149. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, *inter alia*:

a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) Whether Defendants' publicly disseminated statements made during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c) Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of XOMA's common stock to be artificially inflated during the Class Period;

d) Whether Defendants acted with the requisite level of scienter in omitting and/or misrepresenting material facts;

e) Whether the Individual Defendants were controlling persons of XOMA;

f) Whether reliance may be presumed pursuant to the *Affiliated Ute* presumption, fraud-on-the-regulatory process, or fraud-on-the-market doctrine for the Exchange Act Claims; and

g) Whether the Class members have sustained damages, and if so, the proper measure of damages.

150. Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

151. A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable. In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

**LOSS CAUSATION**

152. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated XOMA's stock price and operated as a fraud or deceit on Class Period purchasers of XOMA stock by misrepresenting the Company's business and prospects. During the Class Period, Defendants misled investors regarding the magnitude and relevance of the Rescues and regarding the significance of the Trial's blinded data. As a result of their purchases of XOMA stock during the Class Period at artificially inflated prices, Plaintiff and other Class members suffered damages as the true facts and XOMA's fraud were revealed.

153. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and the Class.

154. Defendants' false and misleading statements and omissions in their SEC filings and other public statements during the Class Period directly and proximately caused losses to Plaintiff and the Class. On the strength of these false and misleading statements, the Company's stock price was artificially inflated to a Class Period high of $5.70 per share on November 26, 2014.

Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of XOMA's business, operations, performance, and prospects. The allegations herein suffice under a corrective disclosure or a materialization of the risk theory of loss causation.

155. When the truth emerged regarding the failure of the EYEGUARD-B Trial, the price of XOMA's stock declined as the market processed these previously undisclosed facts. This corrective disclosure removed a portion of the artificial inflation in the price of XOMA's common stock and directly and proximately caused Plaintiff and other Class members to suffer damages. For example, on July 22, 2015, when XOMA announced that the Trial failed, shares of XOMA common stock closed at $0.91, on a one-day decline of more than 79% from the day prior.

156. Under a materialization of the risk theory, the Defendants' false and misleading statements and omissions in their SEC filings and other public statements during the Class Period also concealed the circumstances which would have spared all or some of Plaintiff's loss as a result of the disclosure of the negative EYEGUARD-B results. *See Berson v. Applied Signal Tech., Inc*, 527 F.3d 982, 989 (9th Cir. 2008) (plaintiffs alleged loss causation element "by alleging particular facts indicating that 'but for the circumstances that the fraud concealed'—namely, the fact that much of [Defendant's] backlog had been halted by stop-work orders—[plaintiffs'] investment . . . would not have lost its value."); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 546-48 (N.D. Cal. 2009).

157. Until shortly before Plaintiff filed this Complaint, he was unaware of the facts alleged herein and could not have reasonably discovered the Defendants' misrepresentations and omissions by the exercise of reasonable diligence.

**CONTROL PERSON LIABILITY**

158. The Individual Defendants are liable as direct participants with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of

Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of XOMA's business.

159. Specifically, because of their positions within the Company, the Individual Defendants possessed the power and authority to control the contents of XOMA's SEC filings, annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market, including those containing the materially false and misleading statements and omissions of material fact alleged herein. Each of the Individual Defendants, by reason of his/her respective management or board position, had the ability and opportunity to review copies of the Company's SEC filings, reports, press releases, and other statements alleged herein to be misleading, prior to, or shortly after their issuance or to cause them to be corrected.

160. By virtue of their positions, the Individual Defendants had access to material non-public information. Each of the Individual Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

**APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE**

161. The market for XOMA's common stock was an efficient market for the following reasons, among others:

a) XOMA's common stock was listed and actively traded on the NASDAQ GM, a highly efficient national market;

b) As a registered and regulated issuer of securities, XOMA filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c) XOMA regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d) XOMA was followed by multiple analysts, which followed XOMA's business and wrote reports which were publicly available and affected the public marketplace;

e) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of XOMA's stock; and

f) Without knowledge of the misrepresented or omitted facts, Plaintiff and other members of the Class purchased XOMA stock between the time Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of XOMA stock was artificially inflated by Defendants' misrepresentations and omissions.

162. As a result of the above, the market for XOMA securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the security's price. The historical daily trading prices and volumes of XOMA's publicly traded stock are incorporated by reference herein. Under these circumstances, many purchasers of XOMA common stock during the Class Period suffered similar injuries through their purchases of shares at prices which were artificially inflated by Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

**THE AFFILIATED UTE PRESUMPTION**

163. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants

are predicated primarily on omissions of material fact which the Defendants had a duty to disclose. Under *Affiliated Ute*, all that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making a decision to purchase or sell the securities. *Id.* at 153-54. Here, Defendants had a duty but failed to disclose, at the time of issuance, regarding the magnitude and relevance of the Rescues and the significance of the blinded data.

