COOLEY LLP
JOHN C. DWYER (136533) (dwyerjc@cooley.com)
JESSICA VALENZUELA SANTAMARIA (220934) (jsantamaria@cooley.com)
AMANDA A. MAIN (260814) (amain@cooley.com)
BRETT DE JARNETTE (292919) (bdejarnette@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304
Telephone:    (650) 843-5000
Facsimile:    (650) 849-7400

Attorneys for Defendants
XOMA CORPORATION, JOHN W. VARIAN,
PAUL D. RUBIN, and KELVIN M. NEU

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH F. MARKETTE, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>XOMA CORPORATION, JOHN W. VARIAN, and PAUL D. RUBIN, et al.,<br><br>Defendants. | Case No.:  3:15-cv-3425-HSG<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>Date:          November 3, 2016<br>Time:         2:00 p.m.<br>Judge:        Hon. Haywood S. Gilliam |

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ................................................................................................................ 2

II.     STATEMENT OF FACTS ................................................................................................... 2

        A.      The Parties. ............................................................................................................. 2

        B.      Gevokizumab and Behçet's Uveitis. ...................................................................... 3

        C.      Phase 2 Gevokizumab Trials in Behçet's Uveitis. ................................................ 3

        D.      XOMA's Phase 3 EYEGUARD-B Trial. ............................................................... 4

        E.      Announcement of EYEGUARD-B Trial Results. .................................................. 8

        F.      The Litigation. ........................................................................................................ 8

III.    LEGAL STANDARDS ....................................................................................................... 9

IV.     PLAINTIFF'S SECTION 10(b) CLAIM MUST BE DISMISSED ................................... 11

        A.      Plaintiff Fails to Plead With Particularity That Defendants Made Any False
                Statement. ............................................................................................................. 11

                1.      The Statements of Optimism Are Not False. ............................................ 12

                        a.      The Complaint does not adequately allege that XOMA's
                                opinions about the blinded data were not genuinely held. ............. 12

                        b.      The Statements of Optimism are inactionable puffery. .................. 15

                        c.      As forward-looking, the Statements of Optimism are
                                inactionable. ................................................................................... 16

                2.      The Alleged Rescue Omissions Did Not Render Any Statement False
                        or Misleading. ........................................................................................... 17

        B.      Plaintiff's Allegations Fail to Support a Strong Inference of Scienter; the Far
                More Compelling Inference Is that Defendants Acted in Good Faith. .................. 19

                1.      Core Operations Inference Does Not Apply. ............................................. 20

                2.      Defendants' Stock Sales Negate an Inference of Scienter. ........................ 21

                3.      Plaintiff's Other Scienter Arguments Fail. ................................................ 22

                4.      Viewed holistically, the only cogent and compelling inference is that
                        XOMA was justifiably optimistic. ............................................................ 23

        C.      Plaintiff Fails to Plead Loss Causation. ............................................................... 23

V.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER RULE 10B-5(a) & (c)........... 24

VI.     PLAINTIFF'S SECTION 20(A) CLAIM MUST BE DISMISSED ................................... 25

VII.    Conclusion ........................................................................................................................ 25

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

i.

## TABLE OF AUTHORITIES

PAGE

**Cases**

*Abbate v. Wells Fargo Bank, N.A.*,
2011 WL 9698215 (C.D. Cal. Nov. 17, 2011)................................................................................24

*Anderson v. Peregrine Pharm., Inc.*,
2013 WL 4780059 (C.D. Cal. Aug. 23, 2013)...............................................................................21

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)......................................................................................................................9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................................................9

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 2937483 (N.D. Cal. May 20, 2016)................................................................................23

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)...............................................................................16

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)........................................................................................................12, 13

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) .......................................................................................11, 16

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) .........................................................................................17, 21

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ..............................................................................................15, 16, 17

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) .......................................................................................................10

*DSAM Global Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002) ...........................................................................................................9

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).......................................................................................................................23, 24

*In re ECOtality, Inc. Sec. Litig.*,
2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ..............................................................................15

*In re ESS Tech., Inc.*,
No. C-02-04497 RMW, 2005 WL 418548 (N.D. Cal. Feb. 22, 2005) ..........................................17

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ...............................................................................12

*Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009) .........................................................................................15

*In re FVC.COM Sec. Litig.*,
136 F. Supp. 2d 1031 (N.D. Cal. 2000), *aff'd,* 32 F. App'x 338 (9th Cir. 2002) .........................22

*Gillis v. QRX Pharma Ltd.*,
2016 U.S. Dist. LEXIS 87489 (S.D.N.Y. July 6, 2016) ...............................................................16

*In re Gupta Corp. Sec. Litig.*,
900 F. Supp. 1217 (N.D. Cal. 1994) ............................................................................................25

*In re Intershop Commc'ns AG Sec. Litig.*,
2003 U.S. Dist. LEXIS 26927 (N.D. Cal. Apr. 2, 2003) ..............................................................15

*In re Intrabiotics Pharm., Inc. Sec. Litig.*
2006 WL 2192109 (N.D. Cal. Aug. 1, 2006) .........................................................................19, 20

*Janus Capital Grp., Inc. v. First Derivative Traders*,
131 S. Ct. 2296 (2011) ................................................................................................................11

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) .......................................................................................25

*Lipton v. PathoGenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) .....................................................................................................25

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .......................................................................................................10

*In re MedImmune, Inc. Sec. Litig.*,
873 F. Supp. 953 (D. Md. 1995) ..................................................................................................14

*Metzler Inv. GMHB v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .....................................................................................................10

*In re Nuvelo, Inc., Sec. Litig.*,
2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) ..........................................................................16, 17

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .....................................................................................................10

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii.

**DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG**

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) ...............................................................................................12, 14

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ..............................................................................................9

*Padnes v. Scios Nova Inc.*,
1996 WL 539711 (N.D. Cal. Sept. 18,1996) ....................................................................14

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) .............................................................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ...........................................................................................15

*Reinschmidt v. Zillow, Inc.*,
No. C12-2084 RSM, 2014 WL 5343668 (W.D. Wash. Oct. 20, 2014)...................................18, 19

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ...................................................................................... *passim*

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ...................................................................................10, 20, 22

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ............................................................................................20

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) .................................................................17

*Stichting Pensioenfonds ABP v. Merck & Co.*,
2012 WL 3235783 (D.N.J. Aug. 1, 2012) ...................................................................24, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................................10, 23

*Urman v. Novelos Therapeutics, Inc.*,
867 F. Supp. 2d 190 (D. Mass. 2012) ...............................................................................24

*In re Vantive Corp. Sec. Litig.*,
110 F. Supp. 2d 1209 (N.D. Cal. 2000), *aff'd* 283 F.3d 1079 (9th Cir. 2002) .............................10

*In re Velti PLC Sec. Litig.*,
at *33 (N.D. Cal. Oct. 1, 2015), *appeal dismissed* (Apr. 4, 2016)................................................12

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iv.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ...................................................................................................9

*In re Vical Inc. Sec. Litig.*,
2015 WL 1013827 (S.D. Cal. Mar. 9, 2015) ................................................................14, 15, 20

*Weiss v. Amkor Tech., Inc.*,
527 F. Supp. 2d 938 (D. Ariz. 2007) ......................................................................................15

*Wietschner v. Monterey Pasta Co.*,
294 F. Supp. 2d 1102 (N.D. Cal. 2003) ..................................................................................22

*Wozniak v. Align Tech., Inc.*,
850 F. Supp. 2d 1029 (N.D. Cal. 2012) ..................................................................................22

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
655 F.3d 1039 (9th Cir. 2011) ................................................................................................24

*In re XenoPort, Inc. Sec. Litig.*,
2011 WL 6153134 (N.D. Cal. Dec. 12, 2011).....................................................................21, 22

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ........................................................................................ *passim*

**Other Authorities**

15 U.S.C.
§ 78u-4(b)........................................................................................................................1
§ 78u-4(b)(2) ............................................................................................................10, 19
§ 78u-5(c)(1)(A)(i).....................................................................................................16, 17

21 C.F.R. § 312.21 .......................................................................................................3, 4

Federal Rule of Civil Procedure
8...................................................................................................................................1
9(b) ..........................................................................................................................1, 9
12(b)(6) ....................................................................................................................1, 9

Securities Act of 1933
§ 11..............................................................................................................................12

Securities Exchange Act of 1934
§ 10(b)...........................................................................................................1, 9, 11, 21, 24
§ 20(a) .....................................................................................................................1, 9, 25
§ 21D(b) ............................................................................................................... *passim*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

v.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

**NOTICE OF MOTION AND MOTION TO DISMISS**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 3, 2016, or as soon thereafter as this Motion may be heard, defendants XOMA Corporation ("XOMA" or the "Company"), John W. Varian, Paul D. Rubin, and Kelvin M. Neu (collectively, "Individual Defendants" and with XOMA, "Defendants"), will and hereby do move to dismiss with prejudice all claims asserted against them in Plaintiff's Amended Class Action Complaint (the "Complaint"). This Motion is made pursuant to Federal Rules of Civil Procedure ("Rule") 8, 9(b), and 12(b)(6) and Section 21D(b) ("PSLRA") of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C. § 78u-4(b). This Motion is based on the pleadings; the accompanying Memorandum of Points and Authorities; Defendants' Request for Judicial Notice ("RJN"); the Declaration of Jessie Simpson LaGoy ("Decl.") and exhibits thereto; and other matters as may be presented to this Court at the hearing.

**STATEMENT OF RELIEF SOUGHT**

Defendants seek an order, pursuant to Rule 12(b)(6), dismissing the Complaint and each of its causes of action for failure to state a claim upon which relief can be granted.

**STATEMENT OF ISSUES TO BE DECIDED**

A. Whether Plaintiff fails to adequately plead that Defendants violated Section 10(b) and SEC Rule 10b-5(b) of the Exchange Act where the Complaint fails to allege with particularity that Defendants made any actionable statements during the Class Period that were false or misleading, Defendants' forward-looking statements are protected by the PSLRA's safe harbor, Plaintiff fails to plead with particularity facts that raise a strong inference of scienter, and Plaintiff fails to adequately plead loss causation.

B. Whether Plaintiff fails to adequately plead a scheme liability claim under SEC Rule 10b-5(a) and (c), premised on the same legally inadequate alleged misstatements and omissions that form the basis of his 10b-5(b) claim.

C. Whether Plaintiff's claim under Section 20(a) of the Exchange Act also fails where Plaintiff does not adequately plead a primary violation of Section 10(b).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On July 22, 2015, XOMA, Inc. (the "Company") announced that its double-blinded, Phase 3 clinical trial for its drug gevokizumab failed to meet its primary endpoint.  Not surprisingly, XOMA's stock price dropped following this news.  In an attempt to capitalize on that price decline, Plaintiff now accuses XOMA and certain of its officers and directors of securities fraud based on statements XOMA made in two earnings calls regarding the trial, known as EYEGUARD-B.  Plaintiff's core theory is that XOMA misled investors when it expressed optimism about EYEGUARD-B's outcome.  Plaintiff's claims should fail.  Indeed, the Complaint should be dismissed on five separate and independent grounds.

First, Plaintiff has not alleged any actionable false statement.  While Plaintiff attacks XOMA's expressed opinions regarding the meaning of certain data, he fails to plead any particularized facts that even suggest Defendants' beliefs were anything but honestly held.  Second, XOMA's hopeful words about EYEGUARD-B are statements of corporate optimism or "puffery" that are inactionable as a matter of law.  Third, as forward-looking statements, they are also immunized under the safe harbor language of the PSLRA.  Fourth, the Complaint fails to allege particularized facts sufficient to support an inference of scienter, much less the cogent and compelling inference required to survive a motion to dismiss.  There are no well-pled factual allegations based on contemporaneous documents, records, statements by confidential witnesses or any other source that support that Defendants knew or had any reason to believe that EYEGUARD-B would not meet its primary endpoint.  And finally, Plaintiff fails to adequately plead loss causation as the Complaint fails to plead facts adequately linking the alleged false and misleading statements and the decline in stock price for which Plaintiff seeks to recover.

For each of these reasons, Defendants respectfully request that the Complaint be dismissed in its entirety and with prejudice.

### II.   STATEMENT OF FACTS

#### A.   The Parties.

Plaintiff seeks to represent a class of all persons who acquired XOMA stock between

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

2.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

November 6, 2014 and July 21, 2015 ("Class Period").  (¶ 1.)[1]  XOMA is a biotechnology company headquartered in Berkeley, California.  (¶ 20.)  John W. Varian is XOMA's Chief Executive Officer and a director; Paul Rubin is Chief Medical Officer; and Kelvin Neu is a former director.  (¶¶ 21-23.)

### B.   Gevokizumab and Behçet's Uveitis.

Gevokizumab, XOMA's primary drug candidate during the Class Period, is an antibody designed to treat inflammatory disorders by inhibiting a protein called IL-1 beta.  (¶ 31.)  By binding to the IL-1 beta protein, gevokizumab prevents cellular signals that cause inflammation.  (*Id.*)

During the Class Period, XOMA focused gevokizumab's development on treating uveitis – a group of inflammatory eye diseases, which includes a rare subset called Behçet's uveitis.  (¶ 33.)  Behçet's is one of the most severe forms of uveitis, leading to blindness in approximately 25% of cases.  (¶ 38.)  Unlike other forms of chronic uveitis, Behçet's is characterized by recurrent acute eye exacerbations, or attacks of inflammation.  (Ex. 1 at 1.)[2]  Without treatment, Behçet's uveitis may lead to retinal detachment, hemorrhaging, and glaucoma.  (*Id*. at 1-2.)  The current standard of treatment for Behçet's uveitis is corticosteroids and off-label immunosuppressants, which have serious side effects, including permanent eye damage and increased cancer risk.  (*Id*. at 2.)  XOMA developed gevokizumab as a potentially safer alternative to current treatments.  (*See id*. at 2.)

### C.   Phase 2 Gevokizumab Trials in Behçet's Uveitis.

Before any new therapy can be sold commercially in the U.S., the Food and Drug Administration ("FDA") requires that the drug undergo clinical trials involving three phases of human testing, with each phase involving increasingly larger patient pools.  *See* 21 C.F.R. § 312.21.  Phase 1 trials test the safety, dose tolerance, and other properties of the drug.  *Id.*  Phase 2 trials test the drug in a limited patient population to gather information about efficacy, optimal dosage levels, adverse effects, and safety risks.  *Id.*  Following successful Phase 2 studies, the FDA and drug sponsor meet to agree on a Phase 3 study design.  (*See* Ex. 2 at 2.)  Phase 3 trials are intended to gather further efficacy and safety information used by the FDA to evaluate a drug's overall

---

[1]  All "(¶_ )" citations are to the Complaint filed on July 8, 2016, unless otherwise noted.
[2]  All ("Ex.___") references are to exhibits attached to the Declaration of Jessie Simpson LaGoy Declaration filed herewith.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

3.

risk/benefit profile.  21 C.F.R. § 312.21.

Upon receiving positive Phase 1 results, XOMA conducted a Phase 2 study of gevokizumab in patients with Behçet's uveitis in 2010 to evaluate the drug's safety and efficacy.  (¶¶ 63-64.)  The study enrolled seven patients who suffered from recurrent exacerbations despite receiving standard therapies.  (Compl., Ex. 4 at 564.)  The 98-day trial was successful as the drug reduced inflammation in all seven patients with no drug-related adverse events.  (*Id.*)

To further evaluate gevokizumab's safety and efficacy, XOMA partnered with Servier Laboratories ("Servier"), a French pharmaceutical company, to conduct another Phase 2 study in early 2012. (¶ 65; Compl., Ex. 3.)  It enrolled 21 patients suffering from Behçet's uveitis who received gevokizumab in addition to existing corticosteroid and immunosuppressant treatments. (¶ 65.)  The trial succeeded as gevokizumab was well-tolerated, rapidly decreased inflammation, and improved sharpness of vision in patients who had recently exacerbated. (Compl., Ex. 3 at 1.)  Because the study did not have a control group, it did not evaluate the effectiveness of gevokizumab as a stand-alone treatment.  (*Id*. at 8.)

### D.   XOMA's Phase 3 EYEGUARD-B Trial.

Encouraged by the Phase 2 results, XOMA and Servier began formal discussions with the FDA and European Medicines Agency ("EMA") (the European Union's equivalent to the FDA) to design a series of clinical trials known as "EYEGUARD" to treat various forms of uveitis.  (¶ 3.)  As part of this program, Servier initiated the EYEGUARD-B study of gevokizumab in patients suffering from Behçet's uveitis in September 2012.[3]  (¶ 82.)  Servier designed the protocol, maintained the study database, and analyzed the data.  (Ex. 4 at 6.)  As disclosed years before the start of the Class Period, XOMA had no access to trial data or results from the study until Servier provided XOMA with that information.  (*Id.* at 5; Ex. 5 at 3.)  In designing the trial, Servier consulted "with probably every expert in Behçet's uveitis in the world as well as both the FDA and EMA."  (Ex. 3 at 12.)

***Trial Design***.  The FDA-approved protocol for EYEGUARD-B required patients enrolled in the study to have active Behçet's uveitis with a history of recent exacerbations, with at least one

---

[3] A few months before the start of the Class Period, in September 2014, XOMA initiated EYEGUARD-US in the United States to study gevokizumab's effect on Beçhet's uveitis and to supplement EYEGUARD-B.  (Ex. 3 at 3.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

4.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

exacerbation in the four months prior to enrolling in the study.  (¶ 101.)  Patients who ultimately enrolled in EYEGUARD-B averaged over three exacerbations in the 18 months before the study, despite being treated with corticosteroids (20mg or more) and at least one immunosuppressant. (*See* Ex. 6 at 17; ¶ 105.)

Patients were randomly assigned to one of two groups: those who continued to receive corticosteroids, at a dosage tapered from 20mg/day to 5mg/day on a predetermined schedule, in combination with at least one immunosuppressant (the "Control Group"); and those who received Control Group treatments plus 60mg gevokizumab injections monthly (the "Drug Group").  (¶ 84.) EYEGUARD-B was a double-blinded, placebo-controlled study, meaning that patients, investigators, other site personnel, Servier, and XOMA did not know which patients were in the Drug or Control Groups.  (*See* ¶¶ 99, 101.)

Patients "exacerbated" under the protocol (1) if they experienced an exacerbation as defined in the protocol[4] and (2) if their treating physician did not deviate from protocol, including dosing and tapering requirements.  (*See* Ex. 3 at 5.)  The study's primary endpoint was the difference in "time to first acute ocular exacerbation," meaning the study would be successful if patients in the Drug Group exacerbated at a statistically-significant slower rate over time than those in the Control Group. (Ex. 7 at 1-2; *see* ¶¶ 71, 74-75.)

Servier designed EYEGUARD-B as an event-driven study: the trial would continue (and the results would remain blinded) until a pre-specified number of patients (29) exacerbated.  (*See* ¶¶ 83, 86.)  After reaching this target number, Servier would evaluate the drug's efficacy by comparing the relative rates of exacerbations over time between the Drug and Control Groups.  (¶ 85.)  Given the patients' history of exacerbations and based on consultation with medical experts, Servier expected that the requisite number of patients would exacerbate by June 2014.  (*See* Ex. 3 at 5.)

Once enrolled in the study, patients could drop out for a variety of reasons.  For example, a patient might withdraw for personal reasons or because his or her Behçet's disease manifested in other areas of the body leading his or her treating physician to deviate from the dosing or tapering

---

[4] A medically validated exacerbation is measured according to strict scientific standards that measure, for example, the worsening of visual sharpness and distance vision.  (*Id.*; ¶¶ 66, 83.)

guidelines in the protocol to treat those symptoms. (*Id.* at 6, 11-12.) The protocol addressed this possibility and provided that a patient could be "rescued," or removed from the patient population used to determine if the trial met its primary endpoint, if the patient withdrew or deviated from the protocol. (*See* ¶¶ 72, 99.) Rescued patients would not count towards the target number of exacerbations. (¶ 90.) However, as Dr. Rubin explained on the first day of the Class Period, to eliminate any bias that might result by removing rescues from the primary endpoint analysis, the FDA would conduct a sensitivity analysis of the trial results in which all patients who were rescued would be treated as if they had exacerbated at the time of the rescue. (¶ 92; *See* Ex. 3 at 6, 11-12.)

*Rescues*. In November 2014, at the beginning of the Class Period and nearly nine months before the data was unblinded, XOMA disclosed to investors during its regular quarterly earnings call that some patients in the study, who had been previously identified as having experienced an exacerbation as defined by the study protocol, had been reclassified as rescues. (*See* Ex. 3 at 6.) As explained by Dr. Rubin, Servier had concluded that, "[i]n each of these cases, additional monitoring show[ed] that the physician did not follow the steroid tapering schedule and that they increased or did not reduce to steroid levels strictly as defined in the protocol." (*Id.*) As he further explained, the reasons the treating physicians broke protocol varied:

> Things like they might have had a change that didn't quite meet the actual standard [for an exacerbation] or they had macular edema, which is an inflammatory event . . . . They might have had symptoms of Behçet's disease that are not related to the eye. For example, mouth ulcers or genital ulcers that also might have flared because of lack of effective therapy.

(*Id.* at 11-12.) These reclassifications reduced the number of "per protocol exacerbations," thus resulting in a delay in which the study would reach the number of exacerbations required for unblinding. (*Id.* at 5-6.) Dr. Rubin explained that, because the study was still blinded, XOMA did not know whether any patient, including the reclassified rescues, were in the Drug Group or Control Group. (*Id.* at 6.)

*Blinded data shows possible separation between Drug and Control Groups*. XOMA also disclosed what little information it did have with regard to the progress of the EYEGUARD-B study. Although EYEGUARD-B was double-blinded, Servier had access to blinded data showing *when* patients exacerbated, even though the data did not indicate *which* of these patients were in the Drug

Group and which were in the Control Group.  (*See* Ex. 3 at 6.)  That blinded data revealed that a group of patients exacerbated within the first ninety days after enrollment in the study, and another group did not exacerbate for an average of over nine months.  (Ex. 6 at 17.)  Thus, patients in the latter group were exacerbating at a significantly slower rate than they had before entering the study.  Given that Control Group patients received the *same* treatments they received when entering the study, at *lower* corticosteroid doses, XOMA believed that this exacerbation pattern might indicate that gevokizumab worked.  (*See* ¶ 99; Ex. 6 at 17.)  Such a pattern would be consistent with what XOMA knew about Beçhcet's uveitis from medical literature, experts, the Phase 2 studies, and Servier's analyses.  (*See* ¶ 105.)  During the November call, Dr. Rubin noted that this observation was "an encouraging indication of the potential of gevokizumab" in Behçet's uveitis.  (¶ 99.)  However, he made clear the limitations of this observation: "[W]e are completely masked whether these early exacerbating patients, rescued or controlled patients are in drug or placebo, so nothing can really be read into this distribution." (*Id.*)

During the Company's regularly scheduled earnings call on March 11, 2015, an analyst asked about this bifurcation in the blinded data and asked the Company to "talk about your optimism … with respect to that." (Ex. 6 at 17.) In responding, Mr. Varian was clear: "Here's the big preamble.  Everything – all data are blinded as it should be.  You truly know nothing . . . . It could be great news or it could mean nothing. We won't know until the data are unblinded." (*Id.*)  In responding to the same question, Dr. Rubin was even more succinct: "Although we don't know who is on active and who is on placebo, if you had an active drug, this is sort of the pattern you'd expect to see." (*Id.*)

***XOMA Had No Access to EYEGUARD-B Trial Results until July 2015.***  It is important to note that, pursuant to the FDA-approved protocol, XOMA remained blinded to EYEGUARD-B's results until days before it publicly announced those results in July 2015.  (*See* Ex. 5 at 3; Ex. 8 at 1.)  Plaintiff does not allege otherwise.  Further, XOMA reminded investors that the study was double-blinded throughout the Class Period.  On May 7, 2015, Mr. Varian shared with investors Servier's detailed process to unblind and evaluate the EYEGUARD-B results:

> When we announce the final event has occurred, we are going into a self-imposed quiet period until we announce the data.  No one at XOMA or Servier will know anything for

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG**

the first six weeks, as it will take that long to roll up the data from around the world, clean the database and to lock it. Only after the database is locked can the placebo drug randomization code be broken and applied to the locked data so that the unblinded data analysis can begin. What we want to avoid [is] any unnecessary volatility based on how someone perceives our tone of voice, how many cups of tea I drink in a given day or any other speculative factors people can dream up.

(Ex. 5 at 3.) Mr. Varian further cautioned, "We have absolutely no way of knowing whether the study result will be negative or positive . . . It becomes counterproductive to do anything but wait at this point." (*Id*. at 4.)

When EYEGUARD-B finally reached its target number of exacerbations later that month, the Company disclosed in a press release that Servier would begin analyzing the data and that the primary endpoint results were expected in seven weeks. (Ex. 8 at 1.) Meanwhile, the "trial [was] ongoing and remain[ed] double-masked." (*Id.*) By July 21, 2015, after approximately seven weeks, Servier had completed its analysis and released the results to XOMA. (¶ 105.) XOMA then discovered for the first time that the trial did not reach its primary endpoint.

### E.   Announcement of EYEGUARD-B Trial Results.

The following day, XOMA announced the results. It revealed that, while the mean time to first exacerbation for patients in the Drug Group was 119 days versus 95 days for patients in the Control Group, the difference was not statistically significant, and thus did not meet the primary endpoint. (¶¶ 104, 105.) In a conference call held that morning, Mr. Varian stated:

> While our focus is now on what's ahead, I do have to say that we are truly shocked and surprised that this study did not result in a positive outcome. The [Control Group] patients in the study did not behave in the manner every expert with whom we consulted and every paper we've read would have predicted. Based on the natural history of the disease, the Behçet's uveitis patients were not expected to just get better at the 5 milligram level of corticosteroids they were taking during the study, but somehow they did . . . We really believe[d] gevokizumab was working since it seemed contrary to everything we thought we knew that this could occur without some drug affect [sic]. We and our partners at Servier, as well as their outside advisors were stunned to see that gevokizumab did not reach statistical significance in EYEGUARD-B.

(Ex. 9 at 3; ¶ 105.) On this news, XOMA's stock dropped $3.48 per share that day, or more than 79%. (¶ 106.)

### F.   The Litigation.

Just two days later, Plaintiff filed suit against XOMA, Mr. Varian and Dr. Rubin. (Dkt. No. 1.) After the Court appointed Mr. Tarzia as lead plaintiff, he filed an amended complaint, adding Dr. Neu as a defendant. (Dkt. No. 77.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

8.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

The Complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act, purportedly on behalf of a class of stockholders who purchased XOMA stock during the Class Period. The Complaint challenges as false and misleading statements made by Mr. Varian and Dr. Rubin on two dates, November 6, 2014 and March 11, 2015. (¶¶ 99, 101.) The alleged misstatements fall into two categories: (1) optimistic statements that the exacerbation pattern from the blinded results could mean that gevokizumab was working, and (2) purported omissions regarding the impact the rescues would have on the primary endpoint and sensitivity analyses. (¶¶ 99-102.) Plaintiff also claims that Dr. Neu somehow committed securities fraud, despite not alleging that he made or was involved in a single statement or transaction at issue.

## III.    LEGAL STANDARDS

The Court must dismiss a complaint under Rule 12(b)(6) where it fails to allege facts sufficient to "plausibly" state a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The Court should not accept conclusory statements, unwarranted deductions, unreasonable inferences, or allegations contradicted by judicially noticed facts or exhibits incorporated by reference. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989, 991 (9th Cir. 2009).

To state a claim under Section 10(b), a plaintiff must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which plaintiff relied; and (5) which proximately caused plaintiff's injury. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002). Federal Rule of Civil Procedure 9(b) applies to all elements of a securities fraud claim under Section 10(b). *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). This requires a plaintiff to aver the "who, what, when, where, and how" of the alleged fraud, and "set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The PSLRA heightened the pleading standards even further, by requiring a plaintiff to plead all elements of a Section 10(b) claim with particularity. *Zucco,* 552 F.3d at 990; *Apollo*, 774 F.3d at 605.

***Falsity.*** Under the PSLRA, a complaint must allege with particularity "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *In re*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

9.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

*Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). "This requirement is the PSLRA's single most important weapon against pleading fraud by hindsight because it forces plaintiffs to reveal whether they base their allegations on an inference of earlier knowledge drawn from later disclosures or from contemporaneous documents or other facts." *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1216 (N.D. Cal. 2000), *aff'd* 283 F.3d 1079 (9th Cir. 2002).

*Scienter.* "To adequately plead scienter under the PSLRA, the complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Rigel*, 697 F.3d at 877 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "Thus, the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Deliberate recklessness requires "a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (citations and quotations omitted). To meet this burden, the complaint must contain allegations of specific "contemporaneous statements or conditions." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).

Finally, the scienter analysis "is inherently comparative." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). A court must take into account plausible nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. *Id.* at 314. Indeed, a court must "only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.

*Loss Causation*. To plead loss causation, Plaintiff must allege with particularized facts that "defendant's misrepresentation was a 'substantial cause' of [the plaintiff's] financial loss." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). Thus, Plaintiff must allege that Defendants' fraud was revealed to the market and caused the resulting losses. *Metzler Inv. GMHB v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

10.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

## IV.   PLAINTIFF'S SECTION 10(b) CLAIM MUST BE DISMISSED

### A.   Plaintiff Fails to Plead With Particularity That Defendants Made Any False Statement.

The crux of Plaintiff's claim for securities fraud is that Defendants somehow misled investors when they expressed optimism about EYEGUARD-B's potential outcome. (*See* ¶¶ 100, 102.) Specifically, the Complaint alleges two categories of misstatements and omissions. First, the Complaint challenges statements by Dr. Rubin and Mr. Varian that the exacerbation pattern observed in the blinded data might be consistent with gevokizumab working ("Statements of Optimism"):

- "We remain very ***hopeful*** that these masked results are an ***encouraging*** indication of the potential of gevokizumab in this disease and we eagerly await the opportunity to review the[ ] data in an unmasked fashion in the near future." (¶ 99) (emphasis added.)
- "Our learnings are ***encouraging*** to our ultimate goal." (*Id.*) (emphasis added.)
- "Another factor that is both frustrating as well as ***encouraging*** is that the rate of exacerbations began slowing this summer. It is ***encouraging*** to see that there are still a significant number of ongoing patients in the trial, who have not experienced an exacerbation or have been rescued early." (*Id.*) (emphasis added.)
- "So it's ***encouraging,*** but it doesn't mean anything until the study is unblinded." (¶ 101)
- "***So although we don't know who's on active and who's on placebo***, if you had an active drug, this is sort of the pattern you'd ***expect*** to see." (*Id.*) (emphasis added.)

Second, Plaintiff alleges that statements about the prospects of EYEGUARD-B were false and misleading because Defendants omitted information regarding the potential impact of rescues on the study results ("Rescue Omissions"). Plaintiff alleges that Defendants concealed that the rescues purportedly increased the likelihood that the EYEGUARD-B trial would fail.

Third, Plaintiff does not allege that Dr. Neu made any false or misleading statement. Absent any allegation of "ultimate authority" over a false statement, the Section 10(b) claim against him must be dismissed. *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) (holding only actual speaker of false or misleading statement is liable under Section 10(b)); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070–71 (N.D. Cal. 2012) ("[n]owhere in the Amended Complaint [did] Plaintiffs allege facts demonstrating that [defendant] had 'ultimate authority' over the statements made . . . during the analyst or investor calls").

Because the Complaint fails to plead particularized facts showing that any of the challenged statement were false or misleading, the Complaint should be dismissed.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

11.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

### 1.      The Statements of Optimism Are Not False.

The Statements of Optimism challenged by Plaintiff reflect nothing more than the Company's *opinion* that the blinded data – which revealed that a large population of patients did not exacerbate for more than nine months – suggested that gevokizumab might be working.  Yet, the Complaint offers no particularized facts to support an inference that Mr. Varian and Dr. Rubin did not genuinely believe what they said, i.e., that they were encouraged by what they saw in the blinded data.  Further, the Statements of Optimism are inactionable puffery and are immunized as forward-looking statements.

#### a.      The Complaint does not adequately allege that XOMA's opinions about the blinded data were not genuinely held.

Plaintiff seems to disagree with the opinion expressed by Defendants that the blinded data was encouraging and claims that Defendants "lacked a material factual basis" for making such statements.  (*See* ¶¶ 100, 102.)  But a mere disagreement with Defendants opinions about the blinded data does not give rise to a securities claim.  Indeed, under the Supreme Court's recent decision in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 135 S. Ct. 1318, 1326–27 (2015) statements of opinion or belief are actionable only if they are not genuinely held or if they contain an embedded untrue statement of material fact.[5]  After all, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Id.* at 1327.  Thus, to survive a motion to dismiss, Plaintiff "must identify particular (and material) facts going to the basis for [XOMA's] opinion," such as "facts about the inquiry [XOMA] did or did not conduct or the knowledge it did or did not have." *Id.* at 1332.  Satisfying this test "is no small task for an investor." *Id.*; *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (dismissing fraud claim where plaintiff "failed to adequately allege defendants did not honestly believe their interpretation of the interim [clinical trial] results or that it lacked a reasonable basis").  Plaintiff comes nowhere close to meeting his burden.

The statements challenged by Plaintiff undeniably reflect the opinions of XOMA and its management. *See Omnicare*, 135 S. Ct. at 1325 (an opinion "is a belief[,] a view … or a sentiment

---

[5] *Omnicare* concerned statements of opinion under Section 11 of the Securities Act of 1933. Courts within this Circuit have extended its reasoning to claims under Section 10(b). *In re Velti PLC Sec. Litig.*, at *33 (N.D. Cal. Oct. 1, 2015), *appeal dismissed* (Apr. 4, 2016); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *10 (C.D. Cal. June 9, 2016).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12.

**DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG**

which the mind forms of persons or things"). Indeed, as the Third Circuit held in *Edinburgh*, "[I]nterpretations of clinical trial data are considered opinions." 754 F.3d at 170. It is important to note that Plaintiff does not allege that any **factual** statement attributed to Defendants was false; rather, he takes issue with the opinions Defendants expressed with regard to the unblinded results.

Moreover, Defendants were clear with investors regarding the basis for why they found the blinded data encouraging. Indeed, XOMA and investors knew that enrolled patients exacerbated, on average, three times in the eighteen months before enrolling in the EYEGUARD-B study. (*See* Ex. 6 at 17; ¶ 105.) The blinded exacerbation pattern showed that a group of patients exacerbated early in the study (consistent with what one would expect of the Control Group) and a group of patients stopped exacerbating for well over nine months (consistent with one would expect of the Drug Group if the drug were efficacious). (*See id.*) XOMA found this trend encouraging because in order to meet the study's primary endpoint, there would have to be separation in the time-to-exacerbate between the Control Group and the Drug Group. (*See id.*) And, based on consultations with experts and medical literature, XOMA honestly believed that the group of patients experiencing remissions could not have been in the Control Group since Control Group patients had been tapered to a non-effective dose of corticosteroids – the same treatments that had not worked at higher doses. (*See* ¶¶ 99, 105.) Simply put, XOMA, Servier, and experts did not expect that patients would stop exacerbating while receiving the *same* therapies that previously did not work. (S*ee* ¶¶ 99, 101).

Further, the Complaint is devoid of particularized allegations that call into question the honesty or good faith of XOMA's belief that the blinded data was encouraging. It does not, for example, identify any information that was known to Defendants that undermined their beliefs. Nor does it dispute that the blinded data showed that a large group exacerbated quickly, while another group remained in remission for more than nine months on average. It does not question whether XOMA consulted with or relied on experts. And it does not plead, even in conclusory terms, that Mr. Varian or Dr. Rubin did not actually believe what they said. Instead, Plaintiff devotes over ten pages of the Complaint to his own (strained) interpretation of medical literature (most of which

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

13.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

relates to forms of uveitis other than Behçet's).[6]  (*See* ¶¶ 39-62, 101, 102.)  While Defendants' opinion may have ultimately been proven wrong as the Control Group did not exacerbate as quickly as expected, "a statement of opinion is not misleading just because external facts show the opinion to be incorrect.  Reasonable investors do not understand such statements as guarantees."  *Omnicare*, 135 S. Ct. at 1328; *In re Vical Inc. Sec. Litig.*, 2015 WL 1013827, at \*8 (S.D. Cal. Mar. 9, 2015) (plaintiff cannot plead a securities fraud claim by "attacking perfectly reasonable-if overly optimistic statements proved wrong only in hindsight").  Because Plaintiff fails to plead that the Statements of Optimism were not made honestly or in good faith, they are not actionable under *Omnicare*.

Finally, Defendants could not have been clearer that, while it was possible the exacerbation pattern might indicate efficacy, there was no way of knowing until the data was unblinded.  Indeed, on the first day of the Class Period, XOMA reminded shareholders it was "completely masked whether [ ] exacerbating patients, rescued or controlled patients are in drug or placebo, so nothing can really be read into th[e] distribution." (¶ 99.)  It reiterated in March 2015 that exacerbation rates observed in the blinded data "could be great news, or it could mean nothing.  We won't know until the data [is] unblinded."  (¶ 101)  That same day, the Company disclosed that it "ha[d] absolutely no way of knowing whether the study's result will be negative or positive."  (Ex. 5 at 4.)  Defendants' statements, thus, could not have been misleading.  *Vical* is particularly instructive on this point.  There, defendants conducted a double-blinded, event-driven study for its melanoma drug, where the trial was scheduled to end after a set number of patients died.  *Vical*, 2015 WL 1013827, at \*2.  During the study, the FDA approved two other drugs that were successful in treating melanoma.  *Id.* Defendants knew that study patients could have taken the new drugs during the trial.  *Id*.  Yet, Vical expressed optimism that the slowed death rate observed based on blinded data indicated that its drug worked.  *Id*. at \*2-3.  Vical's statements assumed that patients in the control group died before the FDA approved the new melanoma drugs, thus they could not have taken the new drugs.  *Id.* at \*3.

---

[6] To the extent Plaintiff's allegations are based on a "disagreement[] over statistical methodology and study design," the Ninth Circuit has held such claims are "insufficient to allege a materially false statement."  *Rigel*, 697 F.3d at 877; *see also Padnes v. Scios Nova Inc.*, 1996 WL 539711, at \*5 (N.D. Cal. Sept. 18,1996) ("[R]esearchers may well differ with respect to what constitutes acceptable testing procedures, as well as how best to interpret data garnered under various protocols."); *In re MedImmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995) ("Although the [FDA or others] may have disagreed, there is nothing to suggest that Defendants could not reasonably have entertained the opinion [that their results were favorable] . . . .").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

14.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

But this ultimately proved wrong. *Id.* at *2. The Court found Vical's statements neither false or misleading in large part because "[d]efendants told the investors that although they were hopeful, they could not know [the results] because the [ ] study was blinded." *Id* at *3. The court further reasoned that, "[i]n hindsight, [the] assumptions proved incorrect. However they were simply assumptions, and were characterized as such to investors." *Id.* at *6. The circumstances are nearly identical here.

While ultimately proven to be misplaced, the Statements of Optimism were not false.

### b.      The Statements of Optimism are inactionable puffery.

Plaintiff's claims fail for a second, independent reason:  vague statements of corporate optimism cannot form the basis of a securities fraud claim as reasonable investors do not rely on them. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010); *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives"). Courts within this Circuit routinely dismiss alleged misstatements containing the words "encourage" and "hopeful," like those challenged by Plaintiff, as inactionable puffery.  For example, in *In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280, at *9 (N.D. Cal. Sept. 16, 2014), the plaintiff challenged as false and misleading a statement that the Company was "still in the early stages of building out a nationwide network, but [is] very ***encouraged*** by our early success and [is] well positioned to monetize the growth trajectory of the EV industry."  This Court found this statement to be "precisely the sort of vaguely optimistic statements that are inactionable under the PSLRA." *Id.*; *see also In re Intershop Commc'ns AG Sec. Litig.*, 2003 U.S. Dist. LEXIS 26927, at *16 (N.D. Cal. Apr. 2, 2003) (finding "statement that 'the increase in U.S. revenues was especially encouraging' is immaterial as a matter of law given its vagueness and qualifies as the kind of 'puffery' that no reasonable investor would rely on"); *Weiss v. Amkor Tech., Inc.,* 527 F. Supp. 2d 938, 956 (D. Ariz. 2007)  (finding statement that "[w]e are encouraged [by] strengthening customer forecasts" to be puffery).

Courts have similarly dismissed claims based on statements containing the word "hopeful," especially as they relate to potential clinical trial results. *See Fort Worth Emp'rs Ret. Fund v. Biovail*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

15.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

*Corp.*, 615 F. Supp. 2d 218, 230 (S.D.N.Y. 2009) ("mere[] expressions of 'hope' that the FDA would approve [defendants' drug]" were soft and "immaterial on their face as a matter of law"); *Gillis v. QRX Pharma Ltd.*, 2016 U.S. Dist. LEXIS 87489, at *24 (S.D.N.Y. July 6, 2016) (finding statement that "we are hopeful that the FDA will view [the product's advantages] favourably in their consideration of the benefits of immediate release" is "immaterial puffery"). The Statements of Optimism qualify as "puffery" and, accordingly, cannot form the basis of a securities fraud claim.

### c.   As forward-looking, the Statements of Optimism are inactionable.

Plaintiff's claims relating to the challenged Statements of Optimism fail for a third, independent reason: they are protected by the PSLRA's "safe harbor" provision. The statute's "safe harbor" makes forward-looking statements inactionable as a matter of law, even if the statements prove to be false. *In re Cutera Sec. Litig.*, 610 F.3d at 1113. Such statements are protected if they are identified as forward-looking and accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i); *In re Cutera Sec. Litig.*, 610 F.3d at 1113; *Juniper Networks,* 880 F. Supp. 2d at 1061. Both elements are satisfied here.

A statement is forward-looking if its "truth or falsity . . . cannot be discerned until some point in time after the statement is made." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *12 (N.D. Cal. Mar. 24, 2014). Each challenged Statement of Optimism is forward-looking as each statement relates to future events, the likely results of the EYEGUARD-B study. Thus, their truth could not have been determined when made. *In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *15 (N.D. Cal. Dec. 4, 2008) (statements "relating to future success in phase 3 trials . . . are not actionable for the [ ] reason that they are shielded by the safe harbor provision."). Moreover, XOMA identified the Statements of Optimism as forward-looking. First, XOMA alerted investors that statements with words like "hope" and "expect" are forward-looking. (Ex. 10 at 1; Ex. 11 at 1.) ("The words "believe," "may," "estimate," "continue," "could," "anticipate," "assume," "intend," "**expect**," "predict," "potential" "should," "would," and **similar expressions** are intended to identify forward-looking statements") (emphasis added). XOMA also notified investors that statements about the prospects of its clinical trials were forward-looking: "Certain statements contained herein related to the anticipated size of clinical trials, the anticipated timing of initiation of clinical trials, the expected

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

16.

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG**

availability of clinical trial results . . . are forward-looking statements." (*Id.*)

To qualify as meaningful cautionary language, disclosures must include risk warnings conveying "important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u-5(c)(1)(A)(i)); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *7 (N.D. Cal. Sept. 29, 2000). Disclosures need not include all factors so long as they are of "similar significance to those actually realized." *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004). There is no good faith dispute that XOMA's forward-looking statements were accompanied with meaningful cautionary language. The challenged statements all occurred during two quarterly earnings calls with analysts, one on November 6, 2014 and the other on March 11, 2015. Before each earnings call, XOMA directed investors to review the Company's most recent SEC filings for "[f]actors that could cause our actual results or outcomes to differ materially from those expressed in or implied by such forward-looking statements."[7] (*See, e.g.*, Ex. 3 at 2.) In its SEC filings, XOMA informed investors that it had "received negative results from certain []clinical trials, and [] face[d] uncertain results of other clinical trials of [its] product candidates" and it was "substantially dependent on [Servier] for the development and commercialization of gevokizumab and for other aspects of our business." (Ex. 10 at 1; Ex. 11 at 1.) This meaningful cautionary language is sufficient to invoke the PSLRA's safe-harbor protections. *See, Nuvelo*, 2008 WL 5114325, at *16 (clinical trial risk warnings generally were "precise" and related directly to the forward-looking statements at issue").

Because the Statements of Optimism are forward-looking, and accompanied by meaningful cautionary language, Defendants cannot be liable for securities fraud based on those statements, regardless of their state of mind. 15 U.S.C. § 78u-5(c)(1)(A)(i); *Cutera*, 610 F.3d at 1111-12.

**2.      The Alleged Rescue Omissions Did Not Render Any Statement False or Misleading.**

Plaintiff also alleges that XOMA misled investors about the prospects for EYEGUARD-B as it purportedly failed to disclose that the rescues would "weigh against gevokizumab's efficacy in the sensitivity analysis" thereby materially "decreas[ing] the likelihood of a successful outcome."

---

[7] Companies can incorporate meaningful cautionary language by referencing their SEC filings. *See, e.g., In re ESS Tech., Inc.*, No. C-02-04497 RMW, 2005 WL 418548, at *4 (N.D. Cal. Feb. 22, 2005) (finding that press releases contained meaningful cautionary language by "referring readers to additional cautions in filings on Forms 10-K and 10-Q").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

17.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

(¶¶ 13, 102.)  Plaintiff's theory makes no sense.  The data was blinded, thus nobody knew whether the patients who had been rescued were in the Drug Group or the Control Group.  Therefore, the impact that those rescues might have on the sensitivity analysis or the trial's outcome would be pure speculation.  *Reinschmidt v. Zillow, Inc.,* 2014 WL 5343668, at \*7 (W.D. Wash. Oct. 20, 2014) ("[S]peculation is insufficient to state a claim for an actionable omission.").

Moreover, Plaintiff's assertion that XOMA was anything less than transparent with its investors about the impact rescues might have on the data analysis is plainly wrong.  In fact, during the November 2014 earnings call, Dr. Rubin explained to investors how patients could be rescued due to a worsening of symptoms and that, to avoid a bias in the results, additional analyses would be performed:

> Patients can be rescued based on investigator judgment, even though they did not demonstrate defined exacerbation criteria per the protocol.  It is very possible they may still require rescue due to lack of drug effect.  Because of this, sensitivity analyses are built into the analysis plan and will be performed to provide additional clarity around potential benefit due to receiving gevokizumab ….The additional sensitivity analysis will allow us to capture any differences in this important group between gevokizumab and placebo treated patients.  Because of this, while the study's primary endpoint was powered based on a predetermined number of pre-protocol exacerbations, rescues unrelated to exacerbations are important to analyze in order to appropriately evaluate drug effect.

(Ex. 3 at 5-6.)   Dr. Rubin emphasized that rescues "***directly impact the primary endpoint calculation and even more so, the sensitivity analysis.***" (*Id*. at 6 (emphasis added).)  XOMA was clear that it would not know the impact of rescues on the trial results until it was unblinded:  "we are completely masked whether these [ ] exacerbating patients, rescued or controlled patients are in drug or placebo, so nothing can really be read into this distribution." (*Id*.)  There is no question that investors knew that rescues would impact the sensitivity analysis and that the Company could not predict how.

Plaintiff's bald conclusion that the rescues increased the likelihood the trial would fail is baseless.  Indeed, Plaintiff does not allege that XOMA knew the distribution of rescues, or that more rescues fell in the Drug Group than the Control Group.  Without either piece of information, XOMA had no idea how the rescues were likely to impact the trial's success.  For the same reason, the number of rescues was not material, as it provided no meaningful information to investors until the distribution of rescues between the Control and Drug groups was known.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

18.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

This Court's decision in *In re Intrabiotics Pharm., Inc. Sec. Litig.* is instructive here. 2006 WL 2192109, at \*12 (N.D. Cal. Aug. 1, 2006). In that case, the company conducted a double-blinded study, during which it received case report forms ("CRFs") reporting adverse events, including deaths, that did not disclose whether the patients who suffered those events had received placebo or study drug. *Id.* at \*1-2. During the trial, Intrabiotics made statements that the drug was safe and well-tolerated. When the study was unblinded, the drug group had a higher mortality rate than the control group. *Id.* at \*11. Nevertheless, the Court found the statements about the drug's safety not false or misleading because "[p]laintiffs [did] not provide[ ] a sufficient basis from which it could be inferred that [Intrabiotics] was aware, based on the blinded results as reported in the CRFs, that [the drug] caused a higher rate of [ ] mortality." *Id.* The Court noted that, as the data was blinded, defendants could not know whether the "adverse event was caused by the underlying disease, [the drug], or some other unrelated reason." *Id.* Here, as in *Intrabiotics*, the significance of the blinded data could not be determined without knowing whether rescued patients were in the Drug or Control Groups. Thus, XOMA could not disclose the impact of rescues on the study's outcome because it did not know what that impact could be. There is no actionable omission.

**B.      Plaintiff's Allegations Fail to Support a Strong Inference of Scienter; the Far More Compelling Inference Is that Defendants Acted in Good Faith.**

The Complaint should be dismissed for a fourth reason: it fails to plead a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). Plaintiff all but concedes that Defendants did not knowingly engage in fraud, alleging instead that Defendants acted with "deliberate recklessness." However, the Complaint fails to allege any particularized facts even suggesting that any, let alone each, Defendant engaged in an "extreme departure" from ordinary standards of care when making the challenged statements. *See Zucco*, 552 F.3d at 991. The Complaint is devoid of any facts, much less well-pled ones (based on contemporaneous documents, records, statements by confidential witnesses or any other source), that XOMA knew or had any reason to believe EYEGUARD-B would not meet its primary endpoint. Plaintiff does not allege that XOMA had access to unblinded data during the Class Period. Nor does he dispute that Defendants accurately described the exacerbation trend observed in the blinded data. Plaintiff does not dispute that Defendants consulted and relied on

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

19.

**DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG**

experts and literature on Behçet's uveitis. Nor does Plaintiff allege that Defendants knew the distribution of reclassified rescues between the Drug and Control Groups. These deficiencies are fatal to Plaintiff's claims. *See e.g., Vical*, 2015 WL 1013827, at \*6 (no scienter where plaintiff failed to "allege any facts that would support an inference that Defendants knew the[ir] assumptions were faulty at the time they made the projections . . . since the study was blinded, all Defendants knew was that patients were not dying at the rate they anticipated. A logical inference was the [drug] had been successful"); *Intrabiotics*, 2006 WL 2192109, at \*11 (no scienter where defendants were not aware of "whether the patient who suffered the adverse event was administered [drug] or placebo").

Instead of alleging particularized facts demonstrating deliberate recklessness, Plaintiff offers a myriad of scienter theories, none of which support a cogent and compelling inference of scienter. To the contrary, the Complaint supports just the opposite: Defendants were encouraged about the prospects of EYEGUARD-B based on the blinded data regarding exacerbations, and shared that optimism with investors. That the trial ultimately failed does not turn such optimism into fraud: "Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001); *see also Rigel*, 697 F.3d at 883 (finding no inference of scienter where there were no allegations that defendants "believed that they were misrepresenting the statistical significance of their [trial] results.").

### 1. Core Operations Inference Does Not Apply.

Recognizing that no facts support scienter, Plaintiff attempts to impute knowledge to the Defendants by relying on the "core operations" theory. (¶¶ 113-17.) Plaintiff's understanding of the theory is, however, badly flawed. In rare circumstances, the Ninth Circuit allows the knowledge of a lower-level corporate employee to be imputed to more senior management "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008). The Complaint must include "detailed and specific allegations about management's exposure to factual information within the company" indicating that Defendants had "actual access to the disputed information." *Zucco*, 552 F.3d at 1000. Because the Complaint alleges no such

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

20.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

facts, the core operations inference is of no use to Plaintiff.  *See Id.*  Further, the core operations inference has never been invoked to impute knowledge to management where such knowledge is not otherwise known within a company.  As a result, it provides no solace to Plaintiff.

Indeed, Plaintiff *ignores* the fact that EYEGUARD-B was a double-blinded study.  He does not allege that anybody – much less Defendants – had access to unblinded data, or that anybody knew which patients were in the Drug Group versus the Control Group.  Under such circumstances, the core operations inference simply does not apply.  *See Anderson v. Peregrine Pharm., Inc.*, 2013 WL 4780059, at *2 (C.D. Cal. Aug. 23, 2013) (finding it "absurd" to apply core operations inference to double-blinded study).  *See also, In re XenoPort, Inc. Sec. Litig.*, 2011 WL 6153134, at *6 (N.D. Cal. Dec. 12, 2011) (dismissing complaint where scienter allegations relied on "the small size of the company, the significant role each defendant played, . . . and the importance of [the drug candidate] to the company" because there were no "specific details about what information each defendant was exposed to").

### 2. Defendants' Stock Sales Negate an Inference of Scienter.

Although Plaintiff attempts to bolster his scienter allegations with claims that Mr. Varian and Dr. Rubin sold XOMA's stock at "artificially inflated prices" during the Class Period, their trading activity actually negates an inference of scienter.  In evaluating the impact of stock sales on scienter, the Ninth Circuit looks at "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Zucco*, 552 F.3d at 1005.  Plaintiff bears the burden of showing that sales are "unusual" or "suspicious" – that is, "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Copper Mountain*, 311 F. Supp. 2d at 873.  He fails to do so.

The Complaint asserts no facts even suggesting there is anything unusual or suspicious with Mr. Varian's or Dr. Rubin's stock sales during the Class Period.  First, during the Class Period, Mr. Varian and Dr. Rubin's stock sales were made pursuant to Rule 10b5-1 trading plans.[8]  (Exs. 12, 13.)

---

[8] Mr. Varian and Dr. Rubin each had one class period stock sale that was not pursuant to a 10b5-1 plan, on November 13, 2014 and May 28, 2015, respectively.  As indicated on the Form 4s filed with the SEC, these sales were made for tax purposes, and described as: "Shares sold on the open market to satisfy the maximum amount of taxes [that may be] required to be withheld in connection with the

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

21.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

This supports an inference that Defendants acted in good faith.  *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (noting that shares sold under individual 10b5-1 plans "could raise an inference that the sales were pre-scheduled and not suspicious").  Second, Mr. Varian and Dr. Rubin each sold ***more shares*** in the nine months preceding the Class Period than they did during the nine-month Class Period itself immediately (s*ee* Exs. 12-16):

|  | Shares Sold in 9 Months Before Class Period | Shares Sold During Class Period |
| --- | --- | --- |
| John Varian | 166,152 | 82,630 |
| Paul Rubin | 93,812 | 79,530 |

If Mr. Varian and Dr. Rubin were acting with fraudulent intent, it makes no sense that they would sell ***fewer*** shares during the Class Period than they did before if they knew bad news was coming. Unsurprisingly, Plaintiff ignores Mr. Varian and Dr. Rubin's pre-Class Period stock sales completely.  Third, the relatively small percentage of their holdings sold by Mr. Varian and Dr. Rubin during the class period – 7% and 17% respectively – undermines an inference of scienter.  (¶¶ 136, 138.)  Courts require far larger percentages and corroborating sales by other individual defendants for stock sales to support an inference of scienter.  *Ronconi*, 253 F.3d at 435 (sales of 17% and 98% insufficient to raise an inference of scienter); *In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) (sales of 29% and 30% are "insufficient to support an inference of scienter"), *aff'd,* 32 F. App'x 338 (9th Cir. 2002).[9]

### 3.      Plaintiff's Other Scienter Arguments Fail.

Plaintiff alleges that XOMA's $40 million offering on December 9, 2014 demonstrates that "Defendants conditioned the market to believe that EYEGUARD-B would be successful thereby inflating XOMA's common stock price."  (¶ 133.)  The Ninth Circuit, however, expressly rejects scienter allegations based on a general motive to raise capital.  *See, e.g.*, *Rigel*, 697 F.3d at 884 ("[T]he desire to obtain good financing . . . [is] not, without more, sufficient to allege scienter").  To

vesting of the shares in a non-discretionary transaction pursuant to the reporting person's agreement under the Company's equity incentive plan." (Exs. 12, 13).  Such sales do not support an inference of scienter.  *See In re XenoPort, Inc. Sec. Litig.*, 2011 WL 6153134, at *6 (N.D. Cal. Dec. 12, 2011) (finding alleged insider trading insufficient to support an inference of scienter in part because "shares [were] withheld to pay taxes in connection with acquisitions of additional shares").  Moreover, both Defendants engaged in sales for similar purposes in the period prior to the Class Period.

[9] Plaintiff devotes four pages of the Complaint to Baker Brothers' irrelevant stock sales.  (¶¶ 139-41.)  Regardless of any affiliation with Dr. Neu, these non-party stock sales do not support an inference of scienter.  *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1045, n.10 (N.D. Cal. 2012) (rejecting plaintiff's argument that stock sales by defendant's non-party family members support an inference of scienter).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

22.

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG**

hold otherwise would mean that every development-stage pharmaceutical company has a motive to commit fraud. Such generalized allegations do not satisfy the PSLRA.

**4.    Viewed holistically, the only cogent and compelling inference is that XOMA was justifiably optimistic.**

When the allegations are viewed "holistically" (*Tellabs*, 551 U.S. at 326), the only cogent and compelling inference is that Defendants believed their statements about EYEGUARD-B to be true. Plaintiff fails to dispute that Defendants actually relied on experts, literature, Servier, and their understanding of the severe nature of Behçet's uveitis when expressing optimism that gevokizumab may work. Nor does Plaintiff contest that the blinded exacerbation pattern itself showed that a group of patients exacerbated early and another group did not exacerbate at all, a pattern potentially consistent with the type of separation between patient groups that would be necessary to meet EYEGUARD-B's primary endpoint. It is further undisputed that, during the Class Period, the EYEGUARD-B data remained blinded – Defendants did not know the distribution of reclassified rescues between patient groups. Thus, Defendants could not predict how the rescues would impact the outcome of the study, if at all. Furthermore, Defendants acted in a manner fully consistent with a sincerely-held belief that gevokizumab might be working. Indeed, it devoted significant resources to preparing a submission to the FDA contingent on positive EYEGUARD-B results. (Ex. 3 at 3.) In fact, XOMA launched an entirely *new* clinical trial of gevokizumab to treat Behçet's uveitis (EYEGUARD-US) to further facilitate that effort. (*Id*.) And, Mr. Varian and Dr. Rubin – the purported fraudsters – took no action to benefit from the alleged fraud, actually selling fewer shares while XOMA's stock price was supposedly inflated. The far more compelling inference one can draw from the allegation negates, rather than supports a finding of scienter.

### C.    Plaintiff Fails to Plead Loss Causation.

Plaintiff also fails to adequately plead loss causation. Loss causation requires "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). But Plaintiff pleads no such thing. Plaintiff claims that the disclosure that revealed the purported fraud was XOMA's July 22, 2015 announcement that "the Trial failed." But a corrective disclosure "must 'relate back to the misrepresentation and not to some other negative information about the company.'" *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483,

at *4 (N.D. Cal. May 20, 2016). The July 22, 2015 announcement about the disappointing EYEGUARD-B results said nothing about the optimism Defendants expressed during the Class Period, much less reveal that it was not honest and genuine. It is not enough that these statements and omissions simply pertained to the same study. *See Dura*, 544 U.S. at 343 ("[T]o 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires."); *see Urman v. Novelos Therapeutics, Inc.*, 867 F. Supp. 2d 190, 198 (D. Mass. 2012) (no loss causation where the alleged misstatements pertained to the formulation of the drug used in the trial and the purported corrective disclosure revealed that the trial failed).

## V.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER RULE 10B-5(a) & (c)

Plaintiff purports to bring a claim under Rule 10b-5(a) and (c), based on an alleged scheme to "Pump the Blinded EYEGUARD-B DATA" by omitting the number of rescues and making "encouraging" statements about the blinded data. (¶¶ 88-98.) Scheme claims share some of the same elements as Rule 10b-5(b) claims – *e.g.*, scienter and reliance – but also require that "the defendant commit[] a deceptive or manipulative act . . . in furtherance of the alleged scheme to defraud." *Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 9698215, at *2 (C.D. Cal. Nov. 17, 2011). A scheme claim cannot be based on the same misrepresentations or omissions as a claim under Rule 10b-5(b). *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1058 (9th Cir. 2011) (dismissing scheme claim because, "fundamentally, this is an omission claim"). Because the scheme claim here is nothing more than a repackaging of the Rule 10b-5(b) claims discussed above, it should be dismissed. (*Compare* ¶¶ 88-98 *with* ¶¶ 99-103); *see Stichting Pensioenfonds ABP v. Merck & Co.*, 2012 WL 3235783, at *8-10 (D.N.J. Aug. 1, 2012) (dismissing scheme claim where "[t]he predicate conduct itself does not constitute a deceptive device separate and apart from the misrepresentations").

In any event, no such scheme existed (or makes any sense). XOMA did not even have control over the study or its data – that was Servier's responsibility. (*See* ¶ 99.) Until the study was unblinded, XOMA had no idea what the blinded exacerbation pattern meant or how rescues might impact results. *See supra* Section II.E. Indeed, XOMA did not "hype" the blinded data as Plaintiff contends. (*See* ¶ 97.) Rather, as Plaintiff concedes, Mr. Varian did not mention the blinded data during the March 11, 2015 conference call until an analyst specifically asked about it. (*See* ¶ 101.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

24.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG

It belies common sense that Defendants would perpetrate a fraud and take no action to implement it until an analyst conveniently gave them an opening to do so. Further, once he mentioned the blinded results, Mr. Varian was clear with investors that, because the data was blinded, the Company "truly know[s] nothing" and the data "could be great news or it mean [sic] be nothing." (*Id.*) Simply put, the Complaint's implausible scheme theory fails under even the most basic pleading standards.

## VI.    PLAINTIFF'S SECTION 20(A) CLAIM MUST BE DISMISSED

To state a claim under Section 20(a), Plaintiff must show a primary violation of Section 10(b) and that each defendant "directly or indirectly" controlled the primary violator. *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). As plaintiff fails to plead a primary violation of Section 10(b), his Section 20(a) claim also fails. *See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002). In any event, Plaintiff does not allege that Dr. Neu is a control person within the meaning of Section 20(a). His "status as an officer or director of the issuing corporation is insufficient, standing alone, to demonstrate the exercise of control." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1208 (N.D. Cal. 2012) (citation omitted). So too is his position as managing director of Baker Brothers, a former minority shareholder of XOMA. *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994) (the "position as a minority shareholder of [a company] with an agent on the board does not establish control person liability"). Plaintiff relies on a couple of Confidential Witnesses that Baker Brothers was an "involved investor," and are thus irrelevant as they say nothing about Dr. Neu or EYEGUARD-B. (¶¶ 142-43.) Plaintiff does not plead that Dr. Neu had control over XOMA or the other Defendants at the time of the challenged statements.

## VII.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: September 2, 2016                     COOLEY LLP

                                             _/s/ Jessica Valenzuela Santamaria_
                                             Jessica Valenzuela Santamaria
                                             *Counsel for Defendants* XOMA CORPORATION,
                                             JOHN W. VARIAN, PAUL D. RUBIN, and KELVIN
                                             M. NEU

135176504

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

25.

DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS COMPLAINT
CASE NO. 3:15-CV-3425-HSG