**NO SAFE HARBOR**

164. The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

165. First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact.

166. Second, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

167. Third, such false and misleading statements were not accompanied by cautionary language that was meaningful because any such warnings or “risk” factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings class, or other public statements described herein were general, “boilerplate” statements of risk that would affect any pharmaceutical development company, and misleadingly contained no factual disclosure of any of the specific details of the endemic problems affecting the Company during the Class Period, or similar important factors that would give investors adequate notice of such risks.

168. Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular

speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of XOMA who actually knew that each such statement was false or misleading when made.

**CAUSES OF ACTION**

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

169. Plaintiff re-alleges each allegation above as if fully set forth herein.

170. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Defendants.

171. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings, presentations, press releases, and analyst reports concerning the blinded EYEGUARD-B data reviewed by the Defendants, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

172. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes, and artifices to defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiff and other members of the Class in that the Defendants concealed the magnitude and relevance of the Rescues and the fact that no positive information about the efficacy of gevokizumab could be gleaned from the blinded data.

173. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a

continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

174. Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

175. As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class Members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

176. XOMA is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of respondeat superior, as those persons were acting as the officers, directors, and/or agents of XOMA in taking the actions alleged herein.

177. Plaintiff and Class members purchased XOMA common stock, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects. In so doing, Plaintiff and Class members relied directly or indirectly on false and misleading statements made by the Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements. Plaintiff and Class members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

178. At the time of Defendants' false statements, misrepresentations, and omissions, Plaintiff and Class members were unaware of their falsity and believed them to be true. Plaintiff and the Class would not otherwise have purchased XOMA common stock had they known the truth about the matters discussed above.

179. Plaintiff is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claims, and within five years after the violations with respect to Plaintiff's investments.

180. By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

181. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of XOMA common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

182. Plaintiff re-alleges each allegation above as if fully set forth herein.

183. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

184. As set forth above, XOMA committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by participating in a scheme to mislead investors regarding the magnitude and relevance of the Rescues and the fact that no positive information about the efficacy of gevokizumab could be gleaned from the blinded EYEGUARD-B Trial data.

185. Each of the Individual Defendants, by reason of their status as senior executive officers and/or directors of XOMA, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's and the Class' investments in XOMA common stock within the meaning of §20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

186. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

187. The Individual Defendants knew or recklessly disregarded the fact that XOMA's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

188. By virtue of their high-level positions and their participation in and awareness of XOMA's operations and public statements, the Individual Defendants were able to and did influence and control XOMA's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

189. The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

190. As set forth above, XOMA committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by participating in a scheme to conceal the adverse patient data from the investing public.

191. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of XOMA common stock.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and the Class, pray for relief and judgment including:

A. Determining that Counts I and II of this action are a proper class action under Federal Rules of Civil Procedure 23, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C. Awarding rescissory damages in favor of Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

D. Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

E. Awarding Plaintiff and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

F. Awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all triable claims.

Dated: July 8, 2016

**FARUQI & FARUQI, LLP**

By: _/s/ Richard W. Gonnello_

Richard W. Gonnello (*pro hac vice*)
Katherine M. Lenahan (*pro hac vice*)
Sherief Morsy (*pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: rgonnello@faruqilaw.com
klenahan@faruqilaw.com
smorsy@faruqilaw.com

Barbara A. Rohr SBN 273353
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: brohr@faruqilaw.com

*Attorneys for Lead Plaintiff Joseph Tarzia*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

By: */s/ Richard W. Gonnello*
Richard W. Gonnello

# Mailing Information for a Case 3:15-cv-03425-HSG Markette v. XOMA Corp et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brett Hom De Jarnette**
  bdejarnette@cooley.com,galancr@cooley.com
- **John C. Dwyer**
  dwyerjc@cooley.com,giovannonib@cooley.com
- **Nadeem Faruqi**
  nfaruqi@faruqilaw.com
- **Michael M. Goldberg**
  michael@goldberglawpc.com
- **Richard W. Gonnello**
  rgonnello@faruqilaw.com,msullivan@faruqilaw.com,ecf@faruqilaw.com,dbehnke@faruqilaw.com
- **Phillip C Kim**
  pkim@rosenlegal.com
- **Katherine M. Lenahan**
  klenahan@faruqilaw.com
- **Amanda Alison Main**
  amain@cooley.com,jcorrell@cooley.com
- **Sherief Morsy**
  smorsy@faruqilaw.com,ecf@faruqilaw.com
- **Mark Punzalan**
  markp@punzalanlaw.com,office@punzalanlaw.com
- **Barbara Ann Rohr**
  brohr@faruqilaw.com,smarton@faruqilaw.com,bheikali@faruqilaw.com,ecf@faruqilaw.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net
- **Jessica Valenzuela Santamaria**
  jsantamaria@cooley.com,galancr@cooley.com
- **Megan M Sullivan**
  msullivan@faruqilaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